UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

Case No. 12-CR-20287

v.

HON. MARK A. GOLDSMITH

ALEXANDRA NORWOOD, et al.,

        Defendants.

_____/

## ORDER GRANTING DEFENDANT GILLS'S MOTION TO SUPPRESS (Dkt. 233)

### I.  INTRODUCTION

Defendant Leon Gills filed a motion to suppress (Dkt. 233), seeking to exclude the evidence referenced in paragraph 66 of Count I of the Amended First Superseding Indictment (Dkt. 191), including a quantity of crack cocaine, a digital scale, and $300 cash. Gills argues that the warrant was invalid because the affidavit supporting it failed to establish probable cause and the good-faith exception does not apply. The Government filed a response (Dkt. 290), and oral argument was heard on October 16, 2013. After the hearing, the Court requested, and the parties filed, supplemental briefs (Dkts. 324 and 327). For the reasons set forth below, the Court grants the motion.

### II.  BACKGROUND[1]

The motion to suppress seeks to exclude all evidence seized from a search executed at Gills's residence on November 11, 2010. The search was part of an investigation into the murder of Dominick Barney. On October 16, 2010, Barney was shot and killed at Lapeer Garden

---

[1] The Court has previously provided a recitation of the background of this case and the scope of the Amended First Superseding Indictment in an Opinion and Order denying Defendant Alexandra Norwood's motion to dismiss. See 11/8/13 Opinion and Order (Dkt. 328).

Apartments in Flint, Michigan. Angus Aff. ¶ 1 (Dkt. 233-1).[2] Responding to a 911 call, Flint Police Sergeant Michael Angus and other officers went to Lapeer Gardens, where they observed blood leading from Building 8 to Barney's body, which was found outside Building 11. Id. ¶¶ 3-5.

At some unspecified time, a "confidential informant" advised police officers that two individuals were involved in the shooting and were parked in a vehicle away from the scene, trying to sell the firearm used in the murder. Id. ¶ 5. The individuals were identified as Jonathan Walker and Roderick Dudley. Id. The vehicle was impounded and searched, during which the police seized a cell phone and a copy of Walker's resume from an unspecified location in the car and two guns from the trunk of the car. Id. ¶ 6.

A source, identified as "Source 1," provided information to Sergeant Angus regarding Barney's killing. Source 1 stated that he had spoken to Barney, who had told him that another individual named "Lex" had broken into a truck and that Barney was with Lex at the break-in. Id. ¶ 8. Source 1 further stated that Gills's truck had been broken into at some point prior to Barney's killing. Id. ¶ 7.

Source 1 also claimed to have had a conversation with Gills prior to Barney's shooting. According to Source 1, Gills had come to Lapeer Gardens to find the person who had broken into his truck; Gills purportedly had an "AK" at the time. Id. ¶¶ 7, 9. Source 1 said that Gills stated that he wanted to find someone to kill the person who had broken into his truck. Id. ¶ 9. Source 1 said that Gills stated that he would pay for the killing because he could not personally undertake it, as he was on probation and also under investigation. Id.

---

[2] Although the affidavit states that Barney was murdered on November 16, 2010, this appears to be a typographical error. The parties state that the murder was on October 16, 2010. Def.'s Br. at 3; Gov't Br. at 2.

2

Source 1 also stated that Dudley and Walker, at some unspecified time before the shooting, spoke with Barney about selling Xanax pills. Id. ¶ 10. According to Source 1, Dudley and Walker had guns with extended clips. Id. The duo entered Building 8, spoke with an individual named "BJ," and exited sometime later. Id. ¶ 11. Barney then entered Building 8, visited BJ's apartment, and then exited the building to sit on the stairs of the building. Id. ¶ 12. Sometime afterward, Source 1 heard, but did not see, shots fired. Id. Source 1 believed that Walker and Dudley had been employed by Gills to kill Barney. Id.

At some point, Sergeant Angus spoke with Gills and learned that he lived at 710 Dickinson, Flint, Michigan.[3] Id. ¶ 13.

