UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        HON. MARK A. GOLDSMITH

v.        Case No. 12-CR-20287-8

LEON GILLS, D-8,

        Defendant.

_____/

## OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

A jury returned a verdict against Defendant Leon Gills on July 22, 2014, finding him guilty of the following crimes: (i) Racketeering (RICO) Conspiracy (Count One); (ii) Attempted Murder of MB (Maranda Barnes), RD (Rashima Doby), DM (DeAngelo McEwen), and RH (Rodney Harden) in Aid of Racketeering (Count Eight); (iii) Use and Discharge of a Firearm During and in Relation to a Crime of Violence (Count Nine); and (iv) Attempted Murder of CO (Charles Orr) in Aid of Racketeering (Count Thirty-Five). The Probation Department prepared a Presentence Investigation Report ("PSIR") for sentencing, to which Gills prepared objections. The Probation Department and the Government responded to Gills's objections, see Gov't Resp. (Dkt. 765),[1] and Gills filed a reply (Dkt. 770). The Court now addresses and overrules Gills's objections.

**A. OBJECTION 1**

Gills first objects to the PSIR's handling of his conviction for the attempted murder of Barnes, Doby, McEwen, and Harden. The PSIR treats each victim of this offense as a separate group, thereby increasing Gills's offense level by four levels after a multiple-count adjustment.

---

[1] Neither Gills's objections to the PSIR, nor the Probation Department's response, is filed publicly on the docket.

1

Gills argues that because these four victims were all part of the same count of conviction — Count Eight: Attempted Murder of Barnes, Doby, McEwen, and Harden in Aid of Racketeering — they should not be separated, and this conduct should, therefore, only increase his offense level by one level. In support of this argument, Gills highlights language in the grouping rules referring to "counts."

The Court agrees with the Probation Department that, although charged as a single episode forming one overt act and one count of conviction, the harm incurred by Barnes, Doby, McEwen, and Harden should be treated separately. United States Sentencing Guideline ("U.S.S.G.") § 2E1.1 governs the calculation of the base offense level for purposes of a RICO or RICO-Conspiracy conviction. Under that guideline, the base offense level shall be the greater of: (1) 19 or (2) the offense level applicable to the underlying racketeering activity. "Conduct is 'underlying racketeering activity' under § 2E1.1 if it is 'relevant conduct' as defined in U.S.S.G. § 1B1.3(a)(1)." United States v. Campbell, 567 F. App'x 422, 425 (6th Cir. 2014). That section defines "Relevant Conduct" as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and "in the case of a jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ." U.S.S.G. §§ 1B1.3(a)(1)(A), (B).

Application Note 1 to U.S.S.G. § 2E1.1 provides further guidance for courts in calculating the offense level for a RICO-based conviction:

> Where there is more than one underlying offense, <u>treat each underlying offense as if contained in a separate count of conviction</u> for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

Id. (emphasis added); see also Chapter 3, Part D – Multiple Counts, Introductory Commentary ("Some offenses, e.g., racketeering and conspiracy, may be 'composite' in that they involve a pattern of conduct or scheme involving multiple underlying offenses. The rules in this Part are to be used to determine the offense level for such composite offenses from the offense level for the underlying offenses.").

Accordingly, the sentencing guidelines instruct the Court to treat each underlying offense as a separate count of conviction. Here, the RICO-Conspiracy conviction included Gills's attempted murder of four distinct individuals, each of whom suffered their own harm from Gills's conduct. See U.S.S.G. § 3D1.2, Background ("A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior."). Gills cites no case authority for his argument that each of these victims should be grouped together simply because the Government grouped them into one overt act and corresponding count in the indictment, rather than four overt acts and counts. To do so would attach undue importance to the charging decision or the drafting preference of the Government's attorney, contrary to the Guidelines' teaching. See Chapter 3, Part D, Introductory Commentary (noting that the grouping rules are intended to "limit the significance of the formal charging decision"). The Court concludes the better argument is that set forth by the Probation Department and the Government — that each victim should be treated separately, as a separate count of conviction. See U.S.S.G. § 2E1.1, Application Note 1. Cf. United States v. Vasco, 564 F.3d 12, 23 (1st Cir. 2009)

("Crimes involving multiple victims, even if the offense arose out of a single event, are properly grouped separately.").

