UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                             Case # 12 Cr 20287 (MAG)

LEON GILLS,

        Defendant.

### DEFENDANT GILLS' REPLY TO THE GOVERNMENT'S RESPONSE
### OPPOSING HIS MOTION FOR COMPASSIONATE RELEASE

    DEFENDANT LEON GILLS hereby submits this reply brief in reference to the government's response opposing his motion for compassionate release filed pursuant to 18 U.S.C. Section 3582(c).  The government argues that the Bureau of Prisons overall response to the COVID-19 crisis, Defendant Gills' inability to substantiate extraordinary and compelling reasons, and the factors of 18 U.S.C. Section 3553(a) independently and collectively disqualify him from receiving compassionate release, or, in the alternative, from receiving a sentence reduction.

    However, Defendant Gills contends that his rehabilitation and medical conditions constitute extraordinary and compelling reasons to justify his compassionate release or sentence reduction.  For the below stated reasons, the Court should grant Defendant Gills' motion for whichever form of relief it deems to be appropriate.

### ARGUMENT

I.  THE BOP'S RESPONSE TO COVID-19 HAS GROSSLY BEEN INADEQUATE
PLACING INMATES INCLUDING DEFENDANT GILLS AT RISK OF DEATH.

A.  The USP Allenwood Staff Ignorantly Infected
almost the entire prison population:

    The government argues that the Bureau of Prisons (BOP) has decreased the risk of COVID-19 within its facilities, arguing:

> "The Bureau of Prisons has reacted quickly to confront COVID-19's spread within its facilities. Wilson v. Williams, 961 F.3d 829, 833-834 (6th Cir. 2020).  For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic.  Consistent with that protocol, the Bureau of Prisons

began planning for COVID-19 in January 2020.  Wilson,
961 F.3d at 833-34.

At the outset of the pandemic, the Bureau of Prisons
started modifying its operations to implement its
COVID-19  Action Plan and minimize the risk of COVID
19 transmission into and inside its facilities.  Id; see
BOP  COVID-19 modified operations website.  Since then,
as the worldwide crisis has evolved, the Bureau of Prisons
has repeatedly revised its plan.  Wilson, 961 F.3d at 834."

(See Government's Resp Brief @ pgs 6-7).  While the holding in Wilson might be true in some facilities ran by the BOP,

it certainly is not true everywhere within the BOP's nationwide operation of all facilities.

First, there is plenty of judicial opinions that held otherwise.  District Courts have granted relief to prisoners based

on the poor management of BOP facilities which posed a high risk to prisoners all across America.

Second, the staff at USP Allenwood deviated from the aforementioned detailed protocol for responding to the

pandemic.  On November 9, 2020, at approximately 7 A.M., when the prisons Health Services Department identified

a prisoner had contracted coronavirus, they immediately placed the prison on lockdown status.  As prisoners were

nasal swab tested for COVID-19, within 15 minutes the results were available to distinguish between the infected

prisoners and non-infected prisoners.  What action the staff did next infected practically the entire prison population.

Someone came up with the bright idea to move all the infected prisoners to the first floor cell range and move the

non-infected prisoners to the second floor cell range.  However, when staff instituted this plan in the evening hours,

they did not permit the non-infected prisoners to sanitize their new cell assignments which moments earlier housed

infected COVID-19 prisoners; as a result, all of the healthy prisoners contracted the virus.

Moreover, the showers for two weeks were not sanitized after their usage by infected prisoners so when uninfect-

ed prisoners showered they became infected as well.  This gross negligence caused the entire housing unit of 3A,

which is the assigned unit for Defendant Gills, to become infected in a very short period of time.

Notwithstanding this incompetence to manage the facility during the pandemic, the government strongly suggests

that the BOP has done everything in its power to protect prisoners with its emergency pandemic plan.  Hundreds of

prisoners became COVID-19 positive because of the BOP's failure but the government does not share this information

with the Court.  In fact, Inmate John Lewis died as a result of their incompetency.  They allowed him to reach the

threshold of death before taking him to an outside hospital but by then it was too late to save him so he died needlessly

It is important to note that the medical department listed every prisoner as asymptomatic even if prisoners were complaining of several severe symptoms * which would have been grounds for admittance in a hospital by societal standards. **

Then social distancing cannot be accomplished at the USP Allenwood environment because it was designed to confine half of the current population. Each housing unit was designed to house 64 prisoners in 64 cells; however, the BOP had placed double bunks in every cell before the facility opened 35 years ago. With two grown men assigned to a cell that was designed under the building codes and fire codes to accommodate one occupancy makes it impossible to social distance according to the CDC guidelines. Plus, the housing unit is overcrowded as well making it impossible to keep a safe distance from anyone. This excessive violation of the maximum-capacity laws contributed immensely to the COVID-19 outbreak at USP Allenwood and in conjunction with the staff's insufficient handling of the pandemic put all lives at risk to the deadly virus.

In fact, the staff did not start to use full protective garb and facial shield for almost two weeks into the outbreak and they issued two disposable face masks to prisoners and it took a couple of weeks before new masks were issued.

From November 9, 2020 to November 24, 2020, while prisoners fought for their lives against the deadly virus, the Food Service Department provided each prisoner with a frozen box meals which consisted of four slices of stale bread, two thin slices of bologna, and a stale snack. These meals were distributed three times per day for breakfast, lunch and dinner. A lot of prisoners threw the meals out because the virus made it impossible to eat them since their symptoms included nausea. Food Service could have served a more friendly food for nourishment against the virus. Instead the whole prison population was treated as if they were on a disciplinary lockdown which is when the frozen

---

* In every case the BOP submits medical records that indicate that the patient is asymptomatic during infection and afterwards as well. In Niu, 2020 U.S. Dist. Lex 193587, at *7-8(D. Haw) the district court sent an expert to query inmates whom the BOP claimed remained asmptomatic and the expert found out otherwise.

** This false notation on practically all inmates' medical files was done probably to protect medical staff against civil liability. In fact, when inmate John Lewis was dying in Unit 3A, the medical staff marked his medical file as asymptomatic pertaining to COVID-19. So the government's argument that Defendant Gills weathered the storm of COVID-19 fairly is the farthest thing from the truth. Defendant Gills experienced symptoms relative to the virus and even after his recovery, he still experiences shortness of breath, pain in his muscles and chest pains to name a few aftereffects. Plus, in CNN News and FOX News and USA Today reporters consistently and currently report that many COVID-19 survivors have been diagnosed with long lingering symptoms and in lots of cases the symptoms have been experienced since the beginning of the pandemic.

box meals is punitively distributed. *

Between November 25, 2020,  and December 6, 2020, hot meals were served in Styrofoam claim-shell shaped trays.  However, on December 7, 2020 to December 20, 2020, the frozen box meals were resumed allegedly because of prisoner to prisoner physical altercation.  Now even if the punitive meals were justify at this point, during a pandemic nonetheless, food service did not provide inmates with a hot meal every three days as required by policy.  The staff inadequately fed the inmate general population thereby placing their lives in jeopardy nutrition wise which is a big factor in the recovery process of the immune system.

Notwithstanding this, the government has the audacity to salute the BOP's handling of the pandemic by arguing the staff ran the prison in an excellent fashion worthy of the court's admiration.

The medical department did not fair any better during the pandemic.  While they made their rounds every day in the unit, they took no notes when querying prisoners about their symptoms and concerns.  They took temperatures daily, but ironically if a prisoner had a high fever, they proscribed no Tylenol to help bring the fever down, nor did the warden approve an emergency commissary purchase of over the counter medications until practically 3 weeks into the COVID-19 lockdown of the prison.  And there were several prisoners in Unit 3A with very high fevers of 103, and they should have been brought to an outside hospital or at least given some type of medical care.  The medical staff did neither to alleviate the suffering of these patients.  And the medical staff did not even use a stethoscope to listen to the lungs and hearts of prisoners who had breathing difficulties.

Nevertheless, the government praises the BOP for their professional management of the facilities, including the USP Allenwood penitentiary, during the pandemic.

The security of the prisons is relaxed to the point where prisoners from other housing units can fraternize with prisoners from other housing units making it a recipe for another outbreak of the COVID-19, and, more troubling, the possible spread of the many new variants which are more contagious and more deadly according to scientists.

With the new variants present in every state of the country, the BOP's protection of Defendant Gills is not a

---

*    Even in a punitive lockdown situation, under policy the warden must issue a hot meal every three days.  This procedure was not followed by the USP Allenwood administration during a pandemic.  There is absolutely no excuse for this deviation from policy which detrimentally placed prisoners" lives in jeopardy.

certainty considering the staff's blunder to protect him and other prisoners the first time.  Dr. Anthony Fauci, a frequent guest speaker on CNN, has stated that there is not enough data available at this time to determine whether the variants from the UK and Africa and Europe could be fatal for re-infected people or vaccinated people.  However, ABC and World News Tonight and USA Today, including Fox News, have reported that the variants are more deadly and more contagious.  It is a fact that re-infected people have died from the original strand of COVID-19.  It is also a fact that vaccinated people have died from COVID-19.  Although there are sparse statistic reported on this matter, Defendant Gills assumes the mortality rate is higher than reported in order to preclude a public distrust in the vaccine which are only experimental in nature to this date.

B.  Home Confinement:

In addition, to support the adequacy of the BOP's handling of the pandemic, the government states: "Currently the Bureau of Prisons has 7,785 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentences) is 20,781" (see Gov't Resp. Brief @ pg 9).

The government does not specifically clarify how many of the  7,785 former prisoners are a direct result of the BOP's placement of prisoners directly from prison into home confinement,  The government response is therefore ambiguous and extremely misleading.   Defendant Gills submits that a vast majority of the 7,785 prisoners who are presently placed in home confinement in all probability have routinely discharged from a halfway house to home confinement status until their shift to fulltime-supervised release .   Thus, a very small percentage  of the 7,785 prisoners were granted home confinement by the BOP, so overall placements in home confinement was a decision made by the halfway-house coordinator who decided to monitor these prisoners residentially through ankle bracelets. Therefore, the government's contentions that the BOP is managing the pandemic perfectly through home confinement of vulnerable prisoners is a falsehood that should be rejected by this court.

C.  Administration of the Vaccine:

The government argues that the BOP is adequately protecting prisoners because "as of January 25, 2021, the Bureau of Prisons has acquired 24,750 doses of the COVID-19 vaccine.  The Bureau of Prisons has already initiated the first dose of vaccine in 24,082 staff members and inmates."  (See Govt's Resp. Br. @ pg 10).

