29

12-20287-8

Dear Judge Goldsmith

Please consider This case USA V. Andrew Ramsey concerning brain science, on behalf of my Compassionate release.

Thank you

Leon Gills

12-20287

---

**UNITED STATES OF AMERICA, -v- ANDREW RAMSAY, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**
**2021 U.S. Dist. LEXIS 89741**
**96-cr-1098 (JSR)**
**May 11, 2021, Decided**
**May 11, 2021, Filed**

---

**Editorial Information: Prior History**

United States v. Ramsay, 1999 U.S. App. LEXIS 3696 (2d Cir. N.Y., Mar. 5, 1999)

**Counsel**          {2021 **U.S. Dist. LEXIS 1**}For United States Of America, Plaintiff:
          Christine H. Chung, LEAD ATTORNEY, Law Office of Christine H. Chung, New York, NY.
**Judges:** JED S. RAKOFF, United States District Judge.

**CASE SUMMARY**In a motion for sentence reduction under the First Step Act, 18 U.S.C.S. §
3582(c)(1)(A)(i), inmate's youth at the time of the offense counseled against a life sentence because
inmate's decision to fire into a crowd has all the hallmarks of adolescent crime: a split-second,
hot-headed choice made in the presence of peers.

**OVERVIEW:** HOLDINGS: [1]-In a motion for sentence reduction under the First Step Act, 18 U.S.C.S. §
3582(c)(1)(A)(i), inmate's youth at the time of the offense counseled against a life sentence because
inmate's decision to fire into a crowd has all the hallmarks of adolescent crime: a split-second,
hot-headed choice made in the presence of peers; [2]-The court found that defendant's sentence of life
imprisonment was utterly inconsistent with the goals of criminal sentencing because inmate offered
compelling evidence of rehabilitation; he has not merely become a model inmate; he has become an
exemplary family member, friend, student, and employee; inmate's youth at the time of the offense, his
upbringing, and his demonstrated rehabilitation, taken together, were extraordinary circumstances that
compel a sentence reduction.

**OUTCOME:** Defendant's motion for sentence reduction granted.

**LexisNexis Headnotes**

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility,***
***Circumstances & Factors***

Congress now permits courts to grant sentence reductions in extraordinary and compelling
circumstances.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility,***
***Circumstances & Factors***

The sentence reduction remedy is sometimes colloquially referred to as compassionate release, but, as
the United States Court of Appeals for the Second Circuit explained, compassionate release is a
misnomer. The First Step Act in fact speaks of sentence reduction. A district court could, for instance,

DISHOT                                        1

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the
restrictions and terms and conditions of the Matthew Bender Master Agreement.

reduce but not eliminate a defendant's prison sentence.

**Criminal Law & Procedure > Sentencing > Imposition > Factors**
**Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Exhaustion**
**Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors**

A court evaluating a sentence reduction motion under the First Step Act  must ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C.S. § 3553(a) sentencing factors consistent with a lesser sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by the extraordinary and compelling reasons.

**Criminal Law & Procedure > Sentencing > Imposition > Factors**

A defendant's relative youth at the time of an offense may contribute to a finding of extraordinary and compelling circumstances.

**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment**
**Criminal Law & Procedure > Sentencing > Imposition > Factors**

The Eighth Amendment compels sentencing courts to consider offenders' relative youth when determining whether especially severe sentences can and should be imposed.

**Criminal Law & Procedure > Sentencing > Imposition > Factors**

The U.S. Supreme Court has held, based on the evolving standards of decency that mark the progress of a maturing society, that youth matters in sentencing.

**Criminal Law & Procedure > Sentencing > Capital Punishment > Cruel & Unusual Punishment**
**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment**

The Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense.

**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment**
**Criminal Law & Procedure > Sentencing > Alternatives > Life Imprisonment in Capital Cases**
**Criminal Law & Procedure > Juvenile Offenders > Capital Punishment**
**Criminal Law & Procedure > Juvenile Offenders > Confinement Practices**

For a juvenile offender who did not commit homicide, the Eighth Amendment forbids the sentence of life without parole.

**Criminal Law & Procedure > Sentencing > Imposition > Factors**
**Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment**
**Criminal Law & Procedure > Juvenile Offenders > Confinement Practices**

DISHOT                                        2

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

A sentencer have the ability to consider the mitigating qualities of youth, and by making youth and all that accompanies it irrelevant to imposition of the harshest prison sentence, the state's scheme poses too great a risk of disproportionate punishment.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***

In the context of sentence reductions, the factors distinguishing adults from adolescents can be usefully grouped into four traits: youthful offenders' immaturity, susceptibility, salvageability, and dependence.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***

To ascertain how sentencing courts should weigh the attributes of adolescence, which, in turn, affects how courts should consider the attributes in the context of a motion for sentence reduction under the First Step Act, the court looks not only to the general impressions provided by everyday experience, common sense, but also to the more refined and tested evidence concerning development of the adolescent brain provided by recent research and studies in neuroscience, psychology, and sociology.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***

In the context of sentence reductions, neuroscience is at a stage where it may be able to provide helpful insights to the general development of the law.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

When sentencing adolescent offenders, particularly when the offence occurred quickly in a high-paced, emotional environment, courts should bear in mind the adolescent maturity gap.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > Depraved Indifference***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***

In the context of sentence reductions, a third broad difference between juveniles and adults is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. The struggle to define their identity decreases the likelihood that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

When sentencing adolescent offenders, judges should consider the chance that their youthful character deficiencies will be reformed.

***Criminal Law & Procedure > Juvenile Offenders > Confinement Practices***
***Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors***

DISHOT

3

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In the context of sentence reductions, adolescent offenders are less culpable because they have been dependent on others for most or all of their lives. Relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment. Juveniles have less control, or less experience with control, over their own environment. As legal minors, juveniles lack the freedom that adults have to extricate themselves from a criminogenic setting.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

In the context of sentence reductions, the U.S. Supreme Court has recognized the importance of considering adolescents' dependence for decades.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Juvenile Offenders > Confinement Practices*

Congress commands that a sentencing court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C.S. § 3553(a)(1). Then, the sentencing court shall impose a sentence sufficient, but not greater than necessary, to comply with four purposes of sentencing. 18 U.S.C.S. § 3553(a). The purposes are just punishment, deterrence, incapacitation, and rehabilitation, 18 U.S.C.S. § 3553(a)(2), and youth matters to each of them. The distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*

The need for just punishment corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean their irresponsible conduct is not as morally reprehensible as that of an adult. A just punishment for an adolescent is usually less severe than a just punishment for a similarly situated adult.

Youths' immaturity, particularly in the context of hot cognition decisions made in the presence of peers, also lessens the value of deterrence because adolescents' immaturity, recklessness, and impetuosity make them less likely to consider potential punishment.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*

Congress has recognized that imprisonment is not an appropriate means of promoting correction and rehabilitation. 18 U.S.C.S. § 3582(a).

*Criminal Law & Procedure > Sentencing > Imposition > Factors*

To impose a sentence that is sufficient, but not greater than necessary, sentencing courts should generally impose lesser sentences on adolescent offenders than on similarly situated adult offenders. Courts cannot simply treat anyone over 18 as an adult for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

DISHOT                                     4

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The court must always consider the history and characteristics of the defendant, 18 U.S.C.S. § 3553(a)(1), such as adolescence, even where the court cannot draw a direct causal relationship between those characteristics and the decision to commit the offense.

In the context of sentencing, juveniles have a greater claim than adults to be forgiven for failing to escape negative influences.

A sentence of life imprisonment is rarely appropriate for adolescent offenders because juveniles still struggle to define their identity, so it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.

***Criminal Law & Procedure > Sentencing > Ranges***

The meteoric rise of mandatory minimum sentences in federal criminal law runs counter to the bedrock principle that punishment for crime should be graduated and proportioned' to both the offender and the offense.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.

***Criminal Law & Procedure > Sentencing > Alternatives > Life Imprisonment in Capital Cases***
***Criminal Law & Procedure > Sentencing > Imposition > Factors***
***Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment***

Discretionary sentencing is only a constitutional imperative in certain limited circumstances. These include sentences of death, and, for offenders under 18, sentences of life without parole. The U.S. Supreme Court generally recognize that individualized sentencing determinations are enlightened policy, and in particular, a sentencer have the ability to consider the mitigating qualities of youth.

***Criminal Law & Procedure > Sentencing > Capital Punishment > Cruel & Unusual Punishment***
***Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment***

The fundamental respect for humanity underlying the Eighth Amendment, combined with the qualitatively different sentence of death and the corresponding need to be certain that death is the appropriate punishment in a specific case, together compel the conclusion that the sentencing court must consider the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

A judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.

