## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**                          **Cr. No. 12-20287**

      **v.**                                  **Hon. Mark Goldsmith**

**LEON GILLS,**

      **Defendant.**

_____/

## REPLY/SUPPLEMENTAL BRIEF IN SUPPORT OF LEON GILL'S PRO SE MOTION FOR COMPASSIONATE RELEASE

## I.  INTRODUCTION

Protecting prisoners from pandemics is not just a "should" or an "ought" but a "must"—as a matter of US constitutional law.  That proposition was established more than 40 years ago when another prisoner (JW Gamble) told Texas staff that he had been injured by a falling 600-bale of cotton.  Responding to his claim that the prison had ignored his pleas for care, the US Supreme Court ruled in his favor.  Ignoring serious medical needs violated the prohibition on "cruel and unusual punishments."

The trigger is knowledge.  That's what the court's key phrase— "deliberate indifference to serious medical needs"—means.

What about infectious diseases?  In 1993, the court explained that prisons cannot knowingly expose people to "a serious, communicable disease."  Rather than wait for a "tragic event," prisons had to try to keep people away from "unsafe, life-threatening" conditions. J Resnik, *INSIGHT:  Protecting Prisoners in Pandemics Is a Constitutional Must* (March 30, 2020), https://news.bloomberglaw.com/health-law-and-business/insight-protecting-prisoners-in-pandemics-is-a-constitutional-must.

Leon Gills, through counsel, submits this supplemental reply brief in support of his pro se motion seeking a reduction of his sentence to time served under the First Step Act of 2018 ("1SA"), 18 U.S.C. § 3582. (*See* ECF No. 1101, Pro Se Mot.)

Mr. Gills is serving a life sentence after a jury convicted him of RICO charges, the most serious being an allegation of attempted murder.  Most of the acts were committed when Leon Gills was as young as 13 years old.[1]  The Court sentenced him to life in prison, despite his young age of 19 years old.

A lot has changed since Mr. Gill's [2014] convictions: the law, our understanding of youth, and Mr. Gills himself. Thanks to the 1SA, this Court has authority to take a second look at Mr. Gills. Today, he is a remorseful man who has been in custody for almost a decade.

While in custody, Mr. Gills has participated in programming, maintained relationships with his family and friends, striven to continue his growth and development.  As detailed in his pro se reply brief, Leon Gills has achieved a remarkable rehabilitation, in a relatively short period of time, with no expectation of release from his life sentence; he wants to be a better person, and he certainly is a much better person now, than when this Court imposed its life sentence.   At the same time, Mr. Gill's health conditions, including morbid obesity and hypertension, have worsened, rendering him particularly vulnerable to COVID-19.

Several circumstances establish extraordinary and compelling reasons for Mr. Gill's release: (1) his continued incarceration during a global pandemic presents grave risks to his

---

[1] Leon Gills filed his pro se reply brief (ECF No. 1101) on July 13, 2021.  Counsel was appointed to file this supplemental reply.  Many good legal and factual points are made in Gills' pro se reply; in particular, the history of his young life as it led to his involvement in the present case.  Accordingly, counsel hereby incorporates Gills' pro se reply brief by reference, as Exhibit A.

health; (2) his youth at the time of the conduct underlying his convictions; and (3) his demonstrated extraordinary rehabilitation.

**LEGAL STANDARD**

Compassionate release is appropriate when: (1) "extraordinary and compelling reasons warrant" a reduction; and (2) the reduction is consistent with the 18 U.S.C. § 3553(a) factors, "to the extent that they are applicable[.]" 18 U.S.C. § 3582(c)(1)(A). "Until the Sentencing Commission updates § 1B1.13 . . . , district courts have full discretion . . . to determine whether an 'extraordinary and compelling' reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *United States v. Jones*, 980 F.3d 1098, 1108 (6th Cir. 2020).

Section 3582(c)(1)(A)(i) permits sentencing judges to grant a reduction of sentence, after considering the § 3553(a) factors, if "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."

Several courts have recognized that the COVID-19 pandemic, for an offender with pre-existing health problems rendering them vulnerable to severe illness from COVID-19, is an extraordinary circumstance warranting release under § 3582(c)(1)(A)(i). *See, e.g., United States v. Jelinek,* No. 15-20312, 2020 WL 3833125, at *1 (E.D. Mich. July 8, 2020); *United States v. Nazzal,* No. 10-20392, 2020 WL 3077948, at *3 (E.D. Mich. June 10, 2020); *United States v. Rahim,* No. 16-20433, 2020 WL 2604857, at *2 (E.D. Mich. May 21, 2020).

**Exhaustion of Administrative Remedies**

There is no exhaustion barrier in this case. Section 3582(c)(1)(A)(i) gives this Court authority to grant the requested relief after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." The government agrees that Gills has satisfied the requirement. Therefore, there is no exhaustion barrier.

## ARGUMENT

### I.   Extraordinary and Compelling Reasons Warrant Mr. Gill's Release.

This Court has discretion to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). In addition to health reasons, courts have found a variety of circumstances "extraordinary and compelling": the defendant's age at the time of the crime,[2] mandatory guidelines,[3] overly long sentences,[4] and extraordinary rehabilitation.[5]

### A.   Mr. Gill's Health Conditions and Confinement during the COVID-19 Pandemic Are Extraordinary and Compelling Reasons.

---

[2] *See, e.g.*, *United States v. Maumau*, No. 08-cr-00758, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (reducing sentence based on age at the time of unlawful conduct, the length of the imposed sentence imposed, subsequent change in law, and rehabilitation).

[3] *See, e.g.*, *United States v. Jones*, No. 94-cr-20079, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (reducing sentence based in part on *Booker*'s change to advisory guidelines); *United States v. Quinn*, 467 F. Supp. 3d 824, 827-28 (N.D. Cal. 2020) (same).