On November 10, 2010, Sergeant Angus obtained a search warrant for Gills's residence from a Genesee county magistrate. Warrant (Dkt. 233-2). Upon execution of the warrant at Gills's residence, police found a digital scale, a half-ounce of crack cocaine, and $300. Police Report (Dkt. 233-3).

### III. ANALYSIS

Gills seeks to suppress the evidence seized from the execution of the search warrant at 710 Dickinson on November 11, 2010. Because the Government concedes in its supplemental brief that the affidavit in support of the warrant was deficient, see Gov't Supp. Br. at 3 (Dkt.

---

[3] Although the parties do not raise it, there is a discrepancy between the controlling indictment, which lists the subject address as 710 Dickinson Avenue, and the affidavit, which initially states that Gills gave his address as 701 Dickinson, but then goes on to seek permission to search "710 Dickinson, located in the City of Flint." This appears to be a mere typographical error and does not impact the Court's analysis. United States v. Rose, 714 F.3d 362, 367 (6th Cir. 2013) ("Finding that the good-faith exception does not apply in this case because the affidavit failed to provide the address listed on the warrant would be a hyper-technical reading of the requirements of the Fourth Amendment."). For ease of reference the Court will refer to 710 Dickinson, the address included in the affidavit as the address to be searched.

327), Gills's motion turns upon whether the good-faith exception of United States v. Leon, 468 U.S. 897 (1984), should apply.[4] Under Leon, when an affidavit supporting a search warrant fails to establish probable cause, good-faith reliance on the warrant by law enforcement officers will bar application of the exclusionary rule to the evidence seized. Leon, 468 U.S. at 922. The Leon court identified four classic situations in which an officer's reliance on a subsequently invalidated warrant could not be considered to be objectively reasonable:

> (1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and, (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.

United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005) (citing Leon, 468 U.S. at 914-923).

Gills's motion raises several arguments, but the one premised on the third situation – addressing what have come to be known as "bare bones" affidavits – is dispositive. Id. Gills argues that the Angus affidavit fails to establish a sufficient nexus between the crime Gills was suspected of committing – solicitation of murder – and his residence, thereby making any reliance on the warrant objectively unreasonable. Def.'s Br. at 16-17. The Court agrees.

---

[4] Gills contested the existence of probable cause in his opening brief, Def.'s Br. at 7-12, but the Government did not offer a probable cause analysis in its response and focused solely on the good-faith exception. Gov't Br. at 3-4 ("Although probable cause arguably supports the search warrant, the good faith exception applies and renders argument on probable cause unnecessary."). In its supplemental brief, the Government conceded that the affidavit in support of the warrant was deficient. Gov't Supp. Br. at 3 ("Although the affidavit was deficient, it was not unreasonable for an officer to rely on the magistrate's finding that probable cause existed to believe Gills had solicited the murder of Barney."). Therefore, the Court confines its analysis solely to whether the good-faith exception applies.

Furthermore, because the Court agrees with Gills that the good-faith exception does not apply, the Court does not reach Gills's other arguments concerning the alleged omissions from the affidavit that he claims misled the magistrate or the lack of particularity in specifying the items to be seized under the warrant. See Def.'s Br. at 12-15, 17-19.

To escape a "bare-bones" characterization and support an officer's good-faith belief in the warrant's validity, an affidavit must contain facts demonstrating "a minimally sufficient nexus between the illegal activity and the place to be searched . . . even if the information provided was not enough to establish probable cause." United States v. Carpenter, 360 F.3d 591, 596 (6th Cir. 2004). Case law illustrates that, while the nexus threshold is a low one, it is still sufficiently robust to serve as a meaningful Fourth Amendment protection.

In Laughton, the Sixth Circuit rejected the Government's argument that the good-faith exception should apply, reasoning that the affidavit failed to establish a sufficient nexus between the suspected crime and the location to be searched. Laughton involved two controlled purchases of narcotics where the police sent a confidential informant (CI) to a residence with marked money, while the residence was under surveillance. 409 F.3d at 746. Following these purchases by the CI, the officer who had sent the CI on the purchases executed an affidavit to obtain a warrant and raid the residence; during the ensuing search, the police found narcotics and firearms. Id. at 746-747. While the details of the purchases were known to the officer, the affidavit merely provided that "there are various stashes [of drugs] around the home," that the CI "made multiple purchases of Methamphetamine in the last 48 hours," and that the "CI has provided information that there is more controlled substances located at or in the residence . . . due to the fact that he has observed these controlled substances." Id. Although the affidavit listed the address to be searched, it did not connect this address to the "home" or "residence" mentioned in the affidavit, nor did it describe that the CI had made the drug purchases at this address or when those purchases had been made. Id. at 750. The defendant sought to suppress the evidence, but the district court found that the good-faith exception saved the search, although probable cause was lacking. Id. at 748.