Nor is the Court persuaded by Gills's argument that the "jury was not given any opportunity to render different verdicts regarding the four individuals named in" Count Eight. Gills argues that "the jury was limited to a single verdict, regarding that single count, and the Government should not receive the benefit of its failure to charge separate 'offenses' regarding those individuals by now having them 'grouped' in order to achieve a higher 'adjusted offense level.'" See Gills Reply at 1-2 (emphasis in original). Gills had the opportunity to object to this phrasing on the verdict form, but failed to do so. Moreover, the verdict form asked whether the jury found Gills guilty of attempted murder as to all four victims by using the conjunction "and"; the jury found him guilty. Therefore, the Court is not persuaded by Gills's suggestion that the result at trial may have been different had the jury not been "limited" to a "single verdict" regarding "that single count." Indeed, Gills does not challenge that these were the four individuals sitting in the van at which he shot. See R. Harden Vol. I at 5-6 (listing the individuals in the van); D. McEwen, 6/26/2014 (Rough Tr.) at 56 (same). And if the result at trial would not have been different based on how the criminal episode was set out in the indictment and verdict form, the Court fails to comprehend why the charging decision should affect the sentencing determination.

Accordingly, the Court overrules this objection.

**B. OBJECTION 2**

Gills next objects to the two-level enhancement added to his PSIR for obstruction of justice. Gills argues that he did not intimidate or threaten witnesses; rather, his rap videos were mere artistic expression, unconnected to any "true threats." Gills also claims that, although there

4

was testimony by Rodney Harden that Gills slipped Harden's statements to him, Harden was not threatened or intimidated by Gills.[2]

The Court concludes that the two-level enhancement for obstruction of justice is appropriate. First, with respect to the rap videos, the Court has repeatedly rejected the argument that these were not threatening, including in the Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784) and in the Opinion and Order Denying Defendants' post-trial motions (Dkt. 786). Gills's videos, which were posted to his social media account only a few months before his trial on a RICO Conspiracy and Attempted Murder charges, specifically names Government cooperators, labels them as "rats," claims that these witnesses will "squeal before the heater get racked back," states that he "got [his] hand on [his] Gat," and asserts that "feds trying to get [him] life, if you tell you gon die." Gills also states that he hopes a young family member of one of these witnesses "get[s] whacked." See Dkt. 765-3. In another rap video posted from jail, Gills states that "[l]oyalty is all [he] know[s], and all you rat niggas gon die slow." See Dkt. 765-2. The tone of these videos, in combination with their timing, suggests that they were intended as threats, not just "artistic expression" — as Gills now claims. To that end, the Government informed the Court that at least one coconspirator — Malcolm Evans — ripped up his cooperation agreement and refused to testify as a result of his family's safety. See 6/10/2014 (Rough Tr.) at 18, 43-47, 53-54. Indeed, the Government showed the Court the disfigured cooperation agreement evidencing Evans's refusal.

Further, these videos were not the only examples of threats by Gills against Government witnesses. For example, Rodney Harden testified that, while in jail, Gills slid Harden's

---

[2] Gills also mentions that he was assessed with an IQ of 67. However, Gills fails to develop any argument regarding why this is relevant to whether his videos were threatening.

5

statements under his door, and that this influenced Harden to tell people that it was not Gills who shot him. See R. Harden Vol. I at 28-30, 32-34, 41. Harden testified that he interpreted the sliding of his statements under the door as a threat. Id. at 34. Although Harden later acknowledged that Gills had never threatened him, nor told him that if Harden testified he would get beaten up, id. at 41, this statement is reconcilable with Harden's earlier testimony: Although Gills never directly verbally threatened Harden, Harden interpreted the sliding of the statements as a threat.