While 25,000 doses of vaccines may sound voluminous, the prison staff is given preferential treatment over in-mates with the administration of the vaccine. Only if staff members decline to get the vaccine, then those vaccine doses are made available to prisoners rather than allowing the vaccine's shelf live to expire.

So the government's number that the BOP has acquired 24,750 doses of vaccine is very misleading, since a vast majority of those doses were used to vaccinate their staff members, not prisoners. As reported by the World Almanac (2019 Edition) the federal inmate population is 189,192 prisoners. Additionally there are currently 135 federal prison facilities in the United States. To better clarify the inadequacy of the vaccine administration, we use simple arithme-tic as follows:

24,750 divided by 135 equals 183 doses per facility

At each facility the amount of staff members exceeds 183, However, as indicated above, some staff members refuse the vaccination and those declined doses are given to prisoners. It is fair to assume based on this math that less than 1% of the inmate prison population has been vaccinated at any given facility. Thus, the government's argu-ment that it is adequately keeping prisoners safe through its distribution of vaccines is absurdly ridiculous according to their own numbers. *

Even with their detailed protocol for a pandemic, and even with their updated detailed protocol for the COVID-19 pandemic, the staff at USP Allenwood were not capable of adequately safeguarding both prisoners and staff members. In addition, the BOP could not safely run the prison. To be honest, at the beginning of the pandemic outbreak at USP Allenwood, the Three Stooges could have ran the medical department, the food service department, and the security department more efficiently.

II.   Defendant Gills has Demonstrated that Extraordinary and
Compelling Reasons Justify Compassionate Release or at
Minimum a Reduction of His Sentence

A.  Extraordinary & Compelling Reason Standard:

As already noted supra, Defendant Gills seeks compassionate release or a reduction of his sentence. He asserts that his medical conditions, his excessive life sentence, and his rehabilitation warrants the Court's consideration to

_____

*    And it is also important to note that the Maderna vaccine requires two shot to be administered which would cut in-half the amount of staff and inmates fully vaccinated at each facility.

grant his motion for either form of relief: compassionate release or a reduction of sentence.

Generally a three-step inquiry would be followed by the District Court in its decisional process in the Section-3582 proceeding for compassionate release or a sentence reduction, but because U.S.S.G. Section 1B1.13 is not an applicable Policy Statement for Defendant Gills' self-initiated Section 3582(c) motion, the Court must disregard the policy statement * and modify the three-step inquiry to a two-step inquiry.  As a result, the Court must (1) find that extraordinary and compelling reasons warrant a sentence reduction; and (2) consider all relevant sentencing factors listed in 18 U.S.C. Section 3553(a).  See Elias, 2021 WL 50169, at *2 (6th Cir. 2021).

Defendant Gills agrees with the government that "extraordinary and compelling" is a two prong criteria.  Extraordinary means exceptional or uncommon,  And compelling denotes "so great that irreparable harm or injustice would result if the relief is not granted. **

Trying to remove COVID-19 from the extraordinary and compelling criteria, the government states "Everyone in our society faces a risk from COVID-19 right now.   Over 350,000 Americans *** have now died from this terrible disease. So as the Sixth Circuit has stressed 'generalized fears of contracting COVID-19, without more,' do not justify compassionate release.  The Bureau of Prisons has also worked diligently to implement precautionary measures reducing the risk from COVID-19 to Gills and other inmates.  Thus, the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  (citations omitted)(See Govt's Resp Br. @ pgs 13-14).

---

\*   In Elias, 2020 WL 50169, at *2 (6th Cir.), the Sixth Circuit held that U.S.S.G. Section 1B1.13 is not an applicable policy statement for a defendant-initiated motion for compassionate release.

\*\*   See United States v. Shah, 2020 WL 1934930, at *2 (E.D. Mich April 22, 2020)(defining the phrase extraordinary and compelling as a two-prong criteria); United States v. Sapp, 2020 WL 515935, at *3 (E.D. Mich January 31, 2020)(same).

\*\*\*   This statistical-death toll is extremely inaccurate as the figure is almost double.  In a USA Today newspaper article, dated June 15, 2021, journalist Jorge L. Ortiz wrote that "As  the states and cities across the country takes steps toward normalcy, the United States on Monday approached at least 600,000 COVID-19 deaths, a stark reminder of the pandemic's enduring toll."  The government should update its boilerplate response.

1.  The BOP Failed to Stop the Spread of COVID-19:

First, Defendant Gills does not have a generalized fear of COVID-19 without more.  As indicated clearly above, the USP Allenwood staff worked diligently at spreading the virus at the facility.  Of course, unknown to the staff, they were actually spreading the virus rather than containing it.  Therefore, Defendant Gills' fear of reinfection of the deadly virus is not general in nature but is "more," indeed, and based on legitimate concerns over negligence.

2.  New Variants of COVID-19 are in The USA:

Second, in the event of a secondary introduction of the virus into USP Allenwood, especially a new variant, does not render Defendant Gills' fear from reinfection or from even death as scientifically illogical.

In society, the public can make choices that limits their exposure to the virus and the public can employ social distancing; whereas, in the prison environment, it is impossible to social distant oneself in a small area that is over-crowded in the first place.  As mentioned above, the one-man cells have been modified into two-man cells since the prison opened nearly 35 years ago. *  This makes the population in each housing unit double of what it was designed to accommodate.  The overcrowding conditions exceed the maximum capacity by 100% grossly violating building and fire codes.  **

Defendant Gills submits that this overcrowding factor alone constitutes extraordinary and compelling reasons to justify his compassionate release or a reduction of sentence.

3.  Antibodies and or Vaccination Do not Guarantee Non-fatal Reinfection:

The government argues that Defendant Gills has not substantiated extraordinary and compelling reasons, writing:

> "It is unlikely he has a high risk of becoming reinfected with the virus in prison.  To be sure, the immune response to COVID-19 is not yet fully understood, and a person's risk of reinfection is not clear.

---

*   About a decade ago the facility began to triple bunk people housed in the Segregation Housing Unit (SHU).  This practice has also occurred across the country within the BOP.  Prisoner filed a lawsuit in the district court for the middle district of Pennsylvania complaining about the triple occupancy in the SHU, and the court or the BOP precluded the practice of triple bunking in the SHU at USP Allenwood.

**   Similarly a majority of the federal prisons both new and old violate the maximum capacity standard making it a death-trap for prisoners facing the COVID-19 pandemic.

> "Nonetheless, numerous experts have stated that COVID-19 infection extended immunity in almost all cases from another COVID-19 reinfection, though estimates vary to how long antibodies will remain. Thus it is likely that Gills will have immunity from COVID19 until a vaccine is available to him"

(See Govt's Resp. Br. @ pg 17). The government's argument reeks of uncertainty. Their argument also ignores the fact that several new variants are already in wide circulation throughout the United States. On March 27, 2021, both CNN and ABC's World News Tonight, between 6:30 & 7:30 P.M., reported that a Canadian variant of the coronavirus, which is more contagious and more deadly, is presently actively spreading in every State. The reporters explained that in every State there are approximately 10,000 people infected by the new variant. The experts stated that they could not verify whether those persons with antibodies or vaccinated would be protected from the variant. A day later, on March 28, 2021, at 7 A.M., airing on CNN, Dr. Anthony Fauci supportably endorsed the aforementioned reports concerning the deadly danger and scientific uncertainty of the new variants.

Therefore, the government's contentions that Defendant Gills is unlikely to encounter or die from a reinfection of COVID-19 is a smokescreen designed to persuade this Court to deny Defendant Gills' viable motion for relief. Simply put, Dr. Fauci and the leading renowned experts in this field disagree with the government's position of safety.

In fact, experts are now agreeing that a booster shot may have to be administered every 6 months to protect the public from the new variants which now according to the CDC are actively found in every states. The origin of these variants have been tagged as coming from Canada, the United Kingdom, and India. These variants equally pose a severe risk to all American, both healthy and unhealthy, including more so those incarcerated who cannot socially distant themselves from others. *

---

* The USP Allenwood Staff has not followed the CDC guidelines when it comes to social distancing. The prison inmate population is 100% over its maximum capacity rate permissible by building and fire codes. This makes it impossible for Defendant Gills to practice social distancing. District Courts have noted their awareness of the growing evidence of the BOP's chronic mismanagement of its vulnerable population during the COVID-19 pandemic. Social distancing is at the very top of the mismanagement list. See Woodward v. United States, 469 F.Supp 3d 499, at *3 (E.D. Va 2020); Wilson v. Williams, 2020 WL 2542131, at *1-2 (N.D. Ohio); United States v. Esparza, 2020 WL 1696084, at *2 (D. Idaho); & United States v. Stephen, 447 F.Supp. 3d 63, 65 (S.D.N.Y. 2020). At the request of the court, Defendant Gills can submit additional opinions on this topic of the BOP's failure to manage their facilities relative to social distancing protocols.

Nevertheless, the government falsely claims that Defendant Gills should be safe until he can receive the vaccination. Honestly it could be a year or more before the vaccine is made available to Defendant Gills. Plus, the experts have already uniformly concurred that the vaccine may not effectively protect people from the variants including the original strand of the virus.

On May 3, 2021, a USA today news article, authored by Miriam Fauzia, section 4D Health, titled "Death Rate Comparison Misleading." She wrote:

> "As of April 20, the CDC has indeed reported a total 7,157 cases of COVID-19 among fully vaccinated people and 88 deaths.
>
> But public health experts say calculating a death rate from those numbers and comparing it to the general population is misleading.
>
> USA Today has reached out to Miller for comment.
>
> To calculate an accurate death rate, the total number of positive coronavirus cases among vaccinated individuals must be known but that number isn't, said Lisa Miller, an Epidemiologist & Clinical Professor at the Colorado School of Public Health."

So in essence health officials do not have the data to calculate an accurate death rate among those vaccinated which means that the death rate is higher than currently known. Based on this scientific information, Defendant Gills sharply challenges the government wishful thinking that he will unlikely be reinfected in the prison environment before he receives his vaccination. To reiterate there is no telling when defendant Gills will receive his opportunity to be vaccinated, and there is no telling whether the Moderna or Pfizer or Johnson & Johnson vaccines will protect Defendant Gills against the deadly variants.

With these controversial facts in mind Defendant Gills surely makes a viable claim establishing extraordinary and compelling reasons to warrant his compassionate release, or, in the alternative, his reduction of sentence.

4. Defendant Gills' medical Conditions:

The government downgrades Defendant Gills medical conditions stating he "does not have a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from COVID-19." (See Govt's Resp. Br. @ pg 14).