***Criminal Law & Procedure > Sentencing > Imposition > Factors***

DISHOT                                        5

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



*Criminal Law & Procedure > Sentencing > Ranges*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

Even when constitutional, a mandatory minimum sentences will often themselves be an extraordinary and compelling reason warranting a sentence reduction, to the extent consistent with 18 U.S.C.S. § 3553(a).

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

The First Step Act requires the court to consider whether a sentence of less than life imprisonment would be consistent with the sentencing factors articulated in 18 U.S.C.S. § 3553(a).

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

The nature and circumstances of the offense, 18 U.S.C.S. § 3553(a)(1), plainly warrant a very substantial term of imprisonment.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Court's Authority*

Congress requires the court to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C.S. § 3553(a) (6).

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

The final question presented by a sentence reduction motion is the question of nexus, whether a particular sentence reduction is both warranted by extraordinary and compelling reasons and consistent with the 18 U.S.C.S. § 3553(a) factors. The requirement comes into focus when the extraordinary and compelling reasons for a sentence reduction are time-sensitive, e.g., requests for compassionate release relating to the coronavirus pandemic, requiring the court to determine whether the 18 U.S.C.S. § 3553(a) factors permit immediate release.

**Opinion**

**Opinion by:**     JED S. RAKOFF

**Opinion**

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.

DISHOT                                              6

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Thirty years ago, **Andrew Ramsay**, then age 17, began selling drugs for the "Crotona Avenue Boys," a Bronx gang. The next year, the Crotona Avenue Boys got into a turf war with a rival gang, the "Clay Avenue Boys." A Crotona Avenue leader known as "Bigga Pong" ordered Ramsay and two others to kill the leader of the Clay Avenue Boys, Benjamin Philips.

On September 7, 1992, the three young men went to a Labor Day block party attended by Philips. Armed, they climbed to the second floor of a building within their intended victim, but Philips was surrounded by other partygoers. Nevertheless, they chose to fire into the crowd. They only grazed Philips, but they fatally wounded two bystanders, Paul Speid and Nicole Brown. Brown was pregnant; following an emergency delivery, her baby died as well.

Ramsay was convicted of murder in aid of racketeering, and this Court imposed the then-mandatory sentence of life imprisonment.

This case presents an important question. Just last{**2021 U.S. Dist. LEXIS 2**} month, eight Justices on the Supreme Court agreed that "youth matters in sentencing." Jones v. Mississippi, 141 S. Ct. 1307, [slip op.] at 8 (U.S., 2021); see id. (Sotomayor, J., dissenting), 141 S. Ct. 1307, slip op. at 9. In the instant case, however, the then-mandatory sentencing regime compelled the Court to sentence Ramsay to life imprisonment, without considering his youth. But Congress now permits courts to grant sentence reductions in "extraordinary and compelling" circumstances. Can an offender's youth, combined with society's evolving understanding of the adolescent brain, constitute such a circumstance?

The Court finds that it can. For that reason, in combination with other reasons unique to Ramsay set forth below, the Court grants Ramsay's motion for a sentence reduction and reduces his sentence from life imprisonment to a term of 360 months' imprisonment, that is, 30 years.

**FACTUAL BACKGROUND**

**A. Ramsay's Upbringing** 1

Ramsay was born in Jamaica. His twin brother died in infancy, a death his family spoke of for years. Throughout his childhood, Ramsay was shunted from home to home with little youthful guidance. His mother worked multiple jobs and was rarely around. Ramsay does not know who his father is. Over the years, Ramsay's mother introduced Ramsay to five{**2021 U.S. Dist. LEXIS 3**} different men, claiming that each was his father. He would sometimes cling to these men as male role models, but, according to Ramsay, they sometimes abused him and, in any case, they all eventually disappeared.

At age 8, Ramsay believed that his mother's then-paramour, Eral Ramsay, was his father. Ramsay would frequently stay with Eral's mother, his putative paternal grandmother, where housekeeper would watch him. According to Ramsay, the housekeeper molested Ramsay repeatedly for about a year. Ramsay further alleges that during his childhood, various caregivers subjected him to corporal punishment that sometimes turned into severe physical abuse. The housekeeper, for example, hit Ramsay with sticks and belts and made him kneel on grains of rice until they pierced his knees or he passed out. Throughout this time, Ramsay says that the woman whom he believed to be his paternal grandmother knowingly permitted the molestations and the abusive corporal punishment, sometimes participating in the latter herself. Ramsay started to run away, but when he returned, he was abused even more because he had run away.

Ramsay reports a period of relative calm around age nine, when he lived with his{**2021 U.S. Dist. LEXIS 4**} maternal grandmother. However, around that time there occurred a spate of especially severe, politically motivated violence in the Dunkirk neighborhood of Kingston, Jamaican, where they lived. Sights of dead bodies and sounds of gunshots were commonplace. Ramsay also reports

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

that he was dropped on his head around this time, though the long-term consequences of that injury, if any, are unknown.

Ramsay's family migrated to the United States when he was 10. Ramsay lived in the Bronx from that time until his arrest. In some ways, Ramsay's life improved in America. He was able to live with his two siblings, who had generally lived elsewhere in Jamaica. However, he was bullied at school and continued to lack emotional support and a male role model. His older sister tried to serve as a mother figure since their mother worked long hours to provide for them, but she was only 12.

Soon after their arrival in the U.S., Ramsay's mother told him that his father was a man named Roy, a retired special education teacher. Ramsay's mother sent Ramsay to stay with Roy during the school week; he would return home on weekends. Roy said that Ramsay had learning and reading disabilities.

Roy has now told Ramsay's{2021 U.S. Dist. LEXIS 5} mitigation specialist that, at the time Ramsay was living with him during the week, Roy genuinely believed Ramsay was his son because he had had a casual sexual relationship with Ramsay's mother when she was one of his students in Jamaica. Roy said that he accepted Ramsay as his son and tried to take care of him, eventually petitioning for custody of Ramsay, but a paternity test showed that Roy was not Ramsay's biological father.2

Ramsay reports that he felt pressure to be the man of the house, but he was bullied at school and felt unsafe in the neighborhood. A group of African American and Hispanic kids waited to assault him almost every day on his way home from school. When Ramsay was 12, his family moved to a new housing project. Ramsay struggled to relate to and feel safe around his new neighbors.

Ramsay began hanging out with a group of Jamaican men who lived a few blocks from his home. They made him feel safe and socially accepted, but they also asked him to sell drugs. He felt conflicted. Ramsay reports that he sometimes had no choice but to shelter with these men: when he stayed out, his mother would punish him by locking the door, forcing him to spend the night elsewhere. At{2021 U.S. Dist. LEXIS 6} age 13, a man put a gun in Ramsay's hand and told him to hide it; he saw an implied threat and believed that he could not refuse. Ramsay dropped out of school in ninth grade and became involved in dealing narcotics.

## B. The Offense

As developed in the trial before this Court and a jury (held in July and August 1997), Ramsay, in the summer of 1991, told an acquaintance, Orville Walsh, that he had started working with the Crotona Avenue Boys, selling marijuana on consignment for Bigga Pong. Trial Tr., Doc. No. 28, at 72, 77-78. Around a year later, on Labor Day, September 7, 1992, Ramsay, now 18 years old, happened to run into Walsh around 1:00 p.m. Walsh asked Ramsay if he planned to attend a Jamaican concert that day at Roy Wilkins Park in Queens. Id. at 78-80. Ramsay said that he did plan to go, id. at 82, but that he had to go to a Labor Day block party on Clay Avenue first "to take care of some business," id. at 81. Walsh testified that Ramsay said that the "boss g[a]ve him and his friend orders to go take care of Spoony [i.e., Philips] . . [because] Clay Avenue and Crotona Avenue got a beef going on." Id. at 80-81. Walsh understood the "boss" to be Bigga Pong. Id. at 81.

At around{2021 U.S. Dist. LEXIS 7} 11:30 p.m. that night, at the Clay Avenue block party, three men ran to the second floor of a building across the street from where Philips was standing and fired in his direction. Philips was grazed. Two bystanders, Paul Speid and Nicole Brown, were hit. Both died. Brown was pregnant, and although her baby was delivered, the baby died soon thereafter.

At the time, an eyewitness named Natasha Mattis identified Ramsay as one of the shooters. Right

DISHOT                                          8

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

after the incident, she telephoned her friend Janet Gordon and told her about it. Id. at 256, 380. According to Gordon, Mattis "saw the guys. She saw the guys and she knew them, the guys that did it. . . . I asked her who they were, and she said it was Lizard [i.e., Ramsey], Latchy and Peter." Id. at 429-30. Gordon did not recognize these names, but she testified that Mattis told her that Mattis knew Ramsay because they had attended school together. Gordon urged Mattis to go to the police, id. at 283, and Gordon anonymously called 911, id. at 432.