[4] *See, e.g.*, *United States v. Price*, No. 07-cr-0152, 2020 WL 5909789, at *4-6 (D.D.C. Oct. 6, 2020) (releasing defendant sentenced to a mandatory life sentence); *United States v. Day*, -- F. Supp. 3d --, 2020 WL 4251803, at *12 (E.D. Va. July 23, 2020) (extraordinary and compelling reasons where defendant's sentence today would be dramatically different); *United States v. Cantu-Rivera*, No. 89-cr-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019).

[5] *See, e.g.*, *United States v. Stephenson*, 461 F. Supp. 3d 864, 872-73 (S.D. Iowa 2020).

COVID-19 is a dangerous disease and the pandemic it gave rise to is a public health crisis unprecedented in modern times. A person's likelihood of succumbing to COVID depends on: (1) their health and demographics and (2) where they live.

> 1. **Mr. Gill's Preexisting Conditions Make Him More Susceptible to the Scourge of COVID.[6]**

As a morbidly-obese Black man with a history of hypertension, Mr. Gills is particularly vulnerable. The combination of his conditions has a compounding effect that places him in serious danger, especially in light of his incarceration in an unmitigated disaster, aka, USP Allenwood.

*Obesity[7].* Mr. Gills is extremely obese. Mr. Gills weighs approximately 315 pounds. At 6'2", Mr. Gill's body mass index ("BMI") is 38.5, just shy of the morbid obesity threshold of 40; yet well over the CDC's obesity index of 30.

The CDC has labeled obesity as a risk factor with the "strongest and most consistent evidence" for an association with severe illness from COVID-19.[8] People with BMIs of 40 or more are 4.5 times more likely to be hospitalized than persons with healthy BMIs **regardless of age**.[9] Further, morbidly-obese racial minorities "are at even higher risk for severe COVID-19 illness."[10] Thus, courts nationwide, including this one, conclude that obesity, either alone or in

---

[6] Mr. Gills thoroughly detailed his underlying medical conditions in his pro se reply brief. Counsel will use this supplemental filing to underscore his conditions, as they merit a compassionate release.

[7] *Defendant Gills, in his pro se filing, inadvertently omitted discussion of his morbid obesity. Obesity is a critical and dangerous condition making persons extremely susceptible to Covid-19 infections, with dangerous consequences. The undersigned counsel was appointed to supplement Gill's reply to the government's filing; and will do so in part by discussing Mr. Gills' morbid obesity in this filing.*

[8] *See* CDC, Medical Conditions Evidence Table.

[9] *See* CDC, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*.

[10] *See* CDC, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*.

combination with other preexisting conditions, satisfies the "extraordinary and compelling" standard.[11]

.        On June 25, 2020, the CDC revised its guidelines and identified a BMI of 30 or more as an underlying condition that places individuals at high risk for both contracting and suffering severe illness from COVID-19.   https://www.ckc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  (listing BMI of 30 or higher).  Obesity alone can expose an individual to deadly consequences from COVID-19.  Obesity, coupled with Gill's hypertension and pre-diabetic condition,  make Mr. Gills extremely vulnerable to the ravages of the Pandemic, particularly confined in a dangerous prison environment.  If exposed to a variant, or the original virus itself, Mr. Gills can only pray for a safe outcome.

**Vaccination**

The government attempts to sanitize this real medical crisis by suggesting Mr. Gills will be just fine until a vaccine rolls around.  Sure, most of us in society can walk into our neighborhood pharmacy and obtain the vaccine.  Not so for Mr. Gills, federal inmate at USP Allenwood.

He has not been vaccinated.  It is not clear when he will get the vaccine.  It is certainly not clear when boosters will be made available.  What is known is that the current vaccines remain effective for approximately 6 months.  A booster is necessary to maintain effective immunity.  If

---

[11] *See, e.g.*, *United States v. King*, No. 17-cr-20332, 2020 WL 5440324, at *2 (E.D. Mich. Sept. 10, 2020) (granting release to man with BMI of 35.2 who also suffered from asthma); *United States v. Mitchell*, No. 17-cr-20263, ECF No. 94 (E.D. Mich. Aug. 18, 2020) (releasing a 24-year-old woman whose sole condition was a BMI of 31-32).

the past foreshadows the future, the BOP will likely  be  no more effective in providing inmates with boosters, when they have yet to administer the first dose to many inmates under their control.

***Reinfection.***

It is indisputable that Mr. Gills suffers from at least two underlying conditions, obesity and hypertension, that the Center for Disease Control (CDC) recognizes as serious risk factors for COVID-19.[12] Moreover, Mr. Gills having tested positive for COVID-19 once, does not prevent him from reinfection.

The government attempts to minimize the risk to Gill's health and life when it suggests that he is immune from infection of the virus because he has previously tested positive.  First, **there is simply no medical evidence to support the claim that a person who previously tested positive for COVID-19, and is deemed recovered, is less susceptible to serious adverse health outcomes than they were before they were exposed to the virus**. The government's suggestion that people who have tested positive for the virus are immune is contrary to CDC guidance, which states that it is "not yet known" whether the presence of antibodies provide "immune protection" for COVID-19.[13]

Moreover, with each passing day there is more evidence that people who are deemed to have "recovered" from COVID-19 can become seriously ill and die of the disease after their purported "recovery." An example is the case of Adam Solarzano, an inmate at Terminal Island who died on May 24, 2020, less than a month after he was deemed by BOP physicians to have

---

[12]      On June 25th, the CDC expanded their list of people at risk of severe medical complications with COVID-19.  The CDC removed any specific age threshold to the risk factors.  https://perma.cc/UJT9-JMHS.  In other words, the CDC has "jettison[ed] earlier warnings that mainly those 65 and older faced higher risk." https://www.statnews.com/2020/06/25/cdc-broadens-guidance-on-americans-facing-risk-of-severe-covid-19/

[13] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html

"recovered" from COVID-19. According to the BOP Press Release: On April 16, 2020, inmate Adrian Solarzano, tested positive for COVID-19 at the Federal Correctional Institution (FCI) Terminal Island in San Pedro, California. On May 10, 2020, in accordance with CDC guidelines, Mr. Solarzano was converted to a status of "recovered" following quarantine and no presentation of active symptoms. On Friday, May 15, 2020, Mr. Solarzano was admitted to the local hospital, due to complaints of chest pains and anxiety. He was tested for COVID-19 by hospital staff on May 15 and 16, 2020, with negative results. Mr. Solarzano's condition continued to decline. On Sunday, May 24, 2020, Mr. Solarzano, who had pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19, was pronounced dead as a result of the virus by hospital staff.

https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf.