The Sixth Circuit reversed. The court noted that, in other cases where the evidence was not suppressed, "some modicum of evidence, however slight," connected "the criminal activity described in the affidavit to the place to be searched." Id. at 749. For instance, in one case an affidavit established a minimal nexus between a residence and drug dealing, where (i) the police observed the defendant arrive in the same car twice to controlled drug buys, (ii) the car was registered to the residence, (iii) prior to one controlled buy the defendant told a CI "that he had to go pick up his car from the mechanic and then, immediately after the phone call, was observed emerging from the residence and getting a ride to a garage where he picked up the same car," and (iv) "the car was observed parked outside of the residence." Id. (citing United States v. Washington, 380 F.3d 236, 243 (6th Cir. 2004)).[5] But the affidavit before the Laughton court – despite the police's investigation and surveillance – (i) did not indicate where the CI had engaged in criminal activity, (ii) did not say "explicitly" that the CI had engaged in criminal activity with the defendant, and (iii) included a statement that the CI had observed drugs at the residence, but did not indicate the location of the residence or when the observations were made. Id. at 751. Without a sufficient nexus between the criminality and the location searched, the Sixth Circuit found that the good-faith exception was not established.

In another narcotics case, United States v. McPhearson, 469 F.3d 518 (6th Cir. 2006), two officers went to the defendant's residence in an attempt to arrest the defendant for simple assault pursuant to a warrant. One of the officers knocked on the defendant's door; when the defendant came out of the residence and onto the front porch, the officer arrested him. While escorting the defendant to the police car, the officers searched the defendant and found narcotics.

---

[5] Other cases that the Laughton court cited were Carpenter and United States v. Savoca, 761 F.2d 292 (6th Cir. 1985). Laughton, 409 F.3d at 747-748. Because the Government relies on these authorities, the Court discusses them later when addressing the Government's arguments.

6

The officers asked if they could search the defendant's residence, but the defendant refused. The officers then obtained a search warrant, entered the home, and found narcotics. The defendant moved to suppress the evidence and the district court granted the motion, finding that the good-faith exception did not apply. Id. at 522-523.

The court of appeals affirmed, finding that "the minimal nexus required to support an officer's good faith belief was not present . . . ." Id. at 526. The court found that the "only connection" in the affidavit between the residence and the suspected drug trafficking was that the police arrested the defendant at his residence and found narcotics on his person in a search incident to the arrest. Id. The court held that this "connection cannot establish the minimal nexus that has justified application of the good-faith exception in cases where the nexus between the place to be searched and the evidence to be sought was too weak to establish probable cause." Id. The court observed that the affidavit did not allege "anything else tying [the defendant] or his home to any criminal activity other than" the possession of narcotics "and the simple assault for which he was arrested." Id. at 527. Concluding that the "evidence in the affidavit connecting the crime to the residence was so vague as to be conclusory or meaningless," the court affirmed the suppression of the evidence. Id. (brackets and quotation marks omitted).

In contrast to these cases, courts have found a minimal nexus to support good-faith reliance where the court was able to draw a reasonable inference that linked a location to the alleged criminal activity. In Carpenter, a police officer observed marijuana patches from a helicopter. Carpenter, 360 F.3d at 593. The officer also saw a beaten path running from the patches to a residence and, at the time of the police officer's observation, he saw two individuals walking on the path. Id. The officer informed a second officer, who sought a warrant to search