Additional evidence was provided at trial of Gills threatening cooperators. For example, in 2012, after the indictment was returned, Gills was recorded in phone calls: (i) agreeing that someone should slit the throat of Xavier Turner, an unindicted cooperating coconspirator; (ii) telling an individual where Turner was located and saying that they should "make it rain on it"; (iii) stating that the day Turner returned to town would be his "death day"; and (iv) actually leaving a voicemail for Turner, in which Gills referred to him as a "rat ass bitch." See Ex. 82. Similarly, there were online social media postings in which Gills stated that "y'all need to beat [Blossom Evans's] lil rat ass," that Blossom needed her "ass whopped," and that Blossom had "better hope [Gills] don't get out." See Ex. 79. Gills also stated in his online postings that he had "video" of a cooperator "tellin," and that he should "upload" it — a serious threat given the distaste with which members viewed cooperators and the harm Gills stated he wished would befall them. Id.

Accordingly, the Court concludes that the two-level enhancement is appropriate, and overrules Gills's objection.

**C. OBJECTION 3**

6

Gills next argues that he should receive a two-level reduction for acceptance of responsibility, pursuant to United States Sentencing Guideline § 3E1.1. Gills argues this reduction is appropriate for two reasons: (i) he testified at trial and took responsibility for some of the underlying conduct, including admitting to having sold cocaine, carried illegal firearms, lied to police, and shot at the van in which he thought Jonathan Wilson was located; and (ii) he apologized to Rodney Harden before trial for having shot at him.

The Court agrees with the Probation Department and the Government that a reduction for acceptance of responsibility is not appropriate. Although Gills took responsibility for some of his conduct, he still put the Government to its burden of proof at trial by denying the essential factual elements of guilt. See U.S.S.G. § 3E1.1, Application Note 2. On the stand, Gills continued to deny the existence of an enterprise and his membership therein. He also denied that any of the shootings attributed to him were in furtherance of any such enterprise. Gills maintained that the MV/HB name was simply a recording label — a conclusion the jury implicitly rejected and that the evidence and trial testimony did not support, particularly in light of numerous members having tattoos of "Murda Ville" or making the letters "M" and "V" with their hands in photographs. Therefore, Gills "elected to put the Government to its burden of proof at trial by denying what was understood to be an essential factual element of guilt." United States v. Reaume, 338 F.3d 577, 582-583 (6th Cir. 2003). Moreover, the Court notes that it did not find Gills's testimony at trial to be remorseful or truthful when it contradicted the testimony of Government witnesses.

Furthermore, as the Probation Department highlights, Gills's obstructive conduct throughout these proceedings, as described above, is inconsistent with a finding of acceptance of responsibility. In addition, after the indictment was returned, Gills was located on a bus to

Atlanta dressed like a female, suggesting that he was seeking to abscond, not accept responsibility.

Nor is the Court persuaded by Gills's claim that he should receive a reduction for having apologized to Harden for having shot at the van. While this may show that he was remorseful for having misidentified the ultimate victim, it does not show that he ended or was remorseful about the original goal: to kill Jonathan Wilson. Moreover, as described earlier, Gills then slipped Harden's statements to him, suggesting that Gills was threatening Harden. Indeed, this encouraged Harden to originally tell people that Gills was not the shooter. See R. Harden Vol. I at 28-30, 32-34, 41.

In light of all of the above conduct, the Court concludes that this is not one of the "rare circumstances" in which a defendant demonstrates acceptance of responsibility despite exercising his constitutional right to trial. See Reaume, 338 F.3d at 582-583.

Accordingly, the Court overrules this objection.

### D. OBJECTION 4

Gills's fourth objection pertains to the language in Paragraph 22 of the PSIR. He seeks to temper this language based on his argument that his rap videos were not "true threats."

As discussed above, the Court concludes that the rap videos posted from the jail were threats against cooperating witnesses. Accordingly, the Court overrules this objection.