However, Defendant Gills' prediabetic condition (diagnosed in 2018) and his consistent high blood pressure and his bronchitis put him within the ambit of high risk for serious illness.  And if these condition are below the boarder-line as the government has argued, then Defendant Gills' obesity places him directly within the heartland of the CDC's current list of conditions for people of any age as creating an increased risk of a severe illness from COVID-19.  The CDC List for Obesity provides as follows:

Obesity (Body Mass Index [BMI] of 30kg/mz or higher but < 40 kg/mz)

Defendant Gills is 6' 2" and weighs  315  pounds.  He has a body mass index of 38.5 which equals obese class III approximately putting him 75 pounds overweight.  In United States v. Camanella, 2020 U.S. Dist. Lexis 147774, 2020 WL 4754014, at *1 (D. Colo August 17, 2020), the district court granted compassionate release for obesity alone. *

Obesity is defined as a Body Mass Index of more than but less than 40.  Severe obesity is defined as a Body Mass Index of 40 or more.  Obesity is a complex health issue resulting from a combination of causes and individual factors such as behavior and genetic.  **

Based on these BMIs Defendant Gills is borderline morbidly obese.  Since he has had weight problems his whole life, Defendant Gills is having his medical file updated by the health service at USP Allenwood.  So if the government chooses to subpoena the medical file keyed under Defendant Gills' name, the information should be available for its confirmation.  In Fact, Defendant Gill's is scheduled to see PA Hernandez on July 8, 2021, concerning his obestiy.

Defendant Gills anticipates that the government may argue that this is the first mention of the obesity argument so the court should preclude its introduction.  First, Defendant Gills apologizes for his late inclusion of this argument concerning his severe and relevant health condition.  For the record, Defendant Gills inadvertently overlooked this condition when listing the above-noted conditions of hypertension, prediabetes, and bronchitis; and second, this Court should liberally construe Defendant Gills pro-se pleading as well as allow him more latitude than attorneys to

---

*     See http://www.cdc.gov/coronavirus/2019-ncov/need-extra-precations/people-with-medical-condition. html#obesity.

**     Adult obesity causes and consequences cdc https://www.cdc.gov/obesity/adult/casues.html

include relevant matters for the Court's proper and fair adjudication of the legal controversy pending before it.

When Defendant Gills' obesity is viewed in conjunction with his other borderline serious medical conditions, it should place him in the higher risk category than if the obesity was a isolated condition.

Finally, the government contends that Defendant Gills has already tested positive for COVID-19 on November 2, 2020 and recovered on December 2, 2020. The government adds that his recovery proves that his body overcame the virus despite his medical condition. Based on this, the government then contends that his motion should be denied because he cannot meet the extraordinary and compelling reason standard for relief. (see Govt's Resp Br. @ pgs 16-17).

Defendant Gills will not recite the arguments raised above that deal with reinfection, reinfection by new variants, the possibility of death, and the BOP's gross negligence. Defendant Gills has quoted from the USA Today, CNN, ABC's World News Tonight all which confirm that reinfection of the original strand has occurred, and even more troubling a concerning percentage of those reinfected have died.

The government also presented an age comparison argument stating that Defendant Gills is only 31 years old and so he does not face the same risk as the elderly do; as a result, the government concludes that Defendant Gills fear over the pandemic cannot rise to the level of exceptional circumstances. (see Govt Resp Br. @ pg 18).

Throughout the 20-month pandemic the mainstream media has consistently reported heartbreaking stories of people of all ages who have succumbed to the indiscriminate nature of COVID-19 which kills the unhealthy and the healthy, the old and the young, which totally debunks the government's age comparison argument. To put it in the nutshell, it will take years to adequately record the statistical data concerning the death-grip and death toll of this awful pandemic. Most of the government's arguments should be updated because their boilerplate arguments and or cut-and-paste arguments are outside the scope of scientific and medical developing COVID-19 data.

For example, all of the 2020 cases cited by the government to advance that "[i]t is unclear whether a person can be re-infected with COVID-19" (Govt Resp. Br. @ pg 17) are outdated opinions on this scientific matter since the facial year of 2021 has proved otherwise finding that people can become reinfected and also possibly succumb to the disease. Once again, those facts shall not be redundantly reiterated here.

The government cites United States v. Bothra, 2020 WL 2611545, at *2 (6th Cir. 2020) to challenge Defendant

Gills' extraordinary and compelling reason for compassionate release. * writing:

> In Bothra, for instance, the defendant was
> in his 70's and had health issues rendering
> him more vulnerable to contracting [COVID-19].
> 2020 WL 2611545, at *2.  But he was a flight
> risk, had orchestrated a large and complex
> fraud scheme, and was detained at a facility
> that had very few cases of COVID-19. Id.  The
> Sixth Circuit thus held that his circumstances
> did not present a compelling reason for release. Id.

Unlike Bothra, Defendant Gills is and was not the key defendant in the criminal case.  Unlike Bothra, Defendant Gills was not deemed a flight risk.  Unlike Bothra, Defendant Gills did not orchestrate a large and complex scheme.  And unlike Bothra, the USP Allenwood staff spread the deadly virus throughout the prison which resulted in hundreds of COVID-19 infections and caused the needless death of inmate John Lewis.

Defendant Gills assumes from reading the government's scant summation of Bothra that the case involved an appeal taken from the district court's denial of a bail application.  Bothra probably argued that he would be safer in society while awaiting the trial proceeding.  The district court, however, did not agree with him for a number of reasons some stated above.  On appeal, the Sixth Circuit apparently affirmed the lower court's decision finding that Bothra did not satisfy the extraordinary and compelling reason standard.

At the other end of the spectrum, Defendant Gills is confined in a death-trap where hundreds of prisoners were negligently infected by the staff and the excessive overcrowding of the facility still renders his confinement there as extremely dangerous considering his health conditions and the possibility of another COVID-19 outbreak.

5.  Defendant Gills' Reason of Imprisonment & Mitigating factors based on Brain Science:

Finally the government contends that Defendant Gills' original ground for incarceration; that is, his participation in the Howard Boys Racketeering Enterprise in which he tried to kill people in aid of that corrupt organization should disqualify his compelling reason for release.  The government further emphasizes that based on the trial evidence

---

*     As indicated in a recent letter to the Court Defendant Gills does not have access to WEST LAW so a majority of the opinions cited by the government come from that publishing company.  Therefore, Defendant Gills cannot review the caselaw relied upon by the government in order to rebut their arguments or their reliance on such citations.  If the government is going to cite opinions that Defendant Gills has absolutely no access to read for himself, the government should then send him courtesy copies.

the Court sentenced Defendant Gills to a life term of imprisonment and that the finality of the sentence should re-main intact. (see Govt Reps. Br. @ pgs 19-20).

Defendant Gills concedes that his conduct of conviction was violent, and he does not try to minimize the serious-ness of those crimes, but the court should have taken into consideration mitigating factors, that is, the fact that his conduct within the criminal-tenure period charged in the indictment began on his thirteen birthday and ended on his nineteenth birthday.

After Defendant Gills was found guilty of racketeering conspiracy, attempting to murder two people, and dis-charging a firearm, the Court concluded that the United States Sentencing Guidelines recommended a sentencing range of 360 months to life. During the sentencing proceeding, the Court concluded that Defendant Gills could not be rehabilitated and that his reentry into society would jeopardize the public's safety so the court imposed a life sen-tence, even though no murders could be attributed to his convicted and charged offenses.

It should be noted that Defendant Gills was the victim of neighborhood adult criminals who incrementally inducted him into the Murda Ville Gang. From his adolescent years into his late teens Defendant Gills was influenced by sea-soned criminals. The Court can now re-evaluate its sentencing based on the fact of juvenile-brain science and the fact that Defendant Gills has been genuinely rehabilitated. We first turn to the brain-science argument to sup-port that he meets the criteria for extraordinary and compelling reasons to warrant compassionate release or a reduc-tion of sentence.

In Graham v. Florida, 560 U.S. 48 (2010), the Supreme Court wrote that juvenile offender's sentence of life im-prisonment without the possibility of parole for nonhomicide crime held to violate Federal Constitution's Eighth Amendment prohibition against cruel and unusual punishment.

In Graham, the Court also found that because juveniles have lessened culpability they are less deserving of the most severe punishments. As compared to adults, juveniles have a lack of maturity and an undeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed. These salient characteristics mean that it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Accordingly , juvenile offen-

14

ders cannot with reliability be classified among the worst offenders. A juvenile is not absolved of responsibility for his actions, but his transgression is not as morally reprehensible as that of an adult.

Defendant Gills' life mirrors this quote from Graham with all the detrimental factors. As a teenager, Defendant Gills was immensely influenced by older neighborhood criminals who were several years older than him. At that point in his childhood he was underdeveloped and immature and greatly influenced by their pressure to conform to their mis-behavior. The several years of influential conformity are the offenses charged in the racketeering conspiracy of the indictment. As a result, this Court should not classify him among the worst offenders especially those whom he was tried with and found guilty with by the jury. From the beginning of their indoctrination of Defendant Gills, these expert criminals took his underdeveloped character and formed it into the image of their own corrupt, illegal nature.

However, the government has argued and the court has noted that it was by the grace of God that Defendant Gills' rampage killed no one. However, not worthy of any discussion, the government stated that Defendant Gills ordered the murder of Malachi Wilson, but surprisingly did not charged him with this murder. In fact, the government's co-operating witness' adlib testimony caught the government off guard with this inculpatory testimony against Gills. If this order to murder had been authentic and reliable testimony, there is no doubt the prosecutors would have included it in the accusatory instrument. However, it was nothing more than mere free-style testimony aimed to curry additional favor with the government. Notwithstanding this incredible story, Defendant Gills was not charged with the Malachi-Wilson murder because the first time this falsified information emerged was at the trial.

In Graham, the Supreme Court, wrote" "There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm, but in terms of moral deprav-ity and of the injury to the person and the public, they cannot be compared to murder in their severity and irrevoca-bility."

Defendant Gills never crossed this line into a higher denomination of violent criminal offenses. And yes it was by the grace of God, indeed. For Defendant Gills to have been given a life term of incarceration is totally dispro-portionate to the nature of his offenses considering the mitigating fact of his age throughout the entire conspiracy. The Graham Court held that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. Nevertheless, Defendant Gills was penalized with a lifetime of imprisonment.