That night, Ramsay encountered Walsh again and told him about the shootings:

> [Ramsay said he] had never got the chance to do what they got to do [Philips]. . . . [Philips's] friends was around him,{2021 U.S. Dist. LEXIS 8} so he couldn't get the chance to do his job. So he said him and his friends fired two shots up in the air, the crowd opens, figured [Philips] would be left by himself. [Philips] end up running, he said, so he had start[ed to] fire shots in the crowd after [Philips] . . . . [Ramsay] said people got hit but he don't know who was hit.Id. at 84-85.

Approximately one week after the murders, Mattis and Gordon met with a prosecutor. Id. at 284, 435-36. Two months later, Mattis signed a detailed statement for Detective O'Brien of the New York City Police Department that described the shooting and identified Ramsay as one of the shooters. In January 1993, Mattis testified consistently with that statement to a Bronx County grand jury. Id. at 297.

### C. Procedural Background

New York City Police Department officers arrested Ramsay for these murders on January 4, 1993. In November 1996, a further state court proceeding took place. At that proceeding, Mattis recanted. Id. at 296-97. Around that time, on November 21, 1996, Ramsay was transferred to federal custody.

The federal case proceeded to a jury trial. When Mattis was called to testify before this Court, she equivocated. She testified that she saw{2021 U.S. Dist. LEXIS 9} the men run to the second floor and shoot into the crowd, but claimed she did not remember their identities or even remember identifying Ramsay to the prosecution shortly after the shooting. Mattis's prior written statement to Detective O'Brien was read into evidence. Id. at 294. Her grand jury testimony was also admitted into evidence. Id. at 511-12. Gordon testified about the phone call from Mattis, and she further testified that Mattis told her that Mattis had recanted because she was terrified of Ramsey and his gang. Id. at 441-42. Walsh also testified about Ramsay's admissions to him. E.g., id. at 84-85. The jury convicted Ramsay of murder in aid of racketeering, and the conviction was affirmed on appeal. Mandate, Doc. No. 34 (Apr. 1, 1999).

When this Court pronounced sentence in January 1998, the United States Sentencing Guidelines were mandatory and required a sentence of life imprisonment. This Court recognized that the crime was heinous and that a substantial sentence of imprisonment was warranted. Even so, the Court expressed doubts about the mandatory life sentence. The Court reasoned,

> I can't totally escape the notion that on all the facts and circumstances of this case,{2021 U.S. Dist. LEXIS 10} extreme though they be in terms of the awfulness of what Mr. Ramsey did, that society as a whole is not entirely well served by adding, in effect, a fourth removal from the everyday world to the three who were so brutally taken away from this world.Sentencing Tr., Doc. No. 32, at 4. Nevertheless, because the Court found that "it would be an absolute flat derogation of duty on my part not to impose the law as the law is written," the Court sentenced Ramsay to life imprisonment. Id.

### D. Rehabilitation

DISHOT                                                                                    9

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Ramsay has now spent most of his life behind bars. During Ramsay's early years in prison, he was involved in serious incidents, including snorting heroin, participating in a fistfight, and slicing an inmate with a razor blade. However, as the Government concedes, "Ramsay's disciplinary records do not show similar infractions since 2006." Gov't Opp. to Sentence Reduction Mot., Doc. No. 67 ("Opp."), at 7.

In fact, the evidence before the Court shows much more than an inmate who avoided trouble over the past fifteen years or so; it shows a man who matured in prison. Ramsay's current girlfriend, Colleen Thompson, who has known him since childhood, says that she observed a change in Ramsay around{2021 U.S. Dist. LEXIS 11} 2009, which she attributes to a religious conversion. Ramsay is now a born-again Christian. From the small sum of money he earns from his work in prison, he donates to Colleen's church, and he has also contributed to the purchase of clothes and other items to be sent to a church in Jamaica, so that the items can be donated to the poor.3

Many family members and friends submitted letters describing Ramsay's maturation. Ramsay's older sister, Ann Marie Bendigo, describes Ramsay as a supportive brother who, after their family's immigration to New York, was lured by the influence of crime and drugs in the community. Since his incarceration, however, she observes that he "has shown a great depth of growth." Doc. No. 63-1, at 2. Ramsay's younger brother, Marlon Reid, echoes that sentiment. He writes that Ramsay was like a father to him growing up and that, even from prison, Ramsay has offered him emotional support:

> He made sure I graduated from high school. The first time I battled depression and suicidal thoughts because [of] the death of my son when I was 18 years old, he was there for me. He helped me to stay positive and he would read me Bible scriptures . . . I watch[ed] **Andrew Ramsay** mature{2021 U.S. Dist. LEXIS 12} and change so much during the time he has been away.Id. at 3-5; see also, e.g., Doc. No. 64-1, at 5 (close friend since childhood observing that Ramsay "has developed a deeper sense of self since he has been away").

A second theme apparent in many letters to the Court is that Ramsay has given helpful advice to parents raising children. His girlfriend Colleen says that Ramsay has supported her emotionally and counseled her while she raises her son as a single mother. Sharon Brown, a friend who has known Ramsay for more than 30 years, says "he has always been there for me and especially my son." Id. at 3. She adds that Ramsay "was able to instill great values in my son's life that he now uses. He helped me raise my son into a great young man while I was a single mother." Id.; see also, e.g., Doc. No. 63-1, at 5 (Ramsay's brother reporting that "[h]e has worked on himself a lot and I can honestly say he is such a positive influence in me and my kids['] lives").

The evidence before the Court also demonstrates that Ramsay has bettered himself in prison through employment and education. During the past 10 to 15 years, Ramsay has taken advantage of hundreds of hours of BOP programming: work-related{2021 U.S. Dist. LEXIS 13} classes like "alternative building practices" and "forklift operations"; self-improvement classes like "drug abuse education," "alternatives to violence," "managing cancer risk," and "leadership in faith and education"; and fitness and recreational classes like "yoga." Ramsay has worked hard at several BOP jobs, securing promotions for excellence. E.g., id. at 42. ("Inmate Ramsay has shown promise of a hard worker and leadership skills and has earned a promotion to an area of the factory which requires these traits."). Sharon Brown, a friend who has known Ramsay for more than 30 years, wrote of "the joy in his voice when he discusses his job and learning how to drive a forklift on his new job." Doc. No. 64-1, at 3.

Ramsay is still "haunted by the deaths" of Speid, Brown, and her infant, but he submits that the decades he has served in prison are "adequate punishment for such a serious crime." Supp. Mot. for

DISHOT                                                        10

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Sentence Reduction, Doc. No. 61, at 18-19; see also Pro Se Mot. for Sentence Reduction and Appointment of Counsel, Doc. No. 59.

**LEGAL BACKGROUND**

Ramsay moves for a sentence reduction under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), which provides:

> [T]he court, . . . upon motion of the defendant after the{**2021 U.S. Dist. LEXIS 14**} defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction.

This remedy is sometimes colloquially referred to as "compassionate release," but, as the Second Circuit has explained, "compassionate release is a misnomer. [The First Step Act] in fact speaks of sentence reduction. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . " United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020). And this Court has done so on several occasions.4

A Court evaluating a sentence reduction motion under this statute must ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser sentence than that{**2021 U.S. Dist. LEXIS 15**} previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by the extraordinary and compelling reasons?

Before the Court can answer these questions in this case, however, the Court will address a background legal question. In evaluating this motion, how, if at all, should the Court consider Ramsay's relative youth at the time of the underlying offense and at the time of sentencing?

Many courts have mentioned in passing that a defendant's relative youth at the time of an offense may contribute to a finding of extraordinary and compelling circumstances.5 But this Court is unaware of any prior case addressing how and why an offender's youth matters to the § 3582(c)(1)(A)(i) inquiry. Given the importance of this issue to this case, however, the Court will consider it in some detail.

First, the Court looks to a related body of case law, in which the Supreme Court has recognized that the Eighth Amendment compels sentencing courts to consider offenders' relative youth when determining whether especially severe sentences can and should be imposed. Those cases directly apply only to minors under the ages of 16 or 18, and Ramsay was 18 at the time of{**2021 U.S. Dist. LEXIS 16**} this offense, so they do not control. Nevertheless, they offer a useful starting point by demonstrating the Supreme Court's approach to adolescent crime.

Next, the Court considers four attributes of adolescence that the Supreme Court has identified as warranting special consideration in criminal sentencing. In this regard, the Court consults recent neuroscientific, psychological, and sociological evidence regarding the adolescent brain.