To be sure, researchers cannot definitively conclude whether Gills, like the late Mr. Solarzano, could contract COVID-19 again and have a more virulent reaction, particularly with his serious comorbidities. William Park, *Can you catch Covid-19 twice?*, BBC (Apr. 22, 2020), https://www.bbc.com/future/article/20200421-will-we-ever-be-immune-to-covid-19 ("Immunity to Covid-19 is not as clear cut as we might hope").   Gills continues to be a sitting duck at USP Allenwood.

For these reasons, Federal courts across this country continue to release otherwise qualified inmates who have previously tested positive for the corona virus.  See *Snell v. United States*, Criminal Case No. 16-20222-6 (E.D. Mich. Jun. 2, 2020); *United States v. McCall*, Case No. 2:18-cr-00095, Dkt. No. 96 (M.D. Ala. June 4, 2020.) (granting compassionate release to inmate who tested positive for COVID-19 and finding the "risk of reinfection" to be

unacceptable); *United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (granting compassionate release to COVID-19 positive inmate who also suffered from asthma because "in the event [his] condition worsens, medical treatment in and around" the prison "may well be inadequate."); *United States v. Arreola-Bretado*, Case No. 3:19-cr-3410, Dkt. No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19).

The district court in *McCall* acknowledged that the risk of "reinfection" for an inmate who has already tested positive for COVID-19 is unknown, but it did not accept the government's view that it was appropriate to leave him in prison and hope for the best. *United States v. McCall*, Case No. 2:18-cr-00095, Dkt. No. 96 (M.D. Ala. June 4, 2020). McCall's doctor testified that he should be isolated from other inmates to protect him from the possibility of reinfection, considering the heightened risk of severe illness that he faced due to his pre-existing medical condition. Id at *24.

COVID-19 is indeed a "novel" virus. Seemingly, every day more horrifying effects of the virus become known to the medical community. However, reinfection is not a well-known aspect of the virus, other than we do know that the risk of reinfection is ever present.

As of May 12, 2020, the CDC's website stated, "Can people who recover from COVID-19 be re-infected with SARS-CoV-2? The immune response to COVID-19 is not yet understood. Patients with MERS-CoV infection are unlikely to be re-infected shortly after they recover, but

**it is not yet known whether similar immune protection will be observed for patients with Covid-19.** https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (emphasis added).

The Journal of the American Medical Association (JAMA) recently spoke to the unknowns regarding re-infection and post-infection immunity. It found that "Whether immunity occurs among individuals after they have recovered from COVID-19 is uncertain. Many human infections with other viral pathogens, such as influenza virus, do not produce a durable immune response…Following infection, detectable…antibodies develop within days to weeks of symptom onset in most infected individuals. **Why some patients seem not to develop a humoral immune response, as reflected by detectable antibodies, is uncertain."** (Emphasis added) The article then goes on to explain in more detail that people with mild cases may recover before developing antibodies to become immune, and even those who do develop detectable levels of antibodies may not be immune. https://jamanetwork.com/journals/jama/fullarticle/2766097.

The Standing Committee on Emerging Infectious Diseases and 21st Century Health Threats, The National Academies of Sciences, Engineering, and Medicine, issued a report identifying "gaps in knowledge" related to the duration of antibody response and immunity to COVID-19. Among the gaps in knowledge it identifies are "[W]hether the presence of antibodies confers protection from illness due to re-protective immunity." https://www.nap.edu/read/25774/chapter1#4 (Report at 5-6).

For coronaviruses, immunity seems to wane quickly, and what is unknown is **how long immunity lasts-and only months into the outbreak, there is now way to know.** Antonio Regalado, *What if immunity to covid-19 doesn't last?,* MIT Tech. Rev. (Apr. 27, 2020), available

at    https://www.technologyreview.com/2020/04/27/1000569/how-long-are-people-immune-to-covid-19/.   **Moreover, it's not yet even clear whether mild or asymptomatic cases will even develop antibodies!**   *See,* Katarina Zimmer, What Do Antibody Tests For SARS-CoV-2 Tell Us About Immunity? (Apr. 15, 2020), *available at* https://www.the-scientist.com/new-opinion/what-do-antibody-tests-for-sars-cov-2-tell-us-about-immunity--67425.   Zimmer's article also indicates that people who are immunocompromised may have less capacity to develop immunity to COVID-19.  *Id.*

Leon Gills is in serious risk of re-infection at USP Allenwood.  If re-infected, he is at high risk, given his obesity, together with his otherwise ill-health, of severe illness or death.

### 2.  COVID-19 poses acute risks to individuals in custody.

The COVID-19 pandemic is devastating the BOP. Already "tinderboxes for infectious disease," prisons are even more dangerous now than we typically accept.[14] As of January 5, 2020, more than 42,000 people incarcerated in the BOP and 4,800 staff had contracted the virus.[15] One hundred and ninety-six incarcerated people have died,[16] including at least 25 who were awaiting decisions on their compassionate release requests. One hundred and thirty-seven facilities (including private prisons) and 66 RRCs have confirmed cases. The spread of the virus in the BOP is not under control. And the consequences are felt far beyond prison walls.