the residence.  Id.  In the affidavit, the second officer recounted the investigation and specified the address of the residence, but did not demonstrate that the individuals owned the residence. Id.  The officers obtained a warrant, searched the residence, and found narcotics.  Id. Subsequently, the two individuals, who owned the residence, were indicted.  Id. at 594.  The individuals moved to suppress the evidence, which the district court denied.  On appeal, the Sixth Circuit affirmed.  Although the affidavit did not connect the residence with the individuals, the Sixth Circuit held that the officers relied on the warrant in good faith because the affidavit established "a minimally sufficient nexus between the illegal activity and the place to be searched."  Id. at 596.  The court stated that "the affidavit was not totally lacking in facts connecting the residence to the marijuana patches" because the marijuana patches were growing near the residence and there was a pathway between the residence and the patches.  Id.  The court reasoned that while the facts "were too vague to provide a substantial basis for the determination of probable cause," they "were not so vague as to be conclusory or meaningless."  Id.

Prior to the Sixth Circuit's articulation of "minimally sufficient nexus" in Carpenter, the court decided United States v. Savoca, 761 F.2d 292 (6th Cir. 1985), a case cited by the Government.  In Savoca, a "terse affidavit" recounted that two individuals, who were known to have been involved in several bank robberies in Ohio and Pennsylvania, were observed at a motel room in Arizona at some unspecified time after the robberies.  Id. at 294.  The court upheld a search of the motel room under Leon, noting that "whether a sufficient nexus has been shown to a particular location turns in part on the type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places."  Id. at 298.  The court concluded that "a reasonably well-trained officer could have" thought that probable cause existed

8

for the search, and that reliance on the magistrate's authorization was not unreasonable. Id. In particular, the court noted that, given the series of crimes committed, it was reasonable to conclude that the individuals would continue to rob banks and would thus have with them the "instrumentalities of such crimes within their control." Id. at 298, n.9.

Here, the Angus affidavit sets forth no facts that connect Barney's murder to Gills's residence. It included much information regarding Walker and Dudley, but nothing linking criminal activity to 710 Dickinson. The affidavit recounted (i) Sergeant Angus's statement that he had 19 years of police experience, (ii) information regarding the murder investigation of Barney, (iii) information from one source that Walker and Dudley likely murdered Barney, and (iv) Gills's statement that he lived at the Dickinson address. The affidavit also contained the following statements from Source 1: (a) Barney had been with Lex when Lex broke into Gills's truck; (b) Gills offered to pay others to kill whoever broke into his truck; (c) Walker and Dudley were at Lapeer Gardens prior to Barney's murder; and (d) Source 1's belief that Walker and Dudley took the hit from Gills.

However, the affidavit fails to reference any criminal activity in relation to 710 Dickinson. There is no statement from Source 1 that he had been at the residence, nor did Sergeant Angus investigate that residence. There also is no suggestion that Dudley or Walker had been at the residence at any point. The affidavit also lacks any statement from Sergeant Angus as to why he believed that 710 Dickinson could possibly be related to the alleged crime. The affidavit does not provide any connection to the residence at all, other than Gills's statement that he lived there.

The evidence linking the crime to the residence is not simply vague or conclusory. See United States v. Frazier, 423 F.3d 526, 536 (6th Cir. 2005) ("An officer's belief that there is a

9

sufficient nexus between the suspected crime and the place to be searched is unreasonable when evidence in the affidavit connecting the crime to the residence is so vague as to be conclusory or meaningless.") (internal quotation marks and citation omitted). It is non-existent. While the nexus need only be minimal, still "some modicum of evidence, however slight," is required "to connect the criminal activity described in the affidavit to the place to be searched." Laughton, 409 F.3d at 749. Here, the affidavit does not meet even this relatively low bar and, therefore, reliance on the affidavit meeting the probable cause standard was objectively unreasonable.

The Court rejects the Government's arguments based on Carpenter and Savoca, the primary authorities it cited. The Angus affidavit differs significantly from the affidavit in Carpenter. Unlike in Carpenter, where there was a footpath between a residence and marijuana plants where the defendants were observed by the police, there are no facts in the Angus affidavit connecting the solicitation of murder to 710 Dickinson.