### E. OBJECTION 5

In his fifth objection, Gills argues that there is no evidence to support the statement in Paragraph 22 of the PSIR that, "As a result of the [rap] video[s] [posted from the jail], a witness refused to testify at trial." Gills claims that Malcolm Evans actually may have refused to testify because his brother continued to face trial in state court for first-degree murder.

The Court rejects this argument. On June 10, 2014, the Government notified the Court that it had intended to offer the testimony of Malcolm Evans that day. However, Government counsel represented to the Court that Malcolm Evans's lawyer had informed the Government that morning that Malcolm had changed his mind about testifying and had ripped up his cooperation agreement because he was not comfortable with his family's safety. See 6/10/2014 (Rough Tr.) at 18; see also 7/9/2014 (Rough Tr.) at 134, 138 (stating that the videos had the effect of encouraging a witness not to testify), 142. The Government also highlighted that Malcolm Evans's family members had been rapped about in the videos Gills posted from jail. See 6/10/2014 (Rough Tr.) at 18.

Later that day, the Government reiterated that the rap videos contained express threats against members of Malcolm Evans's family, and that the family had expressed "great concern" as a result. Id. at 43, 46-47. The Government later noted that Blossom Evans — Malcolm's sister — had come to Government counsel because she had seen the video. See 7/9/2014 (Rough Tr.) at 142, 161. And Government counsel represented to the Court that, in asking other witnesses whether they were willing to testify, at least two possible witnesses responded, "[H]aven't you seen Facebook yet?" Id. at 142.

The Court concludes that, based on these representations presented by Government counsel, there is a fair inference that at least one witness refused to testify at trial given Gills's threatening videos. Although no direct testimony was presented regarding the reason for the witness's refusal to testify, the Court concludes that the Government's offers to the Court are sufficient to sustain the inclusion of this language in the PSIR. See U.S.S.G. § 1B1.4 (sentencing courts "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law"). Indeed, to find that the lack

of direct testimony on this point precludes the Court from considering this conduct would reward Gills for successfully threatening witnesses so that they refused to testify.[3]

Nor is the Court persuaded by Gills's suggestion that Malcolm Evans may have refused to testify because his brother continued to face trial in state court for first-degree murder. Unlike the Government — which offered to the Court that Malcolm Evans's lawyer specifically stated that his client refused to testify out of concern for his family's safety — Gills has offered nothing to support this speculation. Nor has Gills explained why Malcolm Evans would have believed that his decision to testify in federal court was tied to his brother's trial in state court.

Accordingly, the Court overrules this objection.

## F. OBJECTION 6

Gills next objects to the scoring of criminal history points in Paragraph 84 of the PSIR. Gills first argues that this was not a sentence of confinement exceeding 60 days. In his reply in support of his objections, Gills also argues that, to the extent the counted "sentence[] of imprisonment" is duplicative of the sentence listed in Paragraph 85 of the PSIR, this is inappropriate double counting. Gills Reply at 4.

The Court agrees with the Probation Department that Paragraphs 84 and 85 were appropriately scored at two points apiece. First, with respect to Paragraph 84 — Gills's 2001 conviction for breaking and entering a vehicle — the Court notes that the PSIR reflects that Gills was placed at St. Vincents Home in Saginaw County, Michigan from January 29, 2002 until he went "AWOL" on June 11, 2003. Conversations between the Probation Department and the supervisor of Genesee County Juvenile Court Probation indicate that, while at St. Vincents, Gills

---

[3] The Court also notes that the Government has stated — without any response by Gills — that Malcolm Evans's refusal to testify resulted in additional months of imprisonment on his sentence, because the Government was no longer obligated to recommend a sentence of 48 months' imprisonment in exchange for Evans's truthful testimony. See Gov't Resp. at 19-20.

was not free to come and go as he saw fit; instead he was subject to arrest if he left without authorization. This residential placement thus constitutes a "sentence of imprisonment" (confinement) of over 60 days for purposes of calculating criminal history points. See United States v. Hanley, 906 F.2d 1116, 1120 (6th Cir. 1990) (commitment to a juvenile facility constitutes "confinement" under U.S.S.G. § 4A1.2(d)(2)(A)); U.S.S.G. § 4A1.2(d)(2)(A); see also United States v. Lyons, 204 F. App'x 136, 137-138 (3d Cir. 2006) (collecting cases).