15

Defendant Gills' life term of imprisonment is extraordinarily long, and it appears grossly disproportionate when it is compared to average federal sentences for similar or more serious crimes:  robbery (109 months); firearms (50 months); murder (255 months); drug trafficking (76 months); and kidnapping (171 months).  See United States Sentencing Commission, 2019 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 27.3.  See United States v. Baker, 2020 U.S. Dist. Lexis 145670, AT *7 (E.D.MI)(federal sentencing statistics).  Defendant Gills should not be serving a life sentence for attempt murders especially when the average federal sentence is 255 months for murder.  As serious as Defendant Gills conduct was in the case his punishment received is greater than necessary to accomplish the goals of respect for the law.  18 U.S.C. Section 3553(a).  At minimum, the District Court should have sentenced Defendant Gills to any sentence other than life.

Indeed, the sentencing factor assessment of 18 U.S.C. Section 3553(a), which provides "the need to avoid  unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," should prompt the Court to grant compassionate release or grant a sentence reduction in this case.

Several courts have found, based on the ongoing COVID-19 pandemic, extraordinary and compelling reasons to reduce a life without parole sentence.  See eg., United States v. Rio, 2020 U.S. Dist Lexis 230074 (D. Conn Dec. 8, 2020); United States v. Rodriguez, U.S. Dist. Lexis 181004 (S.D.N.Y.  Sept. 30, 2020); and United States v. Hammond, Case No. 3:13 Cr. 00043 (JCH)(D.Conn 2020).

In United States v. Cruz, 2021 U.S. Dist. Lexis 68857, at 12-15 (D. Conn), dealing with the cognitive ability of a juvenile, whose age ranged from 13 to 18, the Court adopted Expert Dr. Laurence Steinberg opinion, writing:

> In his testimony, Dr. Steinberg defined early adolescence
> as occurring between the ages of 10 and 13, middle adolescence
> between the ages of 14 and 17, and late adolescense
> between the ages of 18 and 21. * He distinguished between
> two different decision-making processes: cold cognition,
> which occurs when an individual is clam and emotionally
> neutral, and hot cognition, which occurs when an
> individual is emotionally aroused, such as in anger or
> excitement.  Cold cognition relies mainly on basic thinking

---

*    The three categories of adolescence cognition addressed by Dr. Steinberg in his expert testimony cover the three categories that span the indictment charges lodged against Defendant Gills whose age spanned from 13 to 19 during the racketeering conspiracy from 2002 to 2009.

abilities while hot cognition also requires the individual
to regulate and control his emotions.  While the abilities
required for cold cognition are mature by around the age
of 16, the emotional regulation required for hot cognition
is not fully mature until the early-or mid-20s.  *  See also
Cohen et al, When Does a Juvenile Become and Adult? at
786 (finding that "relative to adults over twenty-one, young
adults show diminished cognitive capacity similar to that of
Adolescents, under brief and prolonged negative emotional
arousal").

Dr. Steinberg also testified that late adolescents 'still show prob-
lems with impulse control and self-regulation and heightened
sensation-seeking, which would make them in those respects
more similar to somewhat younger people than to older people.'
For example, he testified that impulse control is still developing
during the late adolescent years from age 18 to the early-or mid-
20s.  See also Cohen et al, When Does a Juvenile Become an Adult?
at 780.  Additionally, late adolescent are more likely to take risks than
either adults or middle or early adolescent.  According to Dr. Stein-
berg, risk-seeking behavior peaks around ages 17 to 19 and declines
into adulthood. Id. **  See also Steinberg et al, Around the World at
10 (graphing the trajectory of sensation-seeking behavior, as related
to age, as an upside-down "U" with the peak at age 19).  The scientific
evidence therefore demonstrates that 18 years-old display similar cha-
racteristics of immaturity and impulsivity as juveniles under the age of
18."

Had this scientific data been presented to the District Court before Defendant Gills' sentencing proceeding, there

is a strong probability that the District Court would have been more lenient to impose a sentence at the low end of

the guidelines, 360 months, or possibly departed downward from the guideline under the 360-month recommendation.

---

*    This explains why Defendant Gills could not control himself when he was molded by seasoned
criminals to be loyal to the gang and its by-laws from the age of 13 to 19 which is the time period of all
the crimes charged in the indictment against him.  In fact, when his life was threatened with a firearm,
emotionally he lost his temper and went looking for revenge and shot-up a van thinking the culprit was
inside the vehicle.  His adolescent mindset was set by long term brainwashing by adult thugs who trained
him to be gang minded.  This is no excuse for his violent behavior but only a scientific explanation into
psychological makeup of a underdeveloped adolescent whose cognition development was interrupted by cor-
rupt influences.

**    Dr. Steinberg's expert opinion on impulse control and risk taking describes perfectly the risk-
seeking that Defendant Gills' impulsive took from 2007 to 2009 when he committed attempt murders and
his age covered the 17-to-19-year-old peak before the decline would begin to occur.  And as set forth below,
the decline did occur during Defendant Gills' incarceration as his rehabilitation took place and he entered into
adulthood and maturity.

17

6.   Defendant Gills' Remarkable Rehabilitation:

The District Court presently has the opportunity to resentence defendant Gills to a sentence other than life and can take into consideration of post-judgment rehabilitation pursuant to Pepper v. United States, 562 U.S. 476, 487-93 (2011)(federal district court held allowed at resentencing, after a defendant's sentence was set aside on appeal to (1) consider evidence of post-sentencing rehabilitation; and (2) as a result, impose downward variance from advisory federal sentencing guidelines range); see also United States v. Allen, 956 F.3d 335, 358 (6th Cir. 2020)(employing Pepper in a Section 3582(c) proceeding is proper).

While rehabilitation alone cannot support a Section 3582(c) sentence reduction, 28 U.S.C. Section 994(t), it may be considered in conjunction with other reasons.  As the Second Circuit recently noted in Booker, extraordinary re-habilitation may "interact with" other circumstances to create extraordinary and compelling reasons for a sentence reduction.  See Booker v. United States, 976 F.3d 228, 238 (2nd Cir. June 20, 2020); see also United States v. Gaston, 835 Fed. App'x  852, 855 (6th Cir. November 23, 2020)(same).

Defendant Gills, who has been incarcerated without any expectation of release, made it his own personal quest to rehabilitate himself.  he has steadily programmed from October 23, 2015 to the current date, July 2021.  Defen-dant Gills has successfully completed with certifications fifty (50+) programs some of which are as follows:

A.   Educational Programs:

During the pandemic, the educational department shutdown but they provided prisoners with educational courses to complete in their cells.  The School reopened on April 20, 2021 and Defendant Gills has returned to class to study for retaking his GED Test.  He has continuously pursued his education since April of 2016 and when the instructor decides Defendant Gills is ready, he will retake the GED test. *  (See BOP Program Review, pgs 1-2, Education-Course Section)(Exhibit 1).

He enrolled in reentry programs as well.  To name a few, finance programs specifically learning Barriers to Empoly-ment; Professionalism; from Parole to Payroll; Work & Self Sufficiency, ; Common Job Interview Mistakes; When Pre-

---

*     In fact, Defendant Gills was in the process of taking the GED Test and on his last section of the test when the education department switched from the hard-copy test to a computer test.  As a result, he was required to retake the whole test over.  Defendant Gills has to be re-scheduled to take the test and has not done so since the computerization of the test.

sentation Counts, and Digital Media 4 Business.

Defendant  Gills also took re-entry programs namely Countdown to Freedom, Living Free, and Out for Good; in addition, he took financial courses for Bank on It, Borrowing, Pay Yourself, Keep Safe, Credit, Charge It, Loans, Financial Recovery, Own Home, Green Jobs, and You're the Boss Series.

There are many more programs that Defendant Gills completed which are indicated on the BOP Program Review. Defendant Gills successfully completed the following courses:  Victim Impact (listen & learn);  Anger Management; and Stop the Violence. * It is important to note that Defendant Gills was the founder & facilitator for Stop the Violence. For two years, he was the instructor for this 3-month course which graduated over a hundred participants. ** In fact, the District of Columbia Parole Board highly regarded a prisoner's completion of Stop the Violence program when deciding whether or not to grant him parole.

Defendant Gills eventually passed the torch of Stop the Violence to the Education Department which offers the program as a credited ACE program.  The students completion Stop the Violence is judicially considered in many cases since its founding by Defendant Gills and has changed the lives of many prisoners who have sincerely programmed to transform their lives for the better.

In addition, Defendant Gills registered and successfully completed the Orientation Phase of The Challenge Program which is a year-long intense in-residence psychology program.   The program focuses on overcoming patterns of criminal thinking and anger management to name only a few focuses of the curriculum. (See BOP Program Review for notation of Challenge Program ("CHG")(Exhibit 1).  *** And finally, Defendant Gills enrolled in Drug Education and received a certificate of completion.  (See Drug Education Certificate (Exhibit 7)).

These are some of the programs that defendant Gills has taken over the facial year of 2015 to the facial year of

---

* See Certificates for Stop the Violence (Exhibit 2); Victim Impact (Exhibit 3); and Anger Management (Exhibit 4).

** The curriculum for Stop the Violence was based on a booklet authored by Defendant Gills.  a copy of the original booklet is attached as Exhibit 5.

*** Defendant Gills completed the orientation phase which is 90 day in-resident program.  He will enroll to participate in the other three phases which also are 90-day phases in the near future.  See Challenge Program certificate of completion (Exhibit 6).

2021.  Defendant Gills personal goal to rehabilitate himself was put into action long before he had an opportunity to legally file a motion for compassionate release or a reduction of sentence.  His endeavors and actions to change were done without any ulterior motive like to curry favor with the court.  He genuinely pursued his long term goal to rehabilitate himself, and he has tremendously accomplished his plan to do so.

B.  Defendant Gills' Religious Role at the Prison:

Defendant Gills is a leader of the Islamic community at USP Allenwood.  An integral part of his rehabilitation can undoubtedly be connected to his religious-belief system.  For the past six years he has been a devote Muslim.  With the approval of the chaplaincy, he has functioned as a liaison between the chaplain and the Islamic community.  During the pandemic, Defendant Gills has taken a very active role of leadership within the housing unit because of the social-distancing restrictions,  since other housing units could not mingle or attend religious services together at the chapel.

He call Muslims together for their prayer time which occurs five times per day as well as facilitates discussions about passages in the Quran, which is the Holy Book for Islam.

He recently finished his observance of Ramadan which is the ninth month of the Islamic year observed as sacred with fasting practice from dawn to sunset.  Ramadan is observed for 30 days and during that time period a devote Muslim will read the whole Quran in conjunction with his fasting.  His devotion to God, as indicated above, solidified his rehabilitation making him an asset and not a liability to the prison population.  His strong belief system and his self-employed discipline to follow the moral code commanded in the Quran has prepared him for his reentry into society.