Finally, given the purposes of criminal sentencing, the Court considers why and how these attributes of adolescence should influence sentences for young offenders like Ramsay.

**A. "Youth Matters in Sentencing."**

In several cases since the 1980s, the Supreme Court has held, based on "the evolving standards of

DISHOT                                                 11

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



decency that mark the progress of a maturing society," <u>Roper v. Simmons</u>, 543 U.S. 551, 561, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 100-101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)), that "youth matters in sentencing." <u>Jones v. Mississippi</u>, 141 S. Ct. 1307, slip op. at 8 (U.S. 2021).

The first such cases concerned the death penalty. In <u>Thompson v. Oklahoma</u>, a four-Justice plurality concluded that "the Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense." 487 U.S. 815, 838, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (plurality).6 After surveying state laws, the plurality found that a national consensus prohibited execution{2021 U.S. Dist. LEXIS 17} for a crime committed before age 16. It also engaged in its own analysis of the differences between adolescents and adults and concluded that "less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult." <u>Id.</u> at 835. The plurality relied largely on everyday experience to inform its judgments regarding the adolescent brain.7

In <u>Roper v. Simmons</u>, a majority of the Court adopted and expanded the view of the <u>Thompson</u> plurality. 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). "[I]n the exercise of [its] own independent judgment," <u>id.</u> at 564, the Court identified factors that distinguish juvenile offenders from adult offenders. The <u>Roper</u> Court again relied on everyday experience, but it also cited recent developments in the psychological and sociological literature that helped explain adolescent impulsivity and the like. The Court concluded that "the death penalty is disproportionate punishment for offenders under 18." <u>Id.</u> at 575.

Next, the Court extended that principle beyond the death penalty, holding that "for a juvenile offender who did not commit homicide[,] the Eighth Amendment forbids the sentence of life without parole." <u>Graham v. Florida</u>, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). The Court relied on "developments in psychology and brain science [that] continue to show fundamental{2021 U.S. Dist. LEXIS 18} differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." <u>Id.</u> at 68.

Two years later, the Court struck down a state law requiring judges to impose sentences of life imprisonment without the possibility of parole on defendants who committed homicides before age 18. <u>Miller v. Alabama</u>, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The Court "insisted . . . that a sentencer have the ability to consider the 'mitigating qualities of youth,'" <u>id.</u> at 475 (quoting <u>Johnson v. Texas</u>, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)), and held that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, [Alabama's] scheme poses too great a risk of disproportionate punishment," <u>id.</u> at 479.

<u>Thompson, Roper, Graham</u>, and <u>Miller</u> each relied on factors distinguishing adults from adolescents. Those factors can be usefully grouped into four traits: youthful offenders' immaturity,8 susceptibility,9 salvageability,10 and dependence.11

**B. <u>Attributes of Adolescence That Matter in Sentencing</u>**

To ascertain how sentencing courts should weigh these attributes of adolescence -- which, in turn, affects how courts should consider these attributes in the context of a motion for sentence reduction under the First{2021 U.S. Dist. LEXIS 19} Step Act -- this Court, like the Supreme Court, looks not only to the general impressions provided by everyday experience ("common sense") but also to the more refined and tested evidence concerning development of the adolescent brain provided by recent research and studies in neuroscience, psychology, and sociology.

In doing so, the Court proceeds with caution. As this Court recently wrote elsewhere, "[c]ognitive neuroscience is still in its infancy and much of what has so far emerged that might be relevant to the

DISHOT

**12**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



law consists largely of hypotheses that are far from certainties." Jed S. Rakoff, Why the Innocent Plead Guilty and the Guilty Go Free and Other Paradoxes of Our Broken Legal System 72 (2021); see generally id. Ch. 6 (offering examples of "dire results" that have followed the legal system's overly eager reliance on "brain science," including eugenics, lobotomies, and "recovered" memories). History counsels hesitancy, especially when brain science is offered as "evidence about individuals in particular cases." Id. at 82. Still, "neuroscience is at a stage where it may be able to provide helpful insights to the general development of the law." Id. And the developments in neuroscience,{2021 U.S. Dist. LEXIS 20} psychology, and sociology described below have sufficient rigor as to render them useful in determining how adolescence should impact sentencing in general.

1. Immaturity

The first hallmark of adolescence that sentencing courts should consider is adolescents' immaturity. The Supreme Court, as mentioned, has taken note of this simply as a matter of everyday experience. "A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569 (quoting Johnson, 509 U.S. at 367) (internal quotation marks and citation omitted).

But neuroscience and psychology have given us a more refined explanation for this phenomenon, and one that bears on the sentencing of someone over 18. The prevailing neuroscientific explanation for adolescents' immaturity begins with the fact that "[t]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."{2021 U.S. Dist. LEXIS 21}12 Children's brains have a proliferation of neural connections ("dendritic overproduction").13 Then, beginning around age 11 to 12, "rarely used connections are selectively pruned[,] making the brain more efficient."14 This increase in efficiency "progresses from the back to the front of the brain"; "[e]vidence suggests that, in the prefrontal cortex," the area responsible for "executive functions," the process is not complete "until the early 20s or later. "15

Given this understanding of the adolescent brain, scholars have begun to speak less of the outright "immaturity" of adolescents and more of a "maturity gap."16 They point out that the back-to-front process of neural pruning causes two overarching sets of cognitive "systems" to develop on different schedules.17

The first system is "cognitive capacity -- the basic cognitive processes supporting{2021 U.S. Dist. LEXIS 22} the ability to reason logically."18 This system more or less "matures by 16."19 For example, a team of scholars conducted a bevy of tests to measure the cognitive capacity of 5,227 subjects, ages 10-30, from eleven countries across five continents.20 They found that cognitive capacity improved from age 10 to age 16 but showed "little change after age 16."21

The second of the two "dual systems" is "psychosocial maturity -- the capacity to exercise self-restraint[,] especially in emotionally-arousing contexts."22 This system continues to mature throughout the teens and into the twenties. For example, in the aforementioned 5,227-subject study, researchers conducted a variety of tests to measure psychosocial maturity.23 The tests included a self-report questionnaire to measure resistance to peer influence,24 a gambling game to measure reward seeking and loss aversion,25 a puzzle-solving game to measure impulsivity,26 a simulated driving game to measure reward seeking and risk tolerance,27 and an interactive questionnaire to measure orientation toward the future.28 Based on subjects' performance on these tasks, the researchers concluded that psychosocial maturity increases over time{2021 U.S. Dist. LEXIS 23} from 10 to 30 years of age.29 The authors' findings are consistent with other studies.30

DISHOT                                                                            13

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The upshot of this "maturity gap" is that adolescent decision making is situationally dependent. When it comes to academic or deliberative decisions ("cold cognition"), adolescents 16 and older reason about as well as adults.31 On the other hand, in high-pressure, time-sensitive, emotional contexts ("hot cognition"), adolescents tend to make riskier decisions.32 When sentencing adolescent offenders -- particularly when the offence occurred quickly in a high-paced, emotional environment -- courts should bear in mind the adolescent "maturity gap."

2. Susceptibility

The Supreme Court, as noted, has also mentioned a second "area{2021 U.S. Dist. LEXIS 24} of difference [between juveniles and adults] is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Roper, 543 U.S. at 569. Indeed, "[o]ne of the hallmarks of adolescent risk taking is that it is much more likely than that of adults to occur in the presence of peers, as evidenced in studies of reckless driving, substance abuse, and crime."33

Here again, however, recent studies in neuroscience and psychology provide a more refined understanding of how and when this occurs. To begin with, a large body of research shows that this susceptibility is a transitory, age-linked phenomenon, and emerging neuroscientific research may have begun to pinpoint the brain regions responsible for it. Just as scholars believe that adolescents' immaturity reflects the "gap" between two cognitive systems developing on different schedules, "[m]any research groups have posited that adolescents' relatively greater propensity toward risky behavior," especially in the presence of peers,

> reflects the joint contributions of two brain systems that affect decision-making: (i) an{2021 U.S. Dist. LEXIS 25} *incentive processing system* . . ., which biases decision-making based on the valuation and prediction of potential rewards and punishments; and (ii) a *cognitive control* system, . . ., which supports goal-directed decisionmaking by keeping impulses in check and by providing the mental machinery needed for deliberation regarding alternative choices.34Neuroimaging studies show that "impulsive or risky choices often coincide[e] with the increased engagement of [the former] and the decreased involvement of [the latter]."35 And the presence of peers exacerbates that effect.36

Adolescents' temporarily heightened susceptibility to peer pressure may be attributable, in part, to the "dramatic remodeling" undergone by the incentive processing system "in early adolescence."37 "[C]hanges in the mesocorticolimbic dopamine system result in heightened sensitivity to rewards," and adolescents' sensitivity to rewards "correlate[s] with adolescents' self-reported risk taking."38

A 2011 publication illustrates{2021 U.S. Dist. LEXIS 26} how these brain regions may contribute to adolescent susceptibility to peer pressure. The article reports the results of functional magnetic resonance imaging ("fMRI") studies on 40 subjects, ages 14-29, who signed up to participate in groups. While the participants were receiving fMRI scans (which measure brain activity by detecting changes in blood flow), they were performing the "Stoplight task," a computer game in which participants aim to complete a racecourse as quickly as possible. Participants may press their luck by running a yellow light, perhaps letting them finish more quickly but sometimes causing a crash. Some subjects performed the task alone; others were observed by, and interacted with, their peers.