---

[14] *United States v. Rodriguez,* 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020).

[15] Over 1,160 inmate cases occurred in privately-run BOP prisons, a figure buried in a separate link on the BOP's website. Private prisons do not report staff cases.

[16] Fifteen deaths occurred in private prisons and four occurred on home confinement.

"COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population."[17] Moreover, "the adjusted death rate in the prison population was 3.0 times higher than would be expected if the age and sex distributions of the US and prison populations were equal."[18] Based on the BOP's data, the disease the incarcerated at a rate at least 4.45 times the general population ("at least" because without universal testing, we do not know the true rate of infections).

Incarcerated people cannot take appropriate hygienic and social-distancing measures to protect themselves.[19] As the BOP Director told to Congress, "[p]risons are not designed for social distancing. In fact, they are designed for just the opposite."[20] This is problematic given that indoor transmission can occur in places with poor ventilation (such as prisons) from distances up to twenty feet and after as few as five minutes.[21]

 USP Allenwood, where Mr. Gills is currently confined, responded to the pandemic with countless negligent acts, constantly endangering the staff and inmates.  Counsel directs the government and the Court to Gills Pro Se Reply Brief, pages 2-5, where he details the reckless endangerment caused to inmates by the staff's gross negligence.

---

[17] Brendan Saloner, *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Internal Med. (July 8, 2020).

[18] *Id.*

[19] *See United States v. Tamasoa*, No. 15-cr-0124, 2020 WL 6700416, at *4 (E.D. Cal. Nov. 13, 2020) ("Courts have concluded . . . that the danger of COVID-19 to high-risk individuals who are imprisoned is likely much greater than to those who are free to take their own protective measures.") (cleaned up) (collecting cases).

[20] *Examining Best Practices for Incarceration and Detention During COVID-19: Hearing before the Committee on the Judiciary United States Senate*, June 2, 2020 (statement of Michael D. Carvajal, Director, BOP). *See also* BOP, *Correcting Myths and Misinformation About BOP and COVID-19*, at 3 (admitting facilities are incapable of implementing social distancing measures).

[21] *See* Victoria Kim, *Infected after 5 minutes, from 20 feet away: South Korea study shows coronavirus' spread indoors*, L.A. Times (Dec. 9, 2020).

Media accounts confirm that many who test positive for COVID-19 in BOP receive virtually no care, and that staff have "ignored or minimized . . . COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines."[22] Indeed, the Department of Justice Office of Inspector General recently found that "[m]aintaining a safe, secure, and humane prison system remains a challenge for DOJ and the BOP."[23]

Those in federal detention who have been spared by COVID-19 still suffer: during the pandemic medical care for chronic conditions has been delayed and, in many cases, withheld entirely. An OIG inspection of Metropolitan Detention Center (MDC) Brooklyn, found that "sick call requests dating to early July 2020 had not been scheduled or seen as of late September 2020."[24] At FMC Butner, a lawsuit alleges that when people do get sick with COVID-19, "treatment is almost nonexistent," and people are not transferred to a hospital until "they are already experiencing respiratory failure."[25]

**B.     Mr. Gills was an Emerging Adult at the Time of the Crimes and Received a Disproportionately Harsh Life Sentence as Compared to Many Other Similarly Situated Offenders.**

---

[22] Keri Blakiger & Keegan Hamilton, *"I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (June 18, 2020); *see also* Daniel Brown & Nkechi Taifa, *Congress must do more to protect people in prisons and jails and those re-entering the community*, Des Moines Register (Sept. 9, 2020).

[23] Michael E. Horowitz, Dep't of Justice, Office of Inspector General, *Top Management and Performance Challenges Facing the Department of Justice* 16 (Oct. 16, 2020).

[24] Dep't of Justice, Office of the Inspector General, *DOJ Releases Report of Remote Inspection of Federal Bureau of Prisons Metropolitan Detention Center Brooklyn Examining the Institution's Response to the Coronavirus Pandemic* (Nov. 10, 2020).

[25] *Hallinan v. Scarantino*, No. 20-cv-00563, Compl. ¶¶ 78–79, available at https://www.aclu.org/legal-document/complaint-aclu-files-class-action-lawsuit-against-butner-fcc.

The Supreme Court has acknowledged "what 'any parent knows'" and what research has shown time and time again: juveniles and young adults are different.[26] "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control."[27] Specifically, the prefrontal cortex of the brain does not reach "full adult maturity" until "the early to mid-20s," and this part of the brain controls impulse control, complex decision-making, inhibition, and planning.  This is why young people have a difficult time adjusting risky behavior after they have begun.  The immature brain and hormonal balances lead young people "to focus more on the benefits of risky behavior than on the possible negative consequences of their actions."      For these reasons, the Supreme Court acknowledged young people lack maturity and have "an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking."[28] They are also "more vulnerable to negative influences and outside pressures, including from their family and peers."[29] Critically, their characters are "not as well formed as an adult's" because their "traits are less fixed and [their] actions less likely to be evidence of irretrievable depravity."[30]

A growing body of research on the adolescent brain reveals that youthful offenders possess common characteristics of immaturity, susceptibility, salvageability, and dependence. *United States v. Ramsay,* No. 96-cr-1098 (JSR), 2021 WL 1877963, at *7 (S.D.N.Y. May 11, 2021). And we now understand that the distinguishing characteristics of youth "do not disappear when an

---

[26] *Miller v. Alabama*, 567 U.S. 460, 471 (2012).

[27] *Id.* at 471-72 (cleaned up).

[28] *Id.* at 471 (cleaned up).

[29] *Id.* (cleaned up).

[30] *Id.* (cleaned up).

individual turns 18." *Roper v. Simmons,* 543 U.S. 551, 574 (2005).