Savoca is also inapposite. As the Sixth Circuit has observed, the application of the good-faith exception in Savoca turned on the police knowing that the defendants had previously participated in "the type of criminal activity that the police were investigating," i.e., "a string of bank robberies in two states." McPhearson, 469 F.3d at 526. And, as the Savoca opinion itself explained, it was reasonable to assume that the crime spree would continue and that the instrumentalities of this criminal activity would be in the defendants' possession. Savoca, 761 F.2d at 298 n.9. By contrast, in this case, Gills was not suspected of prior criminal activity or any replication of prior criminal activity.

The Government's ultimate argument is that it would be reasonable for "the magistrate or Angus, given the ubiquity of cellular telephones, to infer that those involved in [solicitation of murder] would communicate by phone." Gov't Supp. Br. 3-4. From this premise, the

10

Government contends that "it was not objectively unreasonable for an officer to infer the nexus between Gills' phone and Gills' residence." Id. at 4. The Court disagrees.

Although the ubiquity of cell phones cannot be denied, see, e.g., United States v. Kelley, No. 4:12CR00243-02, 2013 WL 2244317, at *2 (E.D. Ark. May 21, 2013) ("[I]n this day and age, cell phones are ubiquitous."), there is no basis to assume that they would likely be found at a person's residence for a significant portion of any day. In fact, most people keep their cell phones on their persons, meaning that a phone is likely to be found in a residence only when its owner is at home. Under the Government's logic, the cell phone's possible use in the commission of a crime is a gateway into every crevice of a personal residence where a cell phone might theoretically be placed, even though the phone may not be found at the home for most of the day, and even though it may well be kept on the owner's person even when the owner is at home. The Fourth Amendment's general solicitude for the privacy of one's home, see Silverman v. United States, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."), cannot be overridden based on such fleeting and tenuous connections to a residence.

The Government's argument also overreaches because virtually all crimes can be committed or facilitated through communication by cell phone. Not simply solicitation of murder, but myriad routine crimes, such as drug trafficking, illegal firearm distribution, and fraud – to name just a few – could justify a search of a residence with the goal of locating the ubiquitous cell phone, if the Government's position were adopted. Without some indication in the affidavit that a cell phone was used in committing the alleged crime, and that the cell phone is somehow connected to the residence to be searched, the vital protection that the "nexus"

11

requirement provides would quickly evaporate because a "nexus" to a residence would be found in virtually every case.

At bottom, the Government's argument is a pyramid of untenable inferences, which the Sixth Circuit has condemned in the "nexus" context. See Laughton, 409 F.3d at 750 (finding no good-faith where nexus could only be established by "inferences drawn upon inferences"). Nothing connects Gills's residence to the crime other than the possibility that a cell phone may have been used to solicit murder, and that it might be found somewhere in his residence at certain times of the day – and even these possibilities are not derived from facts in the affidavit. The "nexus" is simply not "minimally sufficient" to make reliance on the warrant reasonable.[6]

## IV. CONCLUSION

For the reasons stated above, the Court grants Gills's motion to suppress (Dkt. 233).

SO ORDERED.

Dated: December 24, 2013　　　　　　　　　　s/Mark A. Goldsmith
　　　　Flint, Michigan　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[6] Notably, the inferences that the Government draws were not drawn by Sergeant Angus. His affidavit says nothing about any suspicion he had that a cell phone had been used in the commission of the crime or its connection to the residence. Indeed, the only references to a cell phone in the affidavit are (1) a conclusory reference to cell phone as among the items to be searched and (2) a statement that a cell phone was found in the vehicle after Walker's and Dudley's arrest. But the affidavit does not connect these facts in any way to the shooting. In conducting the "nexus" analysis, a court is confined to the "four corners of the affidavit," Laughton, 409 F.3d at 750, and other information expressly communicated to the magistrate issuing the warrant. See United States v. Frazier, 423 F.3d 526, 535-536 (6th Cir. 2005). Because the Government's inferences are not grounded on any fact contained in the Angus affidavit or communicated to the issuing magistrate, they cannot be deemed reasonable.

**Certificate of Service**

I hereby certify that this Order was electronically submitted on December 24, 2013, using the CM/ECF system, which will send notification to the parties.

s/A. Chubb for Deborah Goltz
Case Manager and Deputy Clerk