Furthermore, while at St. Vincents, Gills assaulted another resident, stole a van belonging to St. Vincents, and went AWOL. See PSIR, ¶ 85. Gills was committed to the Family Independence Agency and was placed at Highfields residential placement from July 23, 2003 until May 27, 2004, both for the new charges arising out of his conduct at St. Vincents, as well as a continuation of his sentence for the original breaking-and-entering charge. Although Gills argues that considering this placement for Paragraph 84 results in impermissible double counting because it considers the same period of confinement, Gills fails to cite any authority in support of this argument. But cf. U.S.S.G. § 4A1.2, Application Note 11 ("If . . . at the time of [probation] revocation another sentence was imposed for a new criminal conviction, that conviction would be computed separately from the sentence imposed for the revocation."). Nevertheless, the Court need not resolve this dispute, because Gills's placement at St. Vincents was sufficient for purposes of scoring Paragraph 84, and his placement at Highfields was sufficient for scoring for purposes of Paragraph 85.[4]

Accordingly, the Court overrules this objection.

## G. OBJECTION 7

---

[4] Under both sentences, Gills also was found in violation of his probation in or around February 8, 2006. As a result, Gills was placed in the Nokomis Challenge residential program until his release on September 21, 2006.

11

Based on his previous objection, Gills also objects to the "raw" history score contained in the PSIR.

Because the Court overrules Gills's objection above, it also overrules this objection.

## H. OBJECTION 8

Lastly, Gills objects to the inclusion of the information in Paragraphs 94-105 of the PSIR, because it describes Gills's prior contact with law enforcement that did not result in convictions. Without citing any authority, Gills argues that these paragraphs are irrelevant and should not be part of his PSIR.

The Court agrees with the Probation Department that this information is properly included in the PSIR. Pursuant to 18 U.S.C. § 3661 and United States Sentencing Guideline § 1B1.4, the Court may consider any information concerning the background, character, and conduct of the defendant in imposing a sentence, unless otherwise prohibited by law. Indeed, numerous courts — including the Sixth Circuit — have concluded that consideration of uncharged offenses, dismissed prosecutions, or even acquittals may be relevant for purposes of sentencing. See United States v. Haj-Hamed, 549 F.3d 1020, 1026 (6th Cir. 2008) ("In general, a district court can consider uncharged or dismissed conduct for sentencing purposes."); State v. Thomas, 29 F. App'x 241, 251 (6th Cir. 2002) ("[C]ourts have consistently held that uncharged but relevant criminal conduct may be used in determining a defendant's sentencing guideline range."); United States v. Graves, 785 F.2d 870, 872, 876 (10th Cir. 1986) (both the sentencing court and the post-sentencing administrative agencies are, "of course, limited to a consideration of information that is accurate, but they are not precluded from considering prior charges that were dismissed or alleged offenses from which charges were not filed because of illegally obtained evidence").

Gills does not dispute the accuracy of Paragraphs 94-105, and these paragraphs explicitly state that the case was dismissed (Paragraphs 97 and 100), that Gills was not prosecuted for the conduct at issue (Paragraphs 94-96, 98, 101-105), or that the conduct is included in the instant case (Paragraph 99). Nor does Gills claim that these paragraphs are prohibited from being included in the PSIR by some statute, regulation, or other authority. Further, as the Probation Department highlights, these paragraphs were not used in calculating the sentencing guidelines; they merely serve informational purposes.

Accordingly, the Court overrules this objection.

SO ORDERED.

Dated: May 18, 2015          s/Mark A. Goldsmith
     Detroit, Michigan          MARK A. GOLDSMITH
                                          United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2015.

                                          s/Johnetta M. Curry-Williams
                                          Case Manager