Plenty of district courts have noticed the significance and benefit of a religious belief and in their orders of granting home confinement have included the allowance to participate in community religious services.  See eg., United States v. Browning, 2021 U.S. Dist. Lexis 38058, ar * 18 (E.D. MI March 2, 2021) and United States v. Parks, 2021 U.S. Dist Lexis 53477, at * 23 (D. GA  2021).  There are too many opinions to share where judges included in their orders of home confinement the recipient's authorization to attend religious services.

C.  Defendant Gills' Ability to Follow Rules:

The Government argues that "While in prison. Gills has had difficulty following rules"  he has been sanctioned six times, including for fighting.  If Gills is released from prison, it is unlikely his willingness to abide by rules will

improve and out of prison, during the pandemic, failure to follow rules will put the public at risk."  (See Gov't's Resp. @ pg 24).

The government math is numerically correct that Defendant Gills has been cited and sanctioned six times for his infraction of prison rules.  However, the government does not mention that five of those times was for minor infractions.  *  And concerning the physical altercation, Defendant Gills was not the aggressor but he was attacked and only defended himself.  Under BOP policy, both prisoners are charged for violation of the prison rule and regulation that prohibits fighting regardless of who aggressively started the fight.  So the innocent party is charged as if he is equally responsible for breaking the rule and regulation.

Defendant Gills does not attempt to gloss over his misconduct but merely puts in context those offenses.  With the exception of the fight, he accepted responsivity before the disciplinary hearing officer and was sanctioned accordly.  Afterwards, Defendant Gills has maintained clear conduct since mid 2019 to the present time.  He is fully capable of following the rules for social distancing which he has meticulously adhered to since the inception of the pandemic. So the government's position that he could not comply with social distancing protocol if released into society is 100% incorrect.  And this argument is totally ironic considering the BOP's utter failure in its mismanagement of the facility that infected a majority of the prison population.

D.  Defendant Gills' Reentry Plans:

Defendant Gills has established two reentry plans and shall implement whichever plan the Court deems is appropriate for his return to society.

1.  First Reentry Plan:

The government argued that Defendant Gills poses a threat to everyone who testified against him and that his release would put their lives in danger of his retaliatory nature.  (See Gov't's Resp. @ pg 20).

Defendant Gills can understand the government's concern over this matter in light of his persistent endeavors to intimidate cooperating witnesses before and during the trial.  Defendant Gills does not minimize the seriousness of that prior conduct as he now finds it appalling including his overall criminal conduct of conviction.  Defendant Gills

---

*   These five minor infractions of prison rules were relative to misuse of email and phone privileges and in no way or form embarked in the direction of expressions of violence.

is not the man who was arrested almost a decade ago.  He has matured into an adult who would never return to such appalling antisocial behavior.  Defendant Gills remarkable rehabilitation should relieve the government of its concern of retaliation. *  For Defendant Gill's first reentry plan he geographically plans to reside in Georgia rather than Michigan.  First and foremost, Defendant Gills states that he shall abide by all the rules and regulations that the court and the probation department require of him.   Second, if acceptable by the court and probation department, he plans to reside with his cousin, Erica Walker in Atlanta, Georgia, where he will enroll in a CDL Class and a GED Class. Additionally he plans to find gainful employment in any field until he can obtain his CDL certification so he could enter the trucking industry which seems to be flourishing largely during the pandemic.  He also plans to continue to pursue his music career and song writing.  Although he has more opportunities employment-wise in Michigan, he believes, Atlanta would be a better environment for his transition back into society.  In the event the court does not agree with such placement, than Defendant Gills offers his second plan for consideration.

2.  Second Reentry Plan:

Defendant Gills' second reentry plan is to reside in Grand Blanc, Michigan with James Frazier who owns a trucking business at which Mr. Frazier has guaranteed Defendant Gills employment in the capacity of detailing and cleaning his semi trucks.  Mr. Frazier's business telephone number is 810-618-0527.  Mr. Frazier has also agreed to assist Defendant Gills with establishing his own business for detailing and cleaning trucks.   Moreover, Mr. Frazier said he would instruct Defendant Gills on the trucking industry and teach him how to drive a semi truck while he studies for his CDL certification.  As indicated above, Defendant Gills will continue to pursue his music and song writing career. And a major project will be to publish his booklet Stop of the Violence because he believes he can make a difference in society by sharing his story through public speaking and music to positively influence people to change their own antisocial behavior.  The music platform can play a gigantic role in reaching people with a positive message.

---

\*    The Sixth Circuit has continuously instructed the lower courts to take post-conviction rehabilitation into consideration when considering a Section 3582(c) motion for compassionate release and or a sentence reduction.  See United States v. Boulding, 960 F.3d 774, 784 (6th Cir. 2020)(thorough consideration of the Section 3553(a) factor is required; court correctly included post-sentencing behavior as part of the inquiry); United States v. Williams, 972 F.3d 815 (6th Cir. 2020)(reversed and remanded because court failed to mention the defendant's argument regarding his post-conviction conduct).

III.  Conclusion:

WHEREFORE, Defendant Gills respectfully asks this Court to bestow mercy upon him because he has met extra-ordinary and compelling reasons to warrant compassionate release or a sentence reduction based on his medical con-ditions, his teenage years spent influenced by seasoned criminals, his potential exposure to COVID-19 and its recent deadly variants, * and his remarkable rehabilitation.

July 11, 2021

Respectfully submitted,

_____
Leon Gills,      Pro-se
Reg. 63760-019
USP Allenwood
Box 3000
White Deer, Pa 17887

### CERTIFICATE OF SERVICE

I, Leon Gills, hereby declare under penalty of perjury that a copy of this 23-page reply brief has been mailed by first class postage to the USA Office for the Eastern District of Michigan, 101 First Street, Suite 200, Bay City, Michigan 48708, on this  11th day of July, 2021.

Respectfully submitted,

Leon Gills,      Pro-se
Reg. # 63760-019
USP Allenwood
Box 3000
White Deer, Pa 17887

_____

*     As this brief was being typed, additional information was reported about the deadly variants. On July 9, 2021, at 4 P.M., CNN on The Lead by Reporter Pamela Brown reported on the necessity of boos-ter shots and the split decisions over them between scientist and the CDC and FDA and the National In-stitute for Science.  The CDC argued that not enough data is available to make such a determination. Reporter Brown sated that new infections are up 11% nationwide and in California new infections are up 165% with the new delta variant.  The Pharmaceutical, however, suggest that booster shots should be given to better protect the public.  Later that evening, at 5 P.M., on CNN in the Situation Room, Wolff Blitzer stated the Pfizer has applied for emergency use of the booster shots because of waning immunity making its vaccine only 60% effective stating their vaccine is losing its efficacy.  The CDC and FDA have sharply disagreed with Pfizer.  This only supports Defendant Gills argument that his life is in danger since the experts cannot even agree on the efficacy of the vaccinations which he will not get any time soon.

Exhibit 1



| **Individualized Needs Plan - Program Review   (Inmate Copy)** | SEQUENCE: 01826889 |
|---|---|
| Dept. of Justice / Federal Bureau of Prisons | Team Date: 05-27-2021 |
| Plan is for inmate: GILLS, LEON  63760-019 | |

| | | | | |
|---|---|---|---|---|
| Facility: | ALP ALLENWOOD USP | Proj. Rel. Date: | UNKNOWN |
| Name: | GILLS, LEON | Proj. Rel. Mthd: | LIFE |
| Register No.: | **63760-019** | DNA Status: | MIL06977 / 06-05-2015 |
| Age: | 31 | | |
| Date of Birth: | 08-16-1989 | | |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| ALP | C SAN 2 AM | CORRIDOR SANATATION 2 AM | 04-07-2021 |

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| ALP | ESL HAS | ENGLISH PROFICIENT | 07-08-2015 |
| ALP | GED EN | ENROLL GED NON-PROMOTABLE | 01-30-2020 |
| ALP | GED UNSAT | GED PROGRESS UNSATISFACTORY | 08-17-2017 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| ALP | | GED CLASS 0730-0930 | 04-20-2021 | CURRENT |
| ALP | | NUTRITION AND BODY COMP | 05-01-2021 | CURRENT |
| ALP | C | MUSCULAR FLEXIBILITY & COMPRE | 04-12-2021 | 04-26-2021 |
| ALP | W | GED CLASS 1230-1430 | 03-17-2020 | 04-20-2020 |
| ALP | C | RHU ACE CLIMATE CHANGE COURSE | 10-07-2020 | 10-30-2020 |
| ALP | C | RHU ACE MIND STRENGTH | 09-30-2020 | 10-30-2020 |
| ALP | C | RHU ACE HISTORY MANIFEST DEST | 09-17-2020 | 10-30-2020 |
| ALP | C | RHU ANIMAL ANATOMY 8:BLOOD | 08-31-2020 | 10-30-2020 |
| ALP | C | RHU ANIMAL ANATOMY 7:MUSCLE | 08-31-2020 | 10-30-2020 |
| ALP | C | RHU FDIC $ SMART 4:$ MATTERS | 08-18-2020 | 08-31-2020 |
| ALP | C | RHU FDIC $ SMART 3:CHECKING | 08-18-2020 | 08-31-2020 |
| ALP | C | RHU OUR SOLAR SYSTEM | 08-18-2020 | 08-31-2020 |
| ALP | C | RHU EXPLORING EUROPE | 08-18-2020 | 08-31-2020 |
| ALP | C | MUSCULAR FLEXIBILITY & COMPRE | 07-11-2020 | 07-31-2020 |
| ALP | C | NUTRITION AND BODY COMP | 05-21-2020 | 05-27-2020 |
| ALP | C | PHYSICAL FIT AND BEHAVIOR MOD | 05-02-2020 | 05-16-2020 |
| ALP | C | RHU FDIC $ SMART 10:OWN HOME | 04-30-2020 | 05-19-2020 |
| ALP | C | RHU FDIC $ SMART 11:FIN RECOVR | 04-30-2020 | 05-12-2020 |
| ALP | C | RHU FDIC $ SMART 9:LOAN | 04-30-2020 | 05-12-2020 |
| ALP | C | RHU FDIC $ SMART 8:CHARGE IT | 04-23-2020 | 05-05-2020 |
| ALP | C | RHU FDIC $ SMART 7:CREDIT | 04-23-2020 | 05-05-2020 |
| ALP | C | RHU FDIC $ SMART 6:KEEP SAFE | 04-16-2020 | 04-29-2020 |
| ALP | C | RHU FDIC $ SMART 5:PAY YOURSLF | 04-16-2020 | 04-29-2020 |
| ALP | C | RHU FDIC $ SMART 2:BORROWING | 04-02-2020 | 04-17-2020 |
| ALP | C | RHU FDIC $ SMART 1:BANK ON IT | 04-02-2020 | 04-16-2020 |
| ALP | W | GED CLASS 0930-1130 | 03-10-2020 | 03-17-2020 |
| ALP | W | GED CLASS 1230-1430 | 08-12-2019 | 11-18-2019 |
| ALP | W | GED CLASS 0930-1130 | 09-17-2018 | 09-19-2018 |
| ALP | W | GED CLASS 1230-1430 | 02-27-2017 | 08-17-2017 |
| ALP CHG | C | RP6-STOP THE VIOLENCE RPP CLS | 01-12-2017 | 03-16-2017 |
| ALP CHG | W | GED CLASS 0930-1130 | 11-21-2016 | 02-27-2017 |
| ALP CHG | W | GED CLASS 0930-1130 | 06-28-2016 | 10-31-2016 |
| ALP CHG | C | HEALING INFECTIONS | 06-29-2016 | 07-27-2016 |
| ALP CHG | C | FUNCTIONAL ANATOMY OF THE CORE | 06-29-2016 | 07-27-2016 |
| ALP CHG | C | MYTHS OF NUTRITION AND FITNESS | 06-29-2016 | 07-27-2016 |
| ALP CHG | W | GED CLASS 0730-0930 | 04-12-2016 | 06-28-2016 |