The researchers found that older subjects showed greater activation in the cognitive control regions.39 The authors inferred that adults were exhibiting "a greater reliance on a deliberative strategy to guide decision-making."40 On the other hand, the level of brain activity in subjects' incentive processing regions was comparable for all participants as long as they were alone. When peers were present, however, adolescents aged 14-18 years (and only that group) exhibited

DISHOT                                    14

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

"significantly{2021 U.S. Dist. LEXIS 27} greater . . . activation" in the incentive processing system.41

This differential activation corresponded with a real-world difference in behaviors: adolescents (and only adolescents) "took significantly more risks when observed by peers than when alone."42 The authors concluded that "th[e] age difference in reward system activity was dependent on social context, consistent with the hypothesis that the presence of peers differentially sensitizes adolescents to the reward value of risky choices."43 These results are consistent with other research.44

It is important to remember that none of these studies is dispositive; but they do suggest a biological basis for adolescents' temporarily increased susceptibility to peer influence, and one that continues until at least age 18. Some have even speculated that this susceptibility serves a valuable evolutionary role.45 But, without going that far, the basic point is that courts, when sentencing adolescent offenders and particularly when the criminal act took place in the presence of peers, should keep in mind adolescents' temporarily{2021 U.S. Dist. LEXIS 28} enhanced susceptibility to peer influence.

### 3. Salvageability

The Supreme Court has noted that a "third broad difference [between juveniles and adults] is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." Roper, 543 U.S. at 570. This "struggle to define their identity" decreases the likelihood "that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." Id.

Respected social science studies support this conclusion. "[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." Id. at 569 (internal quotation marks omitted). This includes crime. Indeed, based on "rigorous self-report studies," entirely "refrain[ing] from crime during adolescence" is "statistically aberrant."46

On the other hand, "the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they mature[.]"47 This holds true even in especially severe cases. Even "most individuals identified as psychopaths at age 13 will not receive such a diagnosis" as adults.48 Nor{2021 U.S. Dist. LEXIS 29} should judges believe that they can predict which offenders will recidivate; even experts cannot reliably do so.49

For these reasons, when sentencing adolescent offenders, judges should consider the chance that their youthful "character deficiencies will be reformed." Graham, 560 U.S. at 68 (internal quotation marks omitted).

### 4. Dependence

Finally, the Supreme Court has explained that adolescent offenders are less culpable because they have been dependent on others for most or all of their lives. Therefore, relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment. Roper, 543 U.S. at 569. ("[J]uveniles have less control, or less experience with control, over their own environment. '[A]s legal minors, [juveniles] lack the freedom that{2021 U.S. Dist. LEXIS 30} adults have to extricate themselves from a criminogenic setting.'") (quoting Steinberg & Scott, supra n.47, at 1014) (cleaned up).

Adolescents' dependence is an obvious legal and biological fact, less tied to recent psychological and neuroscientific research, but no less important. Indeed, the Supreme Court has recognized the importance of considering adolescents' dependence for decades. See Eddings v. Oklahoma, 455

DISHOT                                           15

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (overturning mandatory death sentence for juvenile offender because "when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant").

C. Why Youth Matters in Sentencing

How should courts' understanding of adolescence and adolescent cognition affect sentencing? First and foremost, Congress commands that a sentencing court "shall consider --(1) the nature and circumstances of the offense <u>and the history and characteristics of the defendant.</u>" 18 U.S.C. § 3553(a)(1) (emphasis supplied). Then, the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with" four purposes of sentencing. 18 U.S.C. § 3553(a). These purposes are "just punishment," deterrence, incapacitation, and rehabilitation,**{2021 U.S. Dist. LEXIS 31}** <u>see</u> 18 U.S.C. § 3553(a)(2), and youth matters to each of them. <u>See Miller</u>, 567 U.S. at 472 ("[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.").

The need for "just punishment" corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." <u>Roper</u>, 543 U.S. at 570 (internal quotation marks omitted). Thus, a "just punishment" for an adolescent is usually less severe than a "just punishment" for a similarly situated adult.

Youths' immaturity -- particularly in the context of "hot cognition" decisions made in the presence of peers -- also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment." <u>Miller</u>, 567 U.S. at 472.

The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary**{2021 U.S. Dist. LEXIS 32}** inadequacies of the adolescent brain.

Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

For all these reasons, to impose a sentence that is "sufficient, but not greater than necessary," sentencing courts should generally impose lesser sentences on adolescent offenders than on similarly situated adult offenders. And this also means that courts cannot simply treat anyone over 18 as an "adult" for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent.

**ANALYSIS**

Bearing in mind these principles about adolescent crime, the Court now turns to Ramsay's motion for a sentence reduction.

**I. Administrative Exhaustion**

Ramsay requested compassionate release from the Warden of FCI Schuylkill, the request has not been granted, and more than 30 days have passed since he made**{2021 U.S. Dist. LEXIS 33}** the request. Therefore, as the Government concedes, Ramsay has satisfied the administrative

DISHOT                                   16

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



exhaustion requirement. <u>See</u> 18 U.S.C. § 3582(c)(1)(A)(i).

## II. <u>Extraordinary and Compelling Reasons</u>

Ramsay argues that several extraordinary and compelling reasons warrant a sentence reduction, including (1) Ramsay's youth at the time of the offense, (2) his upbringing, (3) evidence of rehabilitation, and (4) the fact that the Court could not consider Ramsay's individual circumstances when Ramsay was initially sentenced. The Court considers each of these factors in turn.

### A. Ramsay's Youth

Ramsay's youth is highly relevant to the Court's understanding of his offense and the Court's measurement of that offense's blameworthiness. The Court has discussed at length why adolescent crime generally merits lesser punishment. These reasons apply to Ramsay's offense, which he committed at the age of 18 and which might well be attributable, in some part, to limitations of the adolescent brain.

In that respect, the Court notes that this crime contained elements of "hot cognition." The Government suggests that Ramsay's offense evinced indifference to human life because he wantonly fired into a crowd, killing bystanders. But Ramsay's decision{2021 U.S. Dist. LEXIS 34} to fire into a crowd has all the hallmarks of adolescent crime: a split-second, hot-headed choice made in the presence of peers.50

On the other hand, this observation has its limits; Ramsay's choice to commit murder also contained elements of "cold cognition." After Bigga Pong ordered the hit, Ramsay had opportunities, including outside the presence of peers, to decide what to do. He chose to go to that Labor Day party to kill Philips, and that decision merits substantial punishment. Still, while that cooler-headed decision to head to the Labor Day party to kill Philips was undeniably terrible, it only contemplated a single rival dealer's death, not multiple deaths of chance partygoers.

In sum, Ramsay's wanton choice to fire into a crowd cries out for heightened punishment, but that cry is muted somewhat by an understanding of the developing brain. "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult." <u>Roper</u>, 543 U.S. at 570. Viewed in that light, Ramsay's youth at the time of the offense counsels against a life sentence.

### B. Ramsay's Upbringing

Ramsay's upbringing is similarly relevant. Subjected to a history of childhood abuse and neglect, he had less capacity{2021 U.S. Dist. LEXIS 35} than many to resist invitations to criminal activity. <u>See</u> <u>supra</u> Factual Background Part B (describing Ramsay's upbringing). He was victimized and desensitized to violence at an early age. The few responsible adults in his life, struggling to provide him and his siblings with necessities, largely failed to provide him with crucial emotional support, structure, and guidance. Sadly, he found in a drug trafficking gang a bastardized version of the support system his family should have offered.