The Supreme Court has recognized that the Eighth Amendment requires sentencing courts to consider offenders' relative youth when imposing severe sentences. *See, e.g., Jones v. Mississippi,* 141 S. Ct. 1307, 1314 (2021) (emphasizing that "youth matters in sentencing"). Allowing courts to revisit exceptionally long sentences imposed on youthful offenders makes sense. See Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty,* 58 Am. Psych. 1009, 1014 (2003). Pre-*Booker,* however, the guidelines barred judges from considering a defendant's youth at the time of the offense. Even today, mandatory minimum sentences fail to account for developing minds and characters of defendants who are barely over 18.

Accordingly, many courts have recognized that a defendant's youth at the time of her offense may contribute to a finding of extraordinary and compelling reasons. An example is *United States v. Ramsay,* 2021 WL 1877963. Andrew Ramsay suffered horrific physical and sexual abuse throughout his childhood. *Id.* at 1-2. Never knowing who his father was, he was shunted from home to home in Jamaica and the United States. *Ibid.* At 17, he fell in with a Bronx gang. When he was 18, the leader of his gang ordered him to kill the leader of a rival gang. *Id.* at 2. Ramsay followed the rival gang leader to a party, but the intended victim was surrounded by a crowd of partygoers. *Id.* at 3. Ramsay fired into the crowd, killing two bystanders. *Ibid.* He was sentenced to mandatory life in prison. *Ibid.*

When the court sentenced Ramsay in 1998, it was not permitted to consider Ramsay's youth. *Id.* at 1. Despite the grim prospect of spending virtually his **\*17** entire adulthood in prison, Ramsay made an incredible transformation into a mature and compassionate adult. *Id.* at 4. Over

nearly three decades of incarceration, he took advantage of educational and vocational programming, donated to charity, received accolades for his BOP jobs, and served as a role model to others. *Id.* at 4-5.

In granting Ramsay's motion, the court considered developments in neuroscience and our understanding of the adolescent brain. *Id.* at 8-12. Ramsay's offense contained all the hallmarks of an immature adolescent brain: "a split-second, hot-headed choice made in the presence of peers." *Id.* at 14. Ramsay's youth, in conjunction with his abusive upbringing, constituted extraordinary and compelling reasons for compassionate release. *Id.* at 15.

Gills' life and involvement in this matter is extremely close to that seen in *Ramsay*. Gills conduct within the criminal-tenure period began on his 13th birthday and concluded when he was 19.  After Defendant Gills was found guilty of racketeering conspiracy, attempting to murder two people, and discharging a firearm, the Court concluded that the United States Sentencing Guidelines recommended a sentencing range of  360 months to life. During the sentencing proceeding, the Court concluded that Defendant Gilts could not be rehabilitated and that his reentry into society would jeopardize the public's safety so the court imposed a life sentence, even though no murders could be attributed to his convicted and charged offenses.

It should be noted that Defendant Gills was the victim of neighborhood adult criminals who incrementally inducted him into the Murda Ville Gang. From his adolescent years into his late teens Defendant Gills was influenced by seasoned

criminals. The Court can now re-evaluate its sentencing based on the fact of juvenile-brain science and the fact that Defendant Gills has been genuinely rehabilitated.

In short, although the law treated Mr. Gills as an adult at the time of his offenses because he was 19, there is a compelling, evidence-based argument to change our approach to criminal conduct by emerging adults (ages 18-25).[31] Simply stated, unlike the law, neurologists resist an 18-year cutoff for good reason. The brain does not typically reach full maturity until age 25.

Mr. Gills was only 19 years old at the time of the last RICO acts.  He was only a minor, as young as 13 when he was pulled into this case by many older adults.  At this age, he was also susceptible to peer pressure and less than fully capable of regulating impulse control or risk-seeking behavior. Yet he is paying a bigger price for his actions than many more culpable men in the federal criminal justice system.  Mr. Gills' youth at the time of his crimes are extraordinary and compelling circumstances.

As a teenager, Defendant Gills was immensely influenced by older neighborhood criminals who were several years older than him. At that point in his childhood he was underdeveloped and immature and greatly influenced by their pressure to conform to their misbehavior. The several years of influential conformity are the offenses charged in the racketeering conspiracy of the indictment. As a result, this Court should not classify him among the worst offenders especially those whom he was tried with and

---

[31] *See generally* Elizabeth S. Scott et. al., *Young Adulthood As A Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016); Ex. 8, Arnett, Jeffrey Jensen, *Emerging Adulthood: A Theory of Development From the Late Teens Through the Twenties*, Am. Psychologist 469 (May 2000); *See* Ex. 9, Lindell, Karen U. & Goodjoint, Katrina L., *Rethinking Justice for Emerging Adults* 11-12 (2020).

found guilty with by the jury. From the beginning of their indoctrination of Defendant

Gills, these older, savvy criminals took his underdeveloped character and formed it into

the image of their own corrupt, illegal nature.

However, the government has argued and the court has noted that it was by the grace

of God that Defendant Gills' rampage killed no one. However, not worthy of any

discussion, the government stated that Defendant Gilts ordered the murder of Malachi

Wilson, but surprisingly did not charge him with this murder. In fact, the government's

cooperating witness' adlib testimony caught the government off guard with this

inculpatory testimony against Gills. If this order to murder had been authentic and based

upon reliable testimony, the prosecutors would have charged Gills.  However, it was

nothing more than mere gratuitous testimony aimed to curry additional favor with the

government. Notwithstanding this incredible story, Defendant Gills was not charged

with the Malachi-Wilson murder because the first time this falsified information

emerged was at the trial.

In Graham, the Supreme Court, wrote" 'There is a line between homicide and

other serious violent offenses against the individual. Serious non-homicide crimes

may be devastating in their harm, but in terms of moral depravity and of the injury to

the person and the public, they cannot be compared to murder in their severity and

irrevocability."