| **Individualized Needs Plan - Program Review   (Inmate Copy)** | SEQUENCE: 01826889 |
|---|---|
| Dept. of Justice / Federal Bureau of Prisons | Team Date: 05-27-2021 |
| Plan is for inmate: GILLS, LEON  63760-019 | |

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| ALP CHG | C | RP6-CRC COUNTDOWN 2 FREEDOM | 05-25-2016 | 06-27-2016 |
| ALP CHG | C | RP2-CRC WORK& SELF-SUFFICIENCY | 06-27-2016 | 06-27-2016 |
| ALP CHG | C | RP2-CRC FROM PAROLE TO PAYROLL | 05-20-2016 | 06-27-2016 |
| ALP | C | RP2-CRC PROFESSIONALISM 101 | 05-23-2016 | 05-25-2016 |
| ALP | C | RP2:CRC BARRIERS TO EMPLOYMENT | 05-20-2016 | 05-21-2016 |
| ALP | C | RP2-CRC COMMON JOB INTV MISTAK | 05-16-2016 | 05-19-2016 |
| ALP | C | RP2-WHEN PRESENTATION COUNTS | 05-19-2016 | 05-19-2016 |
| ALP | C | RP6: CRC LIVING FREE | 05-16-2016 | 05-19-2016 |
| ALP | C | RP2-CRC GREEN JOBS | 05-02-2016 | 05-05-2016 |
| ALP | C | CRC DIGITAL MEDIA 4 BUSINESS | 04-29-2016 | 05-05-2016 |
| ALP | C | RP6-CRC OUT FOR GOOD | 04-29-2016 | 04-29-2016 |
| ALP | C | CRC YOU'RE THE BOSS SERIES | 11-20-2015 | 04-29-2016 |
| ALP CHG | W | GED CLASS 0730-0930 | 11-05-2015 | 12-14-2015 |
| ALP CHG | C | RPP(1)-CONTINUITY CARE/DISEASE | 10-23-2015 | 10-23-2015 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 06-15-2016 |
| CARE1-MH | CARE1-MENTAL HEALTH | 07-20-2015 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| NO PAPER | NO PAPER MEDICAL RECORD | 06-05-2015 |
| REG DUTY W | REGULAR DUTY W/MED RESTRICTION | 07-24-2018 |

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED COMP | DRUG EDUCATION COMPLETE | 08-23-2016 |

## FRP Payment Plan

| Most Recent Payment Plan |
|---|

| **FRP Assignment:** | **COMPLT** | **FINANC RESP-COMPLETED** | **Start: 10-08-2019** |
|---|---|---|---|
| Inmate Decision: | **AGREED** | **$25.00** | Frequency: **MONTHLY** |
| Payments past 6 months: | **$0.00** | Obligation Balance: **$0.00** | |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $400.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

## FRP Deposits

Trust Fund Deposits - Past 6 months:   $4,260.05          Payments commensurate ?   Y

New Payment Plan:     ** No data **

## Progress since last review

Inmate Gills has maintained work assignment as a Corridor Sanitation Orderly since October 14, 2015. Inmate Gills completed the following recreation and education courses:

ACE Money Smart For the Older Population (FSA), ACE Healthy Aging Body (FSA), ACE Health and Wellness Throughout Your Lifespan (FSA), ACE Victim Impact (FSA), ACE Talking With Your Doctor (FSA), and Muscular Flexibility and Compre.

Inmate Gills is currently enrolled in the GED Program, Nutrition and Body Comp, and ACE Arthritis Foundation Walk (FSA). Inmate Gills has maintained clear conduct since January 16, 2019.

## Next Program Review Goals



**Individualized Needs Plan - Program Review    (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: GILLS, LEON  63760-019

SEQUENCE: 01826889
Team Date: 05-27-2021

Maintain enrollment in the GED Program, Nutrition and Body Comp, and ACE Arthritis Foundation Walk (FSA) through November 1, 2021, or until complete. Enroll in ACE Course RHU Email Basics prior to August 1, 2021, and maintain enrollment through November 1, 2021, or until complete.

## Long Term Goals

Maintain enrollment in the GED Program and RHU Email Basics through May 1, 2022, or until complete. Complete Nutrition and Body Comp, and ACE Arthritis Foundation Walk (FSA) prior to May 1, 2022. Enroll in ACE course Would You Pass The U.S. Citizenship Test? prior to May 1, 2022.

## RRC/HC Placement

## Comments

Finance/Poverty Need Screen Is there documentation in the PSR of any of the following? __ Any history of Bankruptcy __ No bank account __ No assets nor liabilities noted in PSR _x_ Debts noted in Credit Report or other sources __ Tax Liabilities/back taxes __ Unpaid alimony/child support __ other indications of lack of financial management skills (specify) _____ YES ___x___ NO _____ (if any of the above, check yes) If the answer is yes, the inmate has a financial/poverty skills need.

FTC - Ineligible
Relocation Supervision - Northern District of Georgia
Treaty Transfer - N/A

Exhibit ▓ 2

# CERTIFICATE OF ACCOMPLISHMENT

This certificate verifies that

## Leon Gills

has successfully tutored

## ACE Stop the Violence

from April until June of 2017

for the USP Allenwood Education Department.

E. Rockey, ACE Coordinator



This Certificate of Completion

is hereby given to

LEON GILLS

on this date

MARCH 16, 2017

For the completion of the ACE

Course

STOP THE VIOLENCE

Presented by

E. ROCKEY, ACE COORDINATOR

USP ALLENWOOD

This Certificate of Completion

is hereby given to

LEON GILLS

on this date

March 3, 2021

For the completion of the FSA Course

# OVC VICTIM IMPACT:

# LISTEN & LEARN

Presented by

E. ROCKEY, ACE COORDINATOR

USP ALLENWOOD

Exhibit 3

# Rational Self-analysis



10-11 Shooting
Attemp Murder of AD, AH, DE, MB

Use this blank RSA form when you are in a situation where you are feeling and acting in an undesirable way. Before you get started, be sure to review the information, "Getting the most from RSAs" in the Challenge Program *Rational Thinking* Journal.

## Irrational approach

### Activating Event

Joe nate broke into The house and Threatin me, and crystal, I Started lookin for him.



## Rational approach

### Camera Check

He Still love her and he's willing to hurt Someone over her.

### Beliefs

I gotta show him That she my Girl and to Leave us Alone



STOP and THINK

### Rational Challenge

I need to contact law enforcement or even Contact him and let him know his actions is unacceptable

### Consequences
(feelings and actions)

I Shot innoscent people and recieved a Life Sentence.

### The Five Rules for Rational Thinking

1. Are your thoughts based on objective reality/facts?
2. Are your thoughts helping protect your life and health?
3. Are your thoughts helping you achieve your short- and long-term goals?
4. Are your thoughts helping to keep you out of conflict with others?
5. Are your thoughts leading you to feel the way you want to feel without abusing alcohol and other drugs?

### Desired Consequences
(feelings and actions)

That We talk it out Nobody have to resort to Violence, We came to a Agreement

**It is illegal to duplicate this page in any manner.**

© 2006 The Change Companies®

# Rational Self-analysis



*Aid & Abetting The Shooting of Charles arm.*

Use this blank RSA form when you are in a situation where you are feeling and acting in an undesirable way. Before you get started, be sure to review the information, "Getting the most from RSAs" in the Challenge Program *Rational Thinking* Journal.

## Irrational approach

### Activating Event

Jay Rideing with my cousin and I know he have alot of beefs.

### Beliefs

Ima Just pick my home girl up and we and we gon be good

### Consequences
(feelings and actions)

We Seen CO on our way to our destination and now Im implicated in a Shooting.

## Rational approach

### Camera Check

Tell cuz Im about to pick a girl up I will be right back

### Rational Challenge

Stay away from people That is violent and into beefs with other



**STOP and THINK**

**The Five Rules for Rational Thinking**

1. Are your thoughts based on objective reality/facts?
2. Are your thoughts helping protect your life and health?
3. Are your thoughts helping you achieve your short- and long-term goals?
4. Are your thoughts helping to keep you out of conflict with others?
5. Are your thoughts leading you to feel the way you want to feel without abusing alcohol and other drugs?

### Desired Consequences
(feelings and actions)

Pick my girl up by myself Nabody get hurt Nobody get shot

It is illegal to duplicate this page in any manner.

© 2006 The Change Companies®

Exhibit 4

# Certificate of Completion

**GILLS, LEON**
Reg. #63760-019

## Anger Management

August 22, 2017

T. McCain, PsyD
Staff Psychologist
FCC Allenwood

Exhibit 5



Stop

The

Violence

by Leon Gills

# Identifying Violent behavior.

Have you ever acted out Violently? Some participants doesnt even Recognize that They are violent people. If Someone doesnt Know That They have a problem How can They Change it.

1) Do you Get Hugry    yes or NO

Does your anger lead to Aggression yes or NO

If So please Explain

IS your anger becoming a Problem?