The Government, for its part, concedes that Ramsay had a difficult upbringing but argues that, unfortunately, so do many others. The Government maintains that what is extraordinary about Ramsay is not his upbringing but rather the fact that, unlike many others in similarly challenging circumstances, he chose to commit heinous murder. The Government is, of course, correct that 18 years of abuse and neglect do not justify Ramsay's crime. Nevertheless, Ramsay's upbringing, like his youth more generally, calls into grave doubt a life sentence. After all, "juveniles have a greater claim than adults to be forgiven for failing to escape negative influences[.]" <u>Roper</u>, 543 U.S. at 570.

### C. Ramsay's Rehabilitation

DISHOT                                               17

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Perhaps the most{2021 U.S. Dist. LEXIS 36} important reason that adolescent crime merits less punishment is that "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." (internal quotation marks omitted). As previously noted, Congress has identified rehabilitation as one of the rationales of criminal sentencing; a sentence of life imprisonment negates that rationale. Such a sentence is therefore rarely appropriate for adolescent offenders because "juveniles still struggle to define their identity[,] [so] it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." Id.

It is all the more important for <u>federal</u> courts to recognize the salvageability of adolescent offenders because (with very limited exceptions not applicable here) the federal criminal justice system no longer permits parole. Judge Newman masterfully described the drastic unforeseen consequences of that decision in <u>United States v. Portillo</u>, 981 F.3d 181 (2d Cir. 2020). Throughout most of the twentieth century, parole boards could release offenders who had served at least one-third of their sentences, "reduc[ing] the duration of imprisonment by{2021 U.S. Dist. LEXIS 37} a substantial amount and reflect [ing] an aggregate assessment of not only the prisoner's conduct in prison but also his or her prospects for leading a law-abiding life upon release." Id. at 185. But in the 1980s, "[t]hose advocating what was considered sentencing reform joined forces with those favoring increased severity of sentences, and both sides found common ground in the concept of a system of sentencing guidelines, designed to reduce sentencing disparity." Id. at 186 (footnote omitted). As a corollary, Congress effectively "eliminated parole." Id.

Because many states still have parole, that change did not produce, as advertised, overall "truth in sentencing," but it did substantially lengthen federal criminal sentences. And now, even an offender who "demonstrate[s] . . . that he has matured beyond the seemingly incorrigible person of his youth," id. at 187, will have no chance to show his rehabilitation to a parole board.

Ramsay is just such an offender. He offers compelling evidence of rehabilitation. <u>See supra</u> Factual Background Part C. He has not merely become a model inmate; he has become an exemplary family member, friend, student, and employee. Ramsay has spent decades behind bars without any reason{2021 U.S. Dist. LEXIS 38} to expect that he would be released. Nevertheless, he has matured. He offers emotional support to his family and friends, excels in his employment, takes advantage of opportunities to learn new skills, and donates to charity.

For all these reasons, the Court finds that Ramsay's sentence of life imprisonment is utterly inconsistent with the goals of criminal sentencing. Ramsay's youth at the time of the offense, his upbringing, and his demonstrated rehabilitation, taken together, are extraordinary circumstances that compel a sentence reduction.

D. <u>The Mandatory Nature of the Sentence</u>

The Court would find extraordinary and compelling reasons for a sentence reduction even if it had sentenced Ramsay to life imprisonment as a matter of discretion. But these extraordinary circumstances are all the more compelling because, when the Court previously imposed its sentence, it had no choice in the matter.

The meteoric rise of mandatory minimum sentences in federal criminal law runs counter to the bedrock principle that "'punishment for crime should be graduated and proportioned' to both the offender and the offense." <u>Miller</u>, 567 U.S. at 469 (quoting <u>Roper</u>, 543 U.S. at 560). To be sure, mandatory sentencing regimes were once commonplace. See{2021 U.S. Dist. LEXIS 39} <u>Woodson v. North Carolina</u>, 428 U.S. 280, 290, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (controlling plurality opinion of Stewart, J.) (noting the "problem posed by the not infrequent refusal of juries to convict

DISHOT                                                                                      **18**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



murderers rather than subject them to automatic death sentences").51 But that practice long ago fell from favor. Id. at 296-97 (quoting Williams v. New York, 337 U.S. 241, 247, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949)) ("The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender."). Instead, throughout the last century, courts have observed that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55, 58 S. Ct. 59, 82 L. Ed. 43 (1937).

The Supreme Court has held that discretionary sentencing is only "a constitutional imperative" in certain limited circumstances. Woodson, 428 U.S. at 304. These include sentences of death,52 and, for offenders under 18, sentences of life without parole.53 Nevertheless, the Supreme Court has generally recognized that individualized sentencing determinations are "enlightened policy,"{**2021 U.S. Dist. LEXIS 40**} Woodson, 428 U.S. at 304, and, in particular, the Court has "insisted . . . that a sentencer have the ability to consider the mitigating qualities of youth." Miller, 567 U.S. at 475.

Requiring a court to impose a mandatory minimum sentence on an adolescent offender -- especially a substantial minimum, like life without parole -- directly contravenes these principles. Therefore, even when constitutional, such mandatory minimum sentences will often themselves be an extraordinary and compelling reason warranting a sentence reduction, to the extent consistent with § 3553(a).

This reasoning applies fully to the case at bar. The mandatory life sentence weighed heavily on the Court at sentencing because the Court recognized that the sentence was likely greater than necessary to satisfy the purposes of criminal sentencing:

> Despite the very serious nature of the offense here involved that resulted in the wanton murder of three persons, and despite the obvious need in such circumstances for a very severe sentence, both to punish the defendant for this terrible deed and to deter others, the Court, like many other courts, is not entirely comfortable with the fact that the sentencing guidelines leave no meaningful discretion in this situation. . .{**2021 U.S. Dist. LEXIS 41**} . The need for a very severe sentence is obvious. What is not so obvious is that a determination by the Sentencing Commission that a 24-year-old person who, on the record before the Court, is not without promise of salvageability as a responsible person, is in effect determined to be someone whom society will forever remove from its everyday affairs.

> I can't totally escape the notion that on all the facts and circumstances of this case, extreme though they be in terms of the awfulness of what Mr. Ramsey did, that society as a whole is not entirely well served by adding, in effect, a fourth removal from the everyday world to the three who were so brutally taken away from this world. . . . I make these remarks only for whatever small benefit they might have to the Sentencing Commission in future cases . . . . Were there any discretion to impose less than a life imprisonment term, I would have seriously considered that . . . .Sentencing Tr. 4-7.

To be sure, Ramsay was a legal adult of 18 when he murdered Speid, Brown, and her infant, so the mandatory life sentence did not violate the Eighth Amendment, as currently construed. But the fact that the Court was precluded from "tak[ing] into account the circumstances{**2021 U.S. Dist. LEXIS 42**} of the offense together with the character and propensities of the offender," Sullivan, 302 U.S. at 55, including Ramsay's youth, was in obvious conflict with the Court's usual duty to ensure that punishments are "no greater than necessary" to satisfy the purposes of criminal sentencing.

DISHOT                                     **19**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Therefore, the Court finds that the mandatory nature of Ramsay's sentence is an additional extraordinary and compelling reason warranting a sentence reduction, to the extent consistent with § 3553(a).

### III. The § 3553(a) Factors

The First Step Act next requires this Court to consider whether a sentence of less than life imprisonment would be consistent with the sentencing factors articulated in § 3553(a). Here, this analysis largely overlaps with the extraordinary and compelling circumstances inquiry already conducted.

"[T]he nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), plainly warrant a very substantial term of imprisonment. As the Government argues, Ramsay and his co-conspirators acted "[w]ith murder on their minds and indifferent to the safety of everyone else at the party." See Opp. 8. Murdering a rival gang member is a serious crime in its own right, but the offense here was "notably more heinous," id., because Ramsay and his co-conspirators wantonly{2021 U.S. Dist. LEXIS 43} endangered the lives of all the innocent bystanders at the block party, killing three people and tearing a hole in the fabric of their community that can never fully be repaired. Even today, the applicable Guidelines range for this crime is still life imprisonment. U.S.S.G. §§ 2E1.3, 2A1.1; see 18 U.S.C. § 3553(a)(4) (requiring the Court to consider the now-advisory Guidelines). It is, however, no longer binding on the Court. United States v. Booker, 543 U.S. 220, 245, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005) ("[T]he provision of the federal sentencing statute that makes the Guidelines mandatory [is] incompatible with today's constitutional holding. We conclude that this provision must be severed and excised . . . . So modified, the federal sentencing statute makes the Guidelines effectively advisory.") (citations omitted).

On the other hand, for reasons already stated, "the history and characteristics of the defendant," 18 U.S.C. § 3553(a) (1), including especially his youth at the time of the offense, his upbringing, and his evidence of rehabilitation, strongly contraindicate a sentence of life imprisonment.