Defendant Gills never crossed this line into a higher denomination of violent

criminal offenses. And yes, it was by the grace of God, indeed. For Defendant Gills

to have been given a life term of incarceration is totally disproportionate to the

nature of his offenses considering the mitigating fact of his age throughout the entire

conspiracy. The *Graham* Court held that for a juvenile offender who did not commit

homicide the Eighth Amendment forbids the sentence of life without parole.

Nevertheless, Defendant Gills was penalized with a lifetime of imprisonment.

A sentencing judge must consider Mr. Gill's relative youth at the time of the acts of

conviction, especially in light of modern developments in neuroscience. "While age does not

excuse behavior, a sentencing court should account for age when inquiring into the conduct of a

defendant."[32] Mr. Gill's "'relative youth at the time of the sentence' particularly supports

compassionate release because his young age is coupled with an extremely long sentence."[33]

Defendant Gills' life term of imprisonment is extraordinarily long, and it appears

grossly disproportionate when it is compared to average federal sentences for similar

or more serious crimes: robbery (109 months); firearms (50 months); murder (255

months); drug trafficking (76 months); and kidnapping (171 months). See United

States Sentencing Commission, 2019 Annual Report and Sourcebook of Federal

Sentencing Statistics, Table 27.3. See United States v. Baker, 2020 U.S. Dist. Lexis

---

[32] *United States v. Lopez*, No. 97-cr-01117, 2020 WL 6298061, at *5 (D. Haw. Oct. 27, 2020) (quotation omitted) (granting compassionate release to man who was 18 at the time of his convictions, which included carrying a gun in relation to a drug trafficking conspiracy and in the course of that crime committing first degree murder).

[33] *Id.* (quoting *McCoy v. United States*, No. 03-cr-197, 2020 WL 2738225, at *5 (E.D. Va. May 26, 2020) (granting compassionate release to a man who was a teenager at time of offense who had served over 17 years of his more than 35-year sentence) and citing *Maumau*, No. 08-cr-00758, 2020 WL 806121, at *5, *7 (granting release in part based on the young age of the defendant who was 20 when arrested and 24 when sentenced).

145670, AT ††††7 (E.D.MI)(federal sentencing statistics). Defendant Gills should

not be serving a life sentence for attempt murders especially when the average

federal sentence is 255 months for murder. As serious as Defendant Gills conduct

was in the case his punishment received is greater than necessary to accomplish the

goals of respect for the law. 18 U.S.C. Section 3553(a). At minimum, the District

Court should have sentenced Defendant Gills to any sentence other than life.

Indeed, the sentencing factor assessment of 18 U.S.C. Section 3553(a), which

provides "the need to avoid unwarranted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct,  should prompt the

Court to grant compassionate release or grant a sentence reduction in this case.

Several courts have found, based on the ongoing COVID-19 pandemic,

extraordinary and compelling reasons to reduce a life without parole sentence, See e.g.

United States v. Rio, 2020 U.S. Dist Lexis 230074 (D. Conn Dec. 8, 2020); United

States v. Rodriguez, U,S, Dist. Lexis 181004 (S.D.N.Y. Sept. 30, 2020); and United

States v. Hammond. Case No. 3:13 Cr. 00043 (JCH)(D.Conn 2020).

In United States v. Cruz, 2021 U.S. Dist. Lexis 68857, at 12-15 (D. Conn), dealing

with the cognitive ability of a juvenile, whose age ranged from 13 to 18, the Court

adopted Expert Dr. Laurence Steinberg opinion, writing:

> In his testimony, Dr. Steinberg defined
> early adolescence as occurring between the
> ages of 10 and 13, middle adolescence
> between the ages of 14 and 17, and late
> adolescence between the ages of 18 and 21.

16

* He distinguished between two different decision-making processes: cold cognition, which occurs when an individual is clam and emotionally neutral, and hot cognition, which occurs when an individual is emotionally aroused, such as in anger or excitement. Cold cognition relies mainly on basic thinking

––––––––––––––––––––––––––

†††† The three categories of adolescence cognition addressed by Dr. Steinberg in his expert testimony cover the three categories that span the indictment charges lodged against Defendant Gills whose age spanned from 13 to 19 during the racketeering conspiracy from 2002 to 2009.

abilities while hot cognition also requires the individual to regulate and control his emotions. While the abilities required for cold cognition are mature by around the age of 16, the emotional regulation required for hot cognition is not fully mature until the early-or mid-20s. ‡‡‡‡ See also Cohen et al. When Does a Juvenile Become and Adult? at 786 (finding that ''relative to adults over twenty-one, young adults show diminished cognitive capacity similar to that of Adolescents, under brief and prolonged negative emotional arousal").

Dr. Steinberg also testified that late adolescents 'still show problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than to older people.' For example, he testified that impulse control is still developing during the late adolescent years from age 18 to the early-or mid20s. See also Cohen et al, When Does a Juvenile Become an Adult? at 780. Additionally, late adolescent are more likely to take risks than either adults or middle or early adolescent. According to Dr. Steinberg, risk-seeking behavior peaks around ages 17 to 19 and declines into adulthood. Id. §§§§ See also Steinberg et al, Around the World at 10 (graphing the trajectory of sensation-seeking behavior, as related to age, as an upside-down "U" with

the peak at age 19). The scientific evidence
therefore demonstrates that 18 years- old
display similar characteristics of immaturity
and impulsivity as juveniles under the age
of 18,"

Had this scientific data been presented to the District Court before Defendant Gilts'

sentencing proceeding, there is a strong probability that the District Court would have

been more lenient to impose a sentence at the low end of the guidelines, 360 months, or

possibly varied downward from the guideline under the 360-month recommendation.

---

‡‡‡‡ This explains why Defendant Gills could not control himself when
he was molded by seasoned criminals to be loyal to the gang and its by-laws
from the age of 13 to 19 which is the time period of all
the crimes charged in the indictment against him. In fact, when his life was
threatened with a firearm, emotionally he lost his temper and went looking for
revenge and shot-up a van thinking the culprit was inside the vehicle. His
adolescent mindset was set by long term brainwashing by adult thugs who
trained him to be gang minded. This is no excuse for his violent behavior but
only a scientific explanation into psychological makeup of a underdeveloped
adolescent whose cognition development was interrupted by corrupt
influences.