Please Explain

Feelings

Name 2 of The most Important
feelings That make you act out violently
please Explain in Detail

① 
_____

_____

_____

_____

② 
_____

_____

_____

_____

Section 1        Reconizeing   Violent   Behaviors

* Discover  your  triggers That  leads to Violent  behavior.

After  Session 1,  participants  will be  able  to  Identifi  Violent  behavior.

① Define - Violence
② See why  events  from The  past  control  Their  lives  today.
③ acknowledge  That  They  have  The  power  to  be  non-violent

"Introduce The Topic"

Violence  is  characterized  as  phisical Force

Whure  does  violence  come  from?

Violence  comes  from  a  person  That acts  violent  as  to  Injure, damange  or destroy, acting  or  characterized  by  force unlawfully, or callausly, used, caused  by Violence  (a  violent  death).

Anger  and  Violents  comes  from  deep within  Emotions  such  a  strong  feelings

Some  of  us  learns  ▓▓▓▓▓▓  violent behavior  from  our  parents  or  Movies and  TV  shows.  We  Then  learn  That

Violence is a Normal way of Living. Becoming Angry is a Natrual feeling but Violents is NOT in No way shape or form...

Do you have Violent behavior? Have Violents become normal in your life? If you do not Sperarte your self from Violence and being Violent it will not only effect you but it will also effect The people around you and The people not around you.

Violence is so harmful and unsafe That acting with Violence can cause people to get seriously hurt or Death Many Innacence people have died from The acts of phisical force ... ~~and~~, ~~reasons~~ This Course will help you understand True fatle consequences of Violents and to Recanize how ~~you~~ responding peace-full can be very helpful in your life today and forever.

Key Questions

Ask each participant to answer The key questions as hnestly as possible.

key question for The group.

Session 1

① How did you learn about Violence?

② What makes you act Violent?

＊

Violence is Strong Feelings That out-
bursts and Compressed anger ...


Video Introduction.

This video will help you see and
understand The consequences of Violent
behaviors... in This video you will see
real people describing how They have
been effected from Violent actions. This
session of The video will show you
how we learn how to be Violent
from other people Just by being around
violence or even being a victim of
violence. This will show you family's
of Real people That exspirane violence
you will have kids and adults from
the Most Violent area's in America
@ express feeling and Stories about
violent behavior. This is real Non-fiction
uncut versions of how Violence Impact
our lives today from victims...


show The Video
"▢"

4.

Discuss The video

At The conclusion, Talk about concepts discussed in The video. Ask The participants questions Such as The following.

① Do you see how Violence is created?

② Do you see how The past triggers Violence?

③ Do you understand how Small Things can cause Violent behavior

Introduction of The worksheet

This Session Contains eight exercises. At The beging of Session 2 you will be encouraged to review Session 1 worksheet with participants. Usually, participants can easily complete The worksheets inside of class. However, In This Session should be reviewed during class, as The facilitators guide Contain Information That The worksheet do not contain. The Story of Matthew should be read in class With The exercises 1-5 and Should be viewed during class, as scheduled... This story will let people Identify violent behavior. participant May answer The worksheet when True story is read in class. Encourage participant to use extra sheets of paper as needed

[scribbled out text illegible]

# Session 1 Worksheet

## Violence

Identify 3 Violent acts

① _____

_____

_____

② _____

_____

_____

③ _____

_____

_____

# Session 2
# coping Skills

Session 2- Helps participants learn coping skill to controll violent behavior

After session 2, participant will be able to

① discover 5 coping Skills

② difine coping skills

③ use coping skills Every day.

## Review Session 1

Begin class by reviewing The work sheets from session 1 with The participants. They do not need to turn in their assignments just ask Them how They answered Them.

## Introduce The Topic

introduce The topic of coping Skills. Read The following Information to The participants.

coping skills - to fight or contend with successfully or on equal terms, to deal with problems, troubles, etc.. To mange your violent behavior peacefully and in The Right manner. If you take advantage of This session Hou will

# Session 2

Learn how to cope with anger, aggression, and violence. Coping requires skill, resistance, and patience. Coping skill requires treating The cause of The pain Feeling of phisical force.

Coping does not mean turning away from and erasing The past. Instead it means breaking The urge for violence and fixing it with kindness

You cant be healed by others. Only you have your answers, But The Good news is you dont have to heal alone.

untill you learn coping skills to deal with your violent/Anger behaviors Then you will Remain violent. it's like somtone coming up to you and un-locking The trap door on your forehead and looking to see who is in The drivers seat. who is driving your car? is it That hurt child or is it a mature adult?

By taking time to Identifi and learn New coping skills, you will be able to deal with alot of situations and altercations when occurs, This will help you Move with peace, love, and happieness. you will be able to help yourself and others. coping skill will put you in controll your actions and aggression.

# Session 2

## Ask The Key Question

Present The Key questions, Ask each participant to answer as honestly as possible.

## Key questions for The group

Are you Ready to take controll of your violent behaviors?
Do you Know what you need to do?

In answer The question, participants will realize That They need help to manage Their behaviors/actions.

The point - you have The power to react with violence or Respond with kindness.

## Introduction of The Video

This part of The video shows The participants how to Controll Their violent behavior using Coping Skills. This part shows Self Controll over The way That you behave. Participants Need to know how to think befor you Respond Never React toward situations always Respond. It is always New choices to make. Adults make changes Kids make choices.

"Show The Video"

Discuss The Video

At The conclusion, Talk about concepts discussed in The video. Ask participant questions such as The following:

① what are some of The advantages of Self Controll of Violent behavior

② what are The benifits of using Coping Skills

③ what are your plans on using coping Skill Sucessfully.

Make The following Statements

Coping skills is a process of Healing

We can reclaim an enormous amount of Power by Just understanding what is going on in our lives.

If we dont step up and take responsibilty for ourselves, no one else will, The responsibility is ours.

✻ Please continue to Work on your worksheets and all So under- stand That if you dont stop The violence Then its Just gonna get worser and worse. Please... If shes not

5

a Solution Then you arise a problem

participants can easily complete The
work sheet outside or inside with
The class. All of the worksheets deal
with stoping The violence and having
self controll over your life. They allow
participants to Identify violent behavior and
stop it befor its to late.. At The
begining of session 3 please go over
the worksheets from session 2.

# Session 2
## Coping Skills

I dentify 3 diffrent Copeing Skills
① That Will Controll The 3 diffrent Violent acts
from Session 1 wont Thent

_____

② _____

③ _____

# Session 3 Willingness

After session 3 participants will be able to,

① to see that you have to be willing to stop violent behaviors

② understand if you are willing to stop violence then u are half way thur

③ Willingness come from the intentic of the heart

"Review Session 2"

Begin class by reviewing the worksheets from session 2 with the participants. They do not need to turn in their assignment. Just simply ask participants how they feel and how they answered the exercise.

Introduce the Topic

Willing have nothing to do with others it's a gift that you give yourself. Willing begins with an act of will a decision to be a victor, in stoping the violence. If you are unhappy with how violence impacted you life and the people's life around you what are you gona do about it? willingness is favorably disposed or consenting (to do) something spicified or implied). Acting, giving, etc. readily or cheerfully

done, given, etc. readily or Gladly; voluntary

"Ask The Key Questions"

present The key question and ask each participants to answer each question as honestly as possible.

Key questions for The group.

① Tell us about 1 violent incident That you could have avoided but did Not?

② Now tell us about an incident That may have lead to violence but you stoped it?

In answering These 2 questions participant will be able to see how being willing to resolve conflict can be ⊗ safer Then resulting to violence. And you will see That if you don't have Solutions Then you are ⊗ part of The problem.

"The point" Willingness is a intention to want to do something.. It's about being willing to help decrease The violence.

Introduction of Video

This video is about Willingness. This part of The video will demonstrate why Willingness is The most important tool in Stoping violence. It defines Willingness and explains why you have to be willing to

Change behaviors to Impliment This 4 step process to Improve behaviors. It provides powerful testimony about The Importance of moving beyond Violence into Willingness. Watch for Time for steps to stop Violence and take notes if you need to...

"Show The Video"

Discuss The video

After The video conclusion, Talk about Concepts discussed in The Video. Ask The participants questions such as The following

① Why is willingness so Important?

② Is Ther any Violent people That you are willing to help Change?

③ Are you willing to Change?

After answering The questions participant are encouraged to continue to The worksheet portion. please note That it takes Time for The worksheets and They may be done in or out of class.

"Introduce The Worksheets"

participants can easily work together
in an open discussion to complete The
worksheet for session 3 in class or
outside class. The written exercise will
help the participant to see The Importa
and power on Their willingness to change
violent behaviors That Impacts Their
lives.

Willing-ness

Write a 50 Word Essay on you being
Willing to Controll Violent behavior

# Session 4 Relocation

After Session 4, participant will be able to..

① Identifi The most safest cities in America

② Sacafice Your present for Your future

③ Seperate Yourself from Negative people and start relationships with positive people

"Review Session 3"

Begin class by reviewing the work-sheets from session 3 with the participa They do not need to turn in their assignments. Simply ask participants how They answer the exercise.

"Introduce The Topic"

Introduce The topic of relocation. Read out loud The following information.

The word relocation is defined in the dictionary as - to locate to anoth place, to move your self from 1 area to another area. Seperate your self from violence and violent area " This is Very important because it is a known fact That birds of

2

It take hard work to leave your comfort zone to a new location. Sometimes it come to how much you want to leave that lifestyle alone. Remember you can make it in a safer area.

Ask Key Questions

Present the key question. Ask each participant to answer a honesty as possible.

Key question for the group

If you can choose 1 city of of the 10 most safest city in Ameri which 1 will you take?

* You Have to be willing to Relocate.

"Video Introduction"

This vide will explain Relocation are all of the options and choices that you have. Relocation is not as hard as most participant Think it is, you just gotta get up and go. you have to seperate yourself from violence and violent areas. pick new friends that is non-violent. Seperate your thought. Relocate your Think from violenc to kindness.

3

"Show The Video"

"Discuss The Video"

At The conclusion, Talk about concepts discussed in The video. Ask The question such as The following.

what are some you want to Relocate to? Are you willing to Stay in a shelter to relocate?

what steps will you take to relocate?

This is The last chapter/session of The Stop The Violence curriculum please continue to The work sheets portion please note The you can also back track and finish any work sheet you havent completed.