Moreover, Congress requires the Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. § 3553(a) (6). Ramsay committed these murders with two other men, each{2021 U.S. Dist. LEXIS 44} of whom was convicted in state court. But New York, unlike the federal government, retains a system of parole, and both of the other shooters have, in fact, been paroled. Ramsay, meanwhile, is less than fifty years old; if this motion were denied, he could expect to live decades more behind bars. The Court sees no reasonable basis for such an extreme sentencing disparity.

For all these reasons, a sentence of less than life imprisonment is consistent with the § 3553(a) factors.

### IV. Nexus

The final question presented by a sentence reduction motion is the question of nexus -- whether a particular sentence reduction is both warranted by extraordinary and compelling reasons and consistent with the § 3553(a) factors. This requirement comes into focus when the extraordinary and compelling reasons for a sentence reduction are time-sensitive (e.g., requests for compassionate release relating to the coronavirus pandemic), requiring the Court to determine whether the § 3553(a) factors permit immediate release. Here, however, none of the extraordinary and compelling circumstances is time-bound, so this requirement is easily met.

Finally, how much of a reduction these circumstances warrant is, as sentencing always should be,{2021 U.S. Dist. LEXIS 45} a holistic inquiry, not subject to any prescribed calculation. Weighing

DISHOT                                              20

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

all the evidence and arguments offered by both sides, the Court concludes that the extraordinary and compelling circumstances in this case warrant a reduction of sentence to a term of 360 months, i.e., 30 years. The Court also concludes that such a sentence is consistent with the § 3553(a) factors; in other words, if the Court had been able to make an individualized sentencing determination in 1998, but with the benefit of modern scientific understanding and with full foresight of Ramsay's rehabilitation, the Court would have found that a sentence of 360 months' imprisonment was sufficient to comply with the purposes of criminal sentencing.

For the foregoing reasons, Ramsay's motion for a sentence reduction is granted, and his sentence is modified to reduce the term of imprisonment from life to 360 months. All other aspects of his sentence remain in full force and effect.

SO ORDERED.

Dated: New York, NY

May 11, 2021

/s/ Jed S. Rakoff

JED S. RAKOFF, U.S.D.J.

## Footnotes

1

The Court authorized Ramsay's counsel to retain a mitigation specialist, Conrad Lindo, LMSW-R. Lindo prepared a detailed narrative of Ramsay's life based on documentary evidence and interviews with many of Ramsay's friends, family members, and acquaintances. Ltr. to Kenneth Montgomery from Conrad Lindo, Doc. No. 62-1. The Government does not dispute the report. For purposes of this motion, the Court credits it, unless otherwise noted.

2

Ramsay alleges that Roy molested him for years and that another man living with Roy also molested Ramsay. Roy denies the allegations of abuse. The Court need not resolve this dispute for purposes of this motion.

3

Colleen writes that she is open to marrying Ramsay one day, if he is released, and would help him reintegrate into society. Doc. No. 63-1, at 1.

4

E.g., United States v. Cabrera, No. 10 CR. 94 (JSR), 2021 U.S. Dist. LEXIS 63713, 2021 WL 1207382, at *1 (S.D.N.Y. Mar. 31, 2021); United States v. Henareh, 486 F. Supp. 3d 744, 747 (S.D.N.Y. 2021); United States v. Garcia, No. 11 CR. 989 (JSR), 2020 U.S. Dist. LEXIS 230236, 2020 WL 7212962 (S.D.N.Y. Dec. 8, 2020); United States v. Rodriguez, 492 F. Supp. 3d 306, 2020 WL 5810161 (S.D.N.Y. 2020).

5

See, e.g., Brooker, 976 F.3d at 238 ("Zullo's age at the time of his crime[, between 17 and 20,] . . . might perhaps weigh in favor of a sentence reduction."); United States v. McCoy, 981 F.3d 271, 286 (4th Cir. 2020) ("[T]he courts [below] focused on the defendants' relative youth -- from 19 to 24 years old -- at the time of their offenses, a factor that many courts have found relevant under §

DISHOT                                    21

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



3582(c)(1)(A)(i)."); <u>United States v. Jones</u>, 482 F. Supp. 3d 969, 979 (N.D. Cal. 2020) (granting a sentence reduction because, among other reasons, "Mr. Jones was only 22 years old when he began serving his sentence, [so] he has spent more than half his life in prison"); <u>United States v. Harris</u>, No. CR 97-399-1, 2020 U.S. Dist. LEXIS 245018, 2020 WL 7861325, at *13 (E.D. Pa. Dec. 31, 2020) (granting a sentence reduction because of, among other reasons, the defendant's "relatively young age at the time of the offenses," namely, 24 years old); <u>but see United States v. Andrews</u>, 480 F. Supp. 3d 669, 2020 WL 4812626 (E.D. Pa., 2020) (recognizing that "there may be a harm in the continued imprisonment of a person who is considered rehabilitated and less culpable because of his age at the time of the offense" but declining to grant compassionate release absent a harm that is "collateral or secondary to imprisonment," such as "the risk of contracting a serious illness or the risk of harm to a vulnerable dependent").
6

Justice O'Connor concurred in the judgment for other reasons. <u>Id.</u> at 848.
7

<u>Id.</u> ("The basis for this conclusion is too obvious to require extended explanation. Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.")
8

<u>See Miller</u>, 567 U.S. at 476 ("immaturity, irresponsibility, impetuousness, and recklessness") (cleaned up); <u>Graham</u>, 560 U.S. at 68 ("a lack of maturity and an underdeveloped sense of responsibility") (internal quotation marks omitted); <u>Roper</u>, 543 U.S. at 573 ("immaturity"); <u>Thompson</u>, 487 U.S. at 835 (plurality) ("[i]nexperience, less education, and less intelligence").
9

<u>See Miller</u>, 567 U.S. at 476 ("susceptible to influence and to psychological damage") (internal quotation marks omitted); <u>Graham</u>, 560 U.S. at 68 ("more vulnerable or susceptible to negative influences and outside pressures") (internal quotation marks omitted); <u>Roper</u>, 543 U.S. at 573 ("vulnerability"); <u>Thompson</u>, 487 U.S. at 835 (plurality) ("more apt to be motivated by mere emotion or peer pressure").
10

<u>See Miller</u>, 567 U.S. at 476 ("[The] signature qualities [of youth] are all transient[.]") (internal quotation marks omitted); <u>Graham</u>, 560 U.S. at 68 ("[T]heir characters are not as well formed.") (internal quotation marks omitted); <u>Roper</u>, 543 U.S. at 573 ("lack of true depravity"); <u>but cf. Jones</u>, 141 S. Ct. 1307, slip op. at 8 (holding that "permanent incorrigibility is not an eligibility criterion" for a juvenile life-without-parole sentence).
11

<u>See Miller</u>, 567 U.S. at 476 (finding evidence of "neglectful and violent family background . . . particularly relevant"); <u>Roper</u>, 543 U.S. at 569. ("[J]uveniles have less control, or less experience with control, over their own environment."); <u>Thompson</u>, 487 U.S. at 834 (plurality) ("[O]ffenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.").
12

Sara B. Johnson et al., <u>Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience</u>

DISHOT                                    22

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

<u>Research in Adolescent Health Policy</u>, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), <u>available at</u> https://www.ncbi.nlm.nih.gov/pmc/articles /PMC2892678/pdf/nihms207310.pdf, at 1.
13

<u>Id.</u> at 3.
14

<u>Id.</u>
15

<u>Id.</u>
16

Grace Icenogle et al., <u>Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a 'Maturity Gap' in a Multinational, Cross-Sectional Sample</u>, 43 Law & Hum. Behav. 69 (2019) (NIH Public Access Version), <u>available at</u> https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6551607/pdf/nihms-1025357.pdf.
17

Laurence Steinberg, <u>A Dual Systems Model of Adolescent Risk-Taking</u>, Mar. 2010 Dev. Psychobiology 216.
18

Icenogle, <u>supra</u> n.16, at 4; <u>see also</u> Steinberg, <u>supra</u> n.17, at 216 (describing "a 'cognitive control' system, which is mainly composed of the lateral prefrontal and parietal cortices and those parts of the anterior cingulate cortex to which they are interconnected").
19

<u>Id.</u>
20

Specifically, they asked subjects (1) to memorize series of digits and recite them backwards, (2) to recall whether a letter was among a previous set of letters, and (3) to generate as many words as possible in a category (<u>e.g.</u>, vegetables). <u>Id.</u> at 10-11.
21

<u>Id.</u> at 15. The relationship was cubic and was statistically significant, p<0.001. <u>Id.</u> at 14.
22