§§§§ Dr. Steinberg's expert opinion on impulse control and risk taking
describes perfectly the risk seeking that Defendant Gills' impulsive took from
2007 to 2009 when he committed attempt murders and his age covered the 17-
to-19-year-old peak before the decline would begin to occur. And as set forth
below, the decline did occur during Defendant Gills' incarceration as his
rehabilitation took place and he entered into adulthood and maturity.

## II.      The § 3553(a) Factors Weigh in Favor of Release.

This Court sentenced the young, 19 year-old Leon Gills to life in prison.  The Court assumed, of course, that Gills could never be rehabilitated, and that the life sentence reflected the purposes of sentencing.[34] Mr. Gills was sentenced to life imprisonment to reflect on the seriousness of his offenses.  However, in a relatively shorter period of time, Mr. Gills' extraordinary rehabilitation belies this Court's earlier assumption at the time of the original sentencing.  Mr. Gills can indeed be rehabilitated, and he has taken it upon himself to do so; even when he had no reason to believe he had any chance of seeing his community ever again.

Mr. Gill's convictions are serious. Attempted murder is always serious. However, other incarcerated people "convicted of both capital and other violent crimes and sentenced to life have been released by district courts in light of the pandemic."[35] And life sentences are not always appropriate when someone is convicted of murder. Indeed, throughout the country, district courts routinely impose non-life sentences even for murder. For instance, in 2019, the average murder

---

[34] *United States v. Sain*, No. 07-cr-20309, 2020 WL 5906167, at *6 (E.D. Mich. Oct. 6, 2020) ("The overarching § 3553 consideration is that in the end, the Court is to impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.") (citing *Kimbrough*, 552 U.S. at 101 (2007)).

[35] *See, e.g.*, *United States v. Rios*, No. 94-cr-112, 2020 WL 7246440, at *5 (D. Conn. Dec. 8, 2020) (collecting cases); *id.* at *1, *3 (releasing man serving three life sentences, one of which was for VICAR murder, who had 7 disciplinary infractions and six priors by the time he was sentenced at age 27, even though he "planned this murder, acting not on impulse of on orders from others, but rather with the hard heart of a calculated killer"); *Lopez*, No. 97-cr-01117, 2020 WL 6298061 (granting compassionate release to man who was 18 at the time of his convictions, which included carrying a gun in relation to a drug trafficking conspiracy and in the course of that crime committing first degree murder). *Cf. United States v. Rodriguez*, -- F. Supp. 3d. --, 2020 WL 5810161, at *1, *6, *7 (S.D.N.Y. Sept. 30, 2020) (reducing man's life sentence – imposed for RICO convictions as well as the "brutal torture" and "brutal murder" of a government informant pursuant to § 848(e)(1)(A) – where man was the chief lieutenant of the enterprise, 34 at the time of arrest, and where the murder "not was not 'average' murder" but rather "an act of torture and violence designed to send a dangerous message that cooperation with law enforcement would be brutally punished").

sentence was 255 months.[36] Although the average murder sentence in 2018 was 291 months, the Sixth Circuit average was 232 months.[37] This suggests a life sentence is not always necessary to reflect the seriousness of the offense. And most of these offenders were not young minors when they committed their crimes; unlike the young Leon Gills.

The government cannot seriously argue that anything short of a life sentence is insufficient given the sentences of Mr. Gill's codefendants. Gills is no more dangerous than his older confederates. A sentence reduction would address glaring disparities in this case.

Another relevant consideration is his efforts toward rehabilitation.[38] The Court must consider post-offense developments under § 3553(a), which provide "the most up-to-date picture" of Mr. Gills and "sheds light on the likelihood that [he] will [not]engage in future criminal conduct."[39]

Mr. Gills has used his time in custody to work on himself. He has taken advantage of so many opportunities for self-growth and improvement despite not having any reason to suspect that he might one day be released.[40]   He has taken over 50 courses.   Leon Gills has taken advantage of every single program made available to him; and again, all without any expectation of ever seeing the streets again.

A review of Leon Gills' Reply Brief, at pages 18-22, reflect a man determined to play a constructive role in society.  His more recent religious conversion and activity also evinces a man

---

[36] *See* U.S.S.C., *2019 Annual Report and Sourcebook of Federal Sentencing Statistics*, at 64.

[37] U.S.S.C., *Statistical Information Packet, Fiscal Year 2018, Sixth Circuit*, at 11.

[38] *See, e.g., Sain*, No. 07-20309, 2020 WL 5906167, at *4-*5.

[39] *Pepper v. United States*, 562 U.S. 476, 492 (2011).

[40] **Counsel hereby incorporates by reference, again, Gills' pro se Reply Brief, including all facts and arguments; in particular, counsel directs the government and Court to pages 18-22, where Gills details all of his remarkable rehabilitation.  Counsel will not repeat all of his progress in this supplemental reply.**

who has undergone a profound moral transformation as well.  They were genuinely detailed by Leon Gills in his original reply, and will not be repeated here.

Leon Gills is no longer the impulsive adolescent he was during the course of the RICO conspiracy.  He has changed and matured in material and significant ways.  He reflects the more recent body of law which directs sentencing courts to consider the neuroscience of a young offender; as well as positive and constructive rehabilitation efforts that the *Pepper* court directs this Court to now consider.