"Discuss The Worksheets"

Allow participants to discuss They Information That They recieved from This Program. ✗ And allow participant to Write a 100 word summary on an violence and solutions to decrease violence This will help The participant

Session 4
Relocating

Name 2 Relocating areas and write 2 plans can start a New Life in a new Area,

① _____

_____

_____

② _____

_____

_____



Exhibit 6

# Certificate of Completion

## LET IT BE KNOWN THAT

*GILLS, LEON 63760-019*

**HAS SUCCESSFULLY COMPLETED THE CHALLENGE ORIENTATION PHASE**

**AT USP ALLENWOOD FEBRUARY 2ND 2017**

Dr. K. Morris, Challenge Program Coordinator

H. Brown, Specialty Treatment Specialist

P. Kile, Specialty Treatment Specialist

B. Vanderwill, Specialty Treatment Specialist

Exhibit 7

DRUG EDUCATION

# Certificate of Completion

Presented to:

## Leon Gills

Reg. No.: 63760-019

This the 15th day of August, 2016

United States Penitentiary
Allenwood, Pennsylvania

T. Klembara
Drug Treatment Specialist

MARK A GOLDSMITH
THE FEDERAL BUILDING
600 CHRUCH ST
FLINT MICHIGAN

COMPASSIONATE RELEASE/RELEASE PLAN #1

ERICA WALKER
ATLANTA GA

1) I WILL BE RELEASING TO MY COUSIN HOME ERICA WALKER IN ATLANTA GA

2) THIS IS THE ADDRESS THAT THE BOP ALREADY HAS AS MY RELEASING ADDRESS

3) ERICA WALKER WILL HELP MY FIRST 30 DAYS OF JOB HUNTING ALL DAY  UNTILL IM SUCESSFULL

4) I WILL PERSUE MY MUSIC/SONGWRITING CAREER (SEE THE ATTATCHED)

5)I HAVE A FRIEND THAT OWN A DOG KENNEL AND HE SAID HE WILL GIVE ME 3 DOGS TO START MY OWN KENNEL

6)I WILL ALSO ENROLL INTO GED AND CDL TRAINING CLASS

7)I WILL ALSO ATTEND RELGIOUS SERVICES AT THE PROPER TIMES

8) I SWEAR UNDER THE PENALTY OF PERJURY THAT I WILL NOT ENTER THE STATE OF MICHIGAN FOR NOTHING NO MOATTER WHAT, BECAUSE I WANT TO PUT EVERYTHING TO DO WITH THIS CASE BEHIND ME AND 1 THING I HAVE LEARNED IN THESE 9 YEARS IS, TO CHANGE MY LIFE I HAVE TO CHANGE THE PEOPLE, PLACES, AND THINGS TO BECOME SUCESSFULL

9) I WILL LIKE TO ASK THE COURT TO BAND ME FROM THE STATE OF MICHIGAN

10)I WILL ALSO PARTICIPATE IN ANY CLASSES THAT THE COURT AND PROBATION ORDERS ME TO

11)I WILL FOLLOW ALL TERMS AND RULES OF PROBATION

12) AND I WILL FOLLOW ALL THE TERMS OF CDC GUILDLINES TO FIGHT THIS PANDEMIC

13) I SWEAR UNDER OATH THAT THESE STAEMENTS WILL BE UPHELD BY ME AND THEY ARE TRUE STATEMENTS

LEON GILLS 63760019
USP ALLENWOOD
PO BOX 3000
WHITE DEER PA, 17887

1) WHAT DOES YOUR COMPANY DO?
WE PROVIDE MUSIC TO ARTIST AND RECORD LABLES WHO ARE LOOKING TO BUY MUSIC FROM SONG WRITERS..

2)WHAT MAKE YOUR BUISNESS/COMPANY DIFFERENT?
MY COMPANY WILL BE GOING FROM PRISON TO PRISON INTERVIEWING INMATES ALL ACROSS THE WORLD THATS
INTERESTED IN SONGWRITING. THE BEST SONG WRITERS ARE IN PRISON AND ALSO WHO GOT MORE TIME TO
WRITE MUSIC THEN THE INCARSERATED PERSON? MY COMPANY FOCUS ON INMATES BUT YOU DO NOT HAVE TO
BE INCARSERATED TO BE APART OF HIGH PROFILE MUSIC, YOU JUST HAVE TO BE A REALLY GOOD SONGWRITER.

3)WHO IS DOING THE WORK?
I HAVE A TEAM OF 2 PEOPLE AS OF RIGHT NOW, DONA NELSON AND MELVINA REID.. THEY WILL BE DOING THE
INTERVIEWS AND OR OVER THE PHONE AND VISTS AS NEEDED, AS THE BUISNESS FROM HOME GROWS WILL WILL
EVENTUALLY HIRE MORE STAFF.

4) WHO ARE YOUR CUSTOMERS??
ANY AND EVERYBODY WHO ARE INTERESTED AND BUYING MUSIC

5)HOW ARE YOU GOING TO REACH THEM??
THE INMATES WILL BE SENT FLYERS THREW SNAIL MAIL AND GIVING PHONE NUMBERS AND EMAIL ADDRESSES
FOR HIGH PROFILE MUSIC FOR CONTACT PURPOSES BUT ALSO WE WILL UTILIZE VIDEO VISITS EMAIL JAY PAY AND
CORRLINKS..ALSO THREW PHONE LINES POTENTIAL CUSTOMERS WILL BE CONTACTED THREW THER
MANAGEMENT COMPANYS/RECORD LABLES INSTAGRAM, TWITTER ACCOUNTS, AND FACEBOOK ECT.

6)WHERES THE MONEY??
 THE MONEY WILL COME FROM APPLICATION FEE AND MEMBERSHIP FEE ALSO I WILL BE SEEKING A LOAN/ GRANT
FROM THE GOVERMENT.

7) WHAT DOES THE FUTER HOLD?

a) SHORT TERM GOAL IS TO BECOME A MAJOR MUSIC PRODUCTION COMPANY FOR SONGWRITERS ACCROSS THE
WORLD.

b) LONG TERM GOAL IS TO ADD BOOKS, ART WORK, AND MOVIES TO THE COMPANY IN THE SAME FORM AS THE
SONG WRITERS

LEON GILLS

MARK A GOLDSMITH
THE FEDERAL BUILDING
600 CHRUCH ST
FLINT MICHIGAN, 48503

COMPASSIONATE RELEASE/RELEASE PLAN/PLAN 2

JAMES FRAZIER
6114 PINE CREEK CT
GRAND BLANC MICHIGAN, 48439
810-618-0527
BUSINESS NAME- BEDROCK TRUCKING EXPRESS

1) I WILL BE RELEASING TO JAMES FRAZIER HOME IN GRAN BLANC MICHIGAN

2) JAMES FRAZIER OWNS A BUISNESS DRIVING SEMI TRUCKS

3) THE FIRST DAY IM RELEASED I WILL BE HIRED BY JAMES FRAZIER

4) MY JOB WILL CONSIST OF CLEANING AND DETAILING SEMI TRUCKS FOR JAMES FRAZIER

5) I WILL ALSO ENROLL INTO ANY CLASSES THE COURT ORDER ME TO

6) JAMES FRAZIER WILL ALSO TRAIN ME TO DRIVE SEMI TRUCK AND HELP ME STUDY FOR THE CDL'S TEST

7) I WILL ALSO FIND A 1 ON 1 TUTOR TO HELP ME WITH GED TESTING

8) I WILL START MY SMALL BUISNESS (CLENING SEMI TRUCKS) SEE ATTACHED

9) I WILL ALSO BE WORKING MY BUISNESS AS A SONGWRITER SEE ATTACHED

10) I WILL BE WORKING ON GETTING MY STOP THE VIOLENCE WORK BOOK PUBLISHED(SEE ATTACHED EXHIBIT 5)

11) MOST IMPORTANTLY I WILL ABIDE BY THE LAW AND STAY OUT OF TROUBLE

12) I WILL ABIDE BY  ALL THE SOCIAL DISTANCING RULES AND GUIDLINES

13) ALSO I WILL BE USING MY CERTIFICATES LIKE MY FORK LIFTING TO APPLY FOR JOBS

14) I SWEAR UNDER THE PENALTY OF PERJURY TO STAY AWAY FROM WITNESSES AND CODEFANDANTS OF THIS CASE, AND THAT ALL THESE STATEMENTS ARE TRUE..

LEON GILLS 63760019
USP ALLENWOOD
PO BOX 3000
WHITE DEER, PA 17887

1)WHAT DOES YOUR BUSINESS DO?- My business does cleaning and detailing for semi trucks

2)WHAT MAKES YOUR PRODUCT OR SERVICE DIFFERENT?-My company does cleaning any time of the day like emergency cleaning and we will come to you, we are mobile.

3)WHO'S DOING THE WORK?- As of right now i will be starting cleaning trucks for bedrock express trucking that consist of 2 semi trucks that i will be cleaning only on the weekends, but as clientele grows then i will hire extra staff as needed, but it will be just me as of right now until i can complete probation successfully and do more networking..

4)WHO ARE YOUR CUSTOMERS? (Bedrock Express Trucking)... And when im able to move around more on federal probation then i will be able to be flexible and expand my business

5)HOW ARE YOU GOING TO REACH THEM? I will set up Facebook, Instagram, and other social media website to promote my business and encourage others to visit us..Also i will create flyers that i can put on semi truck around the area and also bedrock trucking will help me promote my business when time is right..

6)WHERE'S THE MONEY? The money will come from Bedrock Express Trucking the owner (James Frasier) will loan me the money to get started on the supply's and with what he is paying me i will save in order to get the supply's stacked up that i need to expand my business.

7)WHAT DOES THE FUTURE HOLD? Well the future hold, i will be able to expand my business and start a company that is really big and hopefully i will be cleaning trucks for every semi owner around the area, and one day i wish to buy a building just for my company and also expand and different city's and states

Leon Gills _Leon Gills_



7-13-21

Mark A. Goldsmith
The Federal building
600 Church St.
Flint, MI 48502

Mailed from US Penitentiary

U.S. POSTAGE PAID
MOUNT DEXN, PA
AUG 01 21
$0.00

Dean Falls 63766619
USP - Allenwood
P.O. Box 3000
White Deer,
17666

RECEIVED
Judge
JUL 29 2021
CLERK'S OFFICE
DETROIT

"Legal Mail"
RECEIVED
JUL 21 2021
U.S. DISTRICT COURT
FLINT, MICHIGAN

CERTIFIED MAIL

7004 0960 3376 5757



CERTIFIED MAIL

United States Postal Service®

United States Penitentiary Allenwood, PA 17887

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another address, please return the enclosed to the above address.