<u>Id.</u> at 4; <u>see also</u> Steinberg, <u>supra</u> n.18, at 216 (describing "a 'socioemotional' system, which is localized in limbic and paralimbic areas of the brain, including the amygdala, ventral striatum, orbitofrontal cortex, medial prefrontal cortex, and superior temporal sulcus").
23

Icenogle, <u>supra</u> n.16, at 11-13.
24

<u>See generally</u> Laurence Steinberg & Kathryn C. Monahan, <u>Age Differences in Resistance to Peer Influence</u>, 43 Dev. Psych. 1531, 1538-39 (2007) (pioneering this "resistance to peer influence" measure and finding that "resistance to peer influence increases linearly over the course of adolescence, especially between ages 14 and 18").
25

The game, known as the "modified Iowa Gambling task," repeatedly presented participants with one

DISHOT                                         23

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

of four decks, inviting them to draw a card, with a corresponding gain or loss of prize money depending on the card drawn. Two of the decks were systematically advantageous; two were systematically disadvantageous. Prior studies have demonstrated that participants' performance on this task varies with age. Specifically, adolescents are particularly attuned to the decks that give them rewards and are better than either children or older adults at identifying such decks. Steinberg, supra n.17, at 221. But when it comes to avoiding the bad decks, performance consistently improves with age. Id.; see also Elizabeth Cauffman et al., Age Differences in Affective Decision Making as Indexed by Performance on the Iowa Gambling Task, 46 Dev. Psych. 193, 204, 206 (2010) (similar results in group of 901 subjects aged 10-30).
26

The puzzle, known as the "Tower of London task," requires participants to move a series of balls from a starting state to a desired ending state in as few moves as possible. Older participants are generally less impulsive; they wait longer before making their first move on harder puzzles, as compared to easier ones. Younger participants generally wait the same amount of time before making their first move, regardless of difficulty level. See also Steinberg, supra n.17, at 221.
27

This game, known as the "Stoplight task," is described more fully below. See infra 27.
28

In this task, known as a "delay discounting task," subjects are asked a series of questions of the form "would you rather have $100 now or $500 one year from now" to determine how much of a "discount" subjects apply to future income. See also Laurence Steinberg et al., Age Differences in Future Orientation and Delay Discounting, 80 Child Dev. 28 (2009), erratum noted, 81 Child Dev. 1024 (2012).
29

Icenogle, supra n.16, at 15. The relationship was linear and was statistically significant, p<0.001. Id.
30

See, e.g., Steinberg, supra n.17; Cauffman, supra n.25; Steinberg, supra n.28; Laurence Steinberg et al., Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model, 44 Dev. Psych. 1764 (2008) (reporting increased sensation seeking between ages 10 and 15 and steadily decreasing impulsivity from age 10 to age 30) Rotem Leshem & Joseph Glicksohn, The Construct of Impulsivity Revisited, 43 Personality & Individual Differences 681, 684-86 (2007) (reporting significant decline in impulsivity from ages 14-16 to ages 20-22).
31

See Icenogle, supra n.16, at 4 ("Voting, making decisions in medical contexts, consenting to participate in research, and participating in legal proceedings constitute situations in which adolescents may be competent. Although all 16-year-olds would not necessarily make 'good' decisions in the voting booth or doctor's office, their decisions in these contexts, on average, would be as logical as adults' decisions.") (citations omitted).
32

See id. at 19.
33

Jason Chein, et al., Peers Increase Adolescent Risk-Taking by Enhancing Activity in the Brain's Reward Circuitry, 14 Dev. Sci. F1, F1 (2011) (citations omitted).
34

DISHOT                                  24

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Id. (citations omitted).
35

Id. (citations omitted); see, e.g., Adriana Galvan, et al., Risk Taking and the Adolescent Brain: Who Is at Risk?, 10 Dev. Sci. F8, F12-F13 (2007) (finding, in study of individuals aged 7 to 29, that impulse control develops throughout adolescence and early adulthood, with corresponding increases in activation of the nucleus accumbens); Margo Gardner & Laurence Steinberg, Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study, 41 Dev. Psych. 625, 629-30 & fig.2 (2005) (finding that peers' presence increases adolescents' risk-taking).
36

See generally Chein, supra n.33.
37

Id. at F2 (citations omitted).
38

Id.
39

Id. at F7.
40

Id. at F6.
41

Id. at F5.
42

Id. at F2.
43

Id. at F6. The authors also observed that the subjects who showed increased activation in the incentive processing system in the presence of peers also exhibited lower scores on a self-reported metric of resistance to peer influence, "indicat[ing] that the brain-behavior link observed in our fMRI paradigm reflects an ecologically relevant process that is implicated in risky decision-making in the real world." Id. at F8.
44

See, e.g., Kaitlyn Breiner, et al., Combined Effects of Peer Presence, Social Cues, and Rewards on Cognitive Control in Adolescents, 60 Dev. Psychobiology 292 (2018) (finding that adolescents under 18 "showed diminished cognitive control . . . paralleled by enhanced . . . activation" in part of the incentive processing system when exposed to positive social cues in the presence of a virtual peer).
45

Johnson, supra n.12, at 4 (Increased novelty seeking, increased risk taking, and a shift toward peer-based interactions "is seen not only in human beings but in nearly all social mammals," and "[a]lthough the behaviors may lead to danger, they confer an evolutionary advantage by encouraging separation from the comfort and safety of the natal family, which decreases the chances of inbreeding[;] [and by] foster[ing] the development and acquisition of independent survival skills.").
46

Terrie Moffitt, Adolescent-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental

DISHOT                                                   25

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



<u>Taxonomy</u>, 100 Psych. Rev. 674, 685-86 (1993).
47

Laurence Steinberg & Elizabeth Scott, <u>Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty</u>, 58 Am. Psych. 1009, 1014 (2003).
48

Donald Lynam et al., <u>Longitudinal Evidence That Psychopathy Scores in Early Adolescence Predict Adult Psychopathy</u>, 116 J. Abnormal Psych. 155, 162 (2007).
49

Edward Mulvey et al., <u>Trajectories of Desistance and Continuity in Antisocial Behavior Following Court Adjudication Among Serious Adolescent Offenders</u>, 22 Dev. & Psychopathology 453, 468, 470 (2010) (When a team of scholars attempted to model "trajectories of desistance and continuity" among adolescent offenders, they found that "even within a sample . . . limited to those convicted of the most serious crimes, the percentage who continue to offend consistently at a high level is very small" and the ability to predict which offenders would do so is "exceedingly limited."). <u>Cf.</u> Katherine B. Forrest, <u>When Machines Can Be Judge, Jury, and Executioner: Justice in the Age of Artificial Intelligence</u> 65-96 (2021) (describing failed attempts to predict recidivism using algorithms).
50

The Court does not mean to suggest that it can infer from general neuroscientific research which neurons were firing in Ramsay's brain at the time of the shooting; that is not the relevant inquiry. Rather, the Court must, as noted, always consider the "history and characteristics of the defendant," 18 U.S.C. § 3553(a) (1), such as adolescence, even where the Court cannot draw a direct causal relationship between those characteristics and the decision to commit the offense.
51

<u>See also Apprendi v. New Jersey</u>, 530 U.S. 466, 479, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (quoting John H. Langbein, <u>The English Criminal Jury on the Eve of the French Revolution</u> 36-37, <u>in</u> The Trial Jury in England, France, Germany, 1700-1900 (A. Schioppa ed. 1987)) (When the Constitution and Bill of Rights were ratified, trial judges in felony cases "had very little explicit discretion in sentencing"; instead, "the substantive criminal law . . . prescribed a particular sentence for each offense. The judge was meant simply to impose that sentence (unless he thought in the circumstances that the sentence was so inappropriate that he should invoke the pardon process to commute it).").
52

<u>Id.</u> at 304-05 ("[T]he fundamental respect for humanity underlying the Eighth Amendment," combined with the "qualitatively different" sentence of death and the corresponding "need to be certain that death is the appropriate punishment in a specific case," together compel the conclusion that the sentencing court must consider "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").
53

<u>Miller</u>, 567 U.S. at 475, 489 ("[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," <u>i.e.</u>, "Wmprisoning an offender until he dies.").

DISHOT                                                        **26**

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



12-20287-8

RECEIVED
JUL 2 7 2021
CLERK'S OFFICE
U.S. DISTRICT COURT

RECEIVED
AUG 1 6 2021

Judge Arthur J. Tarnow
600 Church St
Detroit MI, 48503

Mailed From US Penitentiary 1 MAT 1

Leon Gills 63760019
USP-Allenwood
P.O. Box 3000
White Deer, PA
17887

Legal Mail



United States Penitentiary Allenwood, PA 17887

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.