Mr. Gills is not a danger to the community.[41] It is true that he has violent convictions. But people with priors are not irredeemable. Indeed, "this country's criminal justice system is premised on the idea that a person can—and hopefully will—change after several years locked in prison."[42] Mr. Gills acknowledges his past but has worked hard to rise above it and is determined to leave it behind him.  He is not the same man he once was. His years in custody have shed new light on the § 3553(a) analysis as it applies to him. Today, Mr. Gills accepts responsibility for his mistakes and fully appreciates, and lives each day with, the repercussions of his actions. Mr. Gill's acceptance of responsibility, contrition, and remorse is best evidenced by his remarkable rehabilitation, as discussed above.

Mr. Gills is moving on a decade in age.  He is older, more mature, and wiser than he was at 13-19 years of age.  Although convicted of a violent crime, "[w]ithin any given age bracket,

---

[41] 18 U.S.C. § 3553(a)(2)(c).

[42] *Lopez*, No. 97-cr-01117, 2020 WL 6298061, at *5 (quotation omitted).

individuals released after imprisonment for violent crimes recidivate at a lower rate than releasees who served time for any other category of crime."[43]

Mr. Gills' BOP disciplinary history does not speak to his current dangerousness. He has been disciplined 6 times, including one for fighting.  Five other sanctions were for minor infractions.  The government's attempt to cast the current shadow on Gills is misleading.

Frankly, Mr. Gills' relatively short disciplinary history during his time in USPs is remarkable given that he spent so much time at prisons where conflict and violence are commonplace. For example, USP Pollock has been described "a bit like 1960s Vietnam" because it "averaged dozens of stabbings a month."[44]  And USP Beaumont has been dubbed "the thunder dome," a "moniker borrowed from the Mad Max fantasy flicks of the 1980s, [that] refers to the place where two go in and only one leaves alive."[45]

While Mr. Gills' disciplinary record is not spotless, "[n]othing in [it] raises any concern about him having a continued propensity for violence."[46] And, in any event, the BOP sanctioned Mr. Gills for his misconduct, all of which is either too remote or insufficiently severe to warrant denying his motion.[47]

---

[43] J.J. Prescott, Benjamin Pyle, Sonja B. Starr, *Understanding Violent-Crime Recidivism*, 95 Notre Dame L. Rev. 1643, 1688 (2020).

[44] John Broman, *What I Learned from 13 Years of Witnessing Violence in Federal Prisons*, Vice (Sep. 25, 2015); *see also* Brandon Sample, *Violence on the Rise in BOP Facilities*, Prison Legal News (Aug. 15, 2009).

[45] Leah Caldwell, *USP Beaumont, Texas: Murder and Mayhem in the Thunder Dome*, Prison Legal News (Sept. 15, 2005).

[46] *United States v. Clausen*, No. 00-cr-291, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020).

[47] *See, e.g.*, *United States v. Marks*, 455 F. Supp. 3d 17, 27 (2020) (finding defendant with stacked § 924(c) convictions did not pose a danger despite infractions for fighting in 2008, 2009, and 2010, and being found guilty of "bribing a staff member" in 2013); *United States v. James*, 03-cr-21013, ECF Nos. 164, 174 (S.D. Fla. Oct. 7, 2020) (granting release to a defendant with five disciplinary infractions, including testing positive for THC and twice possessing a "hazardous tool"); *United States v. Clemons*,

Mr. Gills' institutional record is a testament to the remorseful and peaceful man he has become and is a strong predictor of how he will perform on supervised release if his sentence is reduced. Mr. Gills' conduct and efforts to prepare for reentry show that his release will not endanger the public.

Finally, Mr. Gills has 2 solid release plans.  (See Pro Se Reply, pp 21-22, Ex A). He enjoys the love and support of family and friends who have offered to help him succeed if he is released early. (*See* Ex. 12, Support Ltrs.) If released, Mr. Gills first plan is to relocate with relatives in Atlanta, Georgia.  There he would enroll in a CDL class and live with his cousins.  He has employment and housing immediately available to him and feels Atlanta would be a fresh and safe environment.

His second, or backup plan, would be to reside in Grand Blanc, Michigan with James Frazier.  Mr. Frazier owns a trucking company and has promised Gills employment there upon release.  Mr. Frazier's business telephone number is 810-618-0527. Mr. Frazier has also agreed to assist Defendant Gills with establishing his own business for detailing and cleaning trucks. Moreover, Mr. Frazier said he would instruct Defendant Gills on the trucking industry and teach him how to drive a semi truck while he studies for his CDL certification. As indicated above, Defendant Gills will continue to pursue his music and song writing career.

---

No. 08-cr-102, 2020 U.S. Dist. LEXIS 12879, at *10 (E.D. Tenn. Jan. 27, 2020) (reducing a 360-month sentence of a defendant with 17 prior convictions who had been sanctioned by the BOP three times in the six months before his motion was filed).

And a major project will be to publish his booklet Stop of the Violence because he believes he can make a difference in society by sharing his story through public speaking and music to positively influence people to change their own antisocial behavior. The music platform can play a gigantic role in reaching people with a positive message.

_____

†††††† The Sixth Circuit has continuously instructed the lower courts to take post-conviction rehabilitation into consideration when considering a Section 3582(c) motion for compassionate release and or a sentence reduction. See United States v. Boulding, 960 F.3d 774, 784 (6th Cir. 2020)(thorough consideration of the Section 3553(a) factor is required; court correctly included post-sentencing behavior as part of the inquiry); United States v. Williams, 972 F.3d 815 (6th Cir. 2020)(reversed and remanded because court failed to mention the defendant's argument regarding his post-conviction conduct).

## CONCLUSION

The Court has wide discretion to craft a sentence that satisfies all the 18 U.S.C. § 3553(a) factors. He requests an order reducing his sentence to time served and imposing a term of supervised release.

Respectfully submitted,

s/SANFORD PLOTKIN
SANFORD PLOTKIN (P38691)
30445 NORTHWESTERN HWY., STE. 225
FARMINGTON HILLS, MI  48334
248-798-5756
SANFORDPLOTKIN@GMAIL.COM

DATED:  NOVEMBER 22, 2021