UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                       Case No. 12-20287

vs.                                    HON. MARK A. GOLDSMITH

LEON GILLS,

       Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (Dkt. 1051)**

A jury convicted Defendant Leon Gills of one count of racketeering conspiracy, two counts of attempted murder in aid of racketeering, and one count of using and discharging a firearm in relation to a crime of violence. Jury Verdict Form (Dkt. 712). The Court sentenced Gills to life imprisonment. Judgment (Dkt. 801). This matter is now before the Court on Gills's motion for compassionate release (Dkt. 1051).[1] The Court has considered all briefing and record materials

---

[1] Gills styled his motion as a motion for "compassionate release/home confinement." To the extent that Gills seeks home confinement under the Coronavirus Aid, Relief, and Economic Security Act, § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (2020), his motion is denied because the Bureau of Prisons (BOP) has sole discretion to grant such relief. See United States v. Mattice, No. 20-3668, 2020 WL 7587155, at *2 (6th Cir. Oct. 7, 2020). However, the Court may consider Gills's request for home confinement under 18 U.S.C. § 3582(c). Courts granting compassionate release pursuant to that statute may convert a defendant's remaining sentence term to a term of supervised release and impose an initial term of home detention. See, e.g., United States v. Amarrah, 458 F. Supp. 3d 611, 620–621 (E.D. Mich. 2020).

submitted by the parties.² For the reasons that follow, the Court denies Gills's motion for compassionate release.³

## I. ANALYSIS

The First Step Act (FSA) modified the statute concerning the compassionate release of federal prisoners, 18 U.S.C. § 3582(c), such that district courts may entertain motions filed by incarcerated defendants seeking to reduce their sentences. United States v. Ruffin, 978 F.3d 1000, 1003–1004 (6th Cir. 2020).⁴ Before granting a compassionate release motion, a district court must engage in a three-step inquiry: (i) the court must find that "extraordinary and compelling reasons warrant [a sentence] reduction"; (ii) it must ensure "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and (iii) it must "consider[] all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." United States v. Jones, 980 F.3d 1098, 1101 (6th Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). If all of those requirements are met, the district court "may reduce the term of imprisonment," but it need not do so. 18 U.S.C. § 3582(c)(1)(A).

Regarding the first step of the inquiry, the United States Court of Appeals for the Sixth Circuit has held that, with respect to motions for compassionate release filed by imprisoned

---

² Gills filed his motion pro se. The Government filed a response (Dkt. 1058), and Gills filed a reply (Dkt. 1101) and a supplemental brief (Dkt. 1108). Gills then filed a motion for appointment of counsel, which the Court granted, and Gills filed a second reply through his newly-appointed counsel (Dkt. 1123). An individual named Yolanda Mayfield filed a letter in support of Gills's motion (Dkt. 1069).

³ Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

⁴ Before an inmate moves for compassionate release under § 3582(c)(1), the inmate must either exhaust his or her administrative remedies with the BOP or wait 30 days from when the inmate filed a request with his or her warden. 18 U.S.C. § 3582(c)(1)(A); United States v. Alam, 960 F.3d 831, 832 (6th Cir. 2020). Here, the Government concedes that Gills has met the exhaustion requirement. See Resp. at 6.

individuals, "extraordinary and compelling" reasons are not limited to those set forth in U.S.S.G. § 1B1.13. Jones, 980 F.3d at 1109. It has further held that "[u]ntil the Sentencing Commission updates § 1B1.13 to reflect the [FSA], district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." Id.

The Court considers (i) whether extraordinary and compelling circumstances compel Gilbert's release, and (ii) whether the § 3553(a) factors support Gilbert's release.

### A. Extraordinary and Compelling Circumstances

Gills argues that the following constitute extraordinary and compelling reasons to release him: (i) his fear of contracting COVID-19, (ii) his youth at the time of the conduct underlying his convictions, (iii) the disproportionate length of his sentence, and (iv) his rehabilitation efforts. Mot. 1–2; 2d Reply at PageID.14617–14618, 14629–14638. The Court addresses each asserted reason in turn.

#### i. COVID-19

With respect to motions for compassionate release premised on a defendant's fear of contracting COVID-19, the Sixth Circuit has held that "generalized fears of contracting COVID-19, without more, do not constitute a compelling reason" to grant compassionate release. United States v. Ramadan, No. 20-1450, 2020 WL 5758015, at *2 (6th Cir. Sept. 22, 2020). Courts generally consult the guidance on high-risk factors published by the Centers for Disease Control and Prevention (CDC) to determine whether a defendant's specific conditions place him at a higher risk of suffering severe illness from COVID-19. See United States v. Elias, 984 F.3d 516, 521 (6th Cir. 2021).

3

Gills contends that various underlying health conditions—hypertension, bronchitis, prediabetes, obesity, and depression—increase his risk of severe illness and death from COVID-19. Mot. at 1–2; 2d Reply at PageID.14620. None of these conditions justify releasing Gills.

First, the CDC recognizes hypertension—which is defined as a blood pressure reading of 130–139/80–89 mm Hg or above[5]—as a condition that "can" make it more likely that an individual will get severely ill from COVID-19.[6] Gills's medical records reflect that his blood pressure fluctuates, sometimes yielding a blood pressure reading that barely qualifies him as hypertensive. See 2d Medical Records at PageID.14272 (Dkt. 1127). For instance, on February 7, 2020, Gills's blood pressure was 127/83, 1st Medical Records at PageID.13398 (Dkt. 1060), and just a few weeks ago on October 29, 2021, Gills's blood pressure was 135/77, 2d Medical Records at PageID.14272. However, his most recent blood pressure reading, from December 2, 2021, was 149/95 mm Hg. Id. But even assuming that Gills is presently hypertensive, courts "routinely" decline to grant compassionate release where an inmate's hypertension can be well-managed through medication. United States v. Ackerman, No. 11-740-KSM-1, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) (citing cases); see also United States v. Evans, No. 3:18-cr-637, 2021 WL 424317, at *2 (E.D. Mich. Feb. 8, 2021) (denying motion for compassionate release based on inmate's fear that his high blood pressure increased his risk of severe illness of COVID-19 where the inmate could take medication daily to manage his hypertension). Gills does not argue—and

---

[5] For an explanation of blood pressure readings, see Mayo Clinic, "Blood Pressure Chart: What Your Reading Means," https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982 (last visited Dec. 14, 2021).

[6] CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 14, 2021).

his medical records do not appear to indicate—that his hypertension could not be managed through medication.

Second, the CDC does not recognize prediabetes as a condition that may increase an individual's likelihood of severe illness from COVID-19.[7]

Third, the CDC instructs that "chronic bronchitis" is a condition that "can" increase an individual's likelihood of severe illness.[8] Gills does not describe his own bronchitis as chronic. Further, although Gills's medical records reflect that he told his healthcare provider that he has a history of bronchitis, see 2d Medical Records at PageID.14718, his most recent medical records reflect that his only actual bronchitis diagnosis was a diagnosis of acute bronchitis almost a year ago, see id. at PageID.14719. As one court in this District has noted: "The difference between acute and chronic bronchitis matters," because "[a]cute bronchitis, also called a chest cold, usually improves within a week to 10 days without lasting effects, although the cough may linger for weeks"; "[h]owever, if someone has repeated bouts of bronchitis, he may have chronic bronchitis, which requires medical attention." United States v. Ballard, No. 17-20691, 2021 WL 37481, at *3 (E.D. Mich. Jan. 5, 2021) (punctuation modified). Based on Gills's medical records, the Court is not satisfied that he actually suffers from chronic bronchitis.

Fourth, the CDC's guidance reflects that being overweight—defined as a body mass index (BMI) greater than 25 kg/m$^2$—can increase an individual's likelihood of severe illness from COVID-19.[9] Gills contends that his BMI is 38.5 kg/m$^2$, 2d Reply at PageID.14620, which would

---

[7] CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 16, 2021).

[8] CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 16, 2021).

[9] CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 16, 2021).

qualify him as overweight. However, as other courts have recognized, "there is nothing uncommon about the risks that Defendant faces to serious illness because of his obesity" because "obesity and overweight are common conditions; 42% of American adults are obese and 32% are overweight." United States v. Humphrey, No. 2:15-cr-20329-4, 2021 WL 1422765, at *2 (E.D. Mich. Apr. 15, 2021) (punctuation modified). Further, "[w]ith monitoring and effective lifestyle changes, high [BMI] can be improved, if not fully treated." Id. (punctuation modified). Because Gills can take proactive steps to reduce his BMI, his high BMI does not warrant compassionate release.

Fifth, Gills contends that he is "a mental health patient and is in deep depression over the out break." Mot. at 2. Gills's medical records reflect that as of July 29, 2021, his "[a]nxiety disorder . . . [m]ixed with depression" was "current." 2d Medical Records at PageID.14748. It bears noting that an anxiety disorder "is neither an actual nor potential COVID-19 risk factor." United States v. Richardson, No. 5:18-CR-00291-3, 2021 WL 1526431, at *4 (E.D. Pa. Apr. 19, 2021). And in any case, "experiencing anxiety and depression during COVID-19 is far from unusual," as "thirty-one percent of Americans have experienced anxiety and depression symptoms during the COVID-19 pandemic." United States v. Taylor, No. 2:17-cr-20640-3, 2021 WL 2283743, at *2 (E.D. Mich. June 4, 2021). Further, Gills has not explained how compassionate release would reduce his anxiety and depression. See id. (declining to grant compassionate release based on a defendant's anxiety and depression where the defendant did not explain how release would resolve these conditions). Accordingly, Gills's anxiety and depression during the pandemic are not extraordinary and compelling reasons to release him.[10]

---

[10] Gills mentions that his grandmother has lung cancer. Mot. at 1–2. However, Gills's medical records do not reflect that he suffers from lung cancer. See 1st Medical Records; 2d Medical Records.

There is another reason that Gills's fear of contracting COVID-19 is non-compelling. The Sixth Circuit clarified that "a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction." United States v. Lemons, 15 F.4th 747, 751 (6th Cir. 2021). Gills's access to the vaccine is evinced by his vaccination status. According to his medical records, Gills received the second dose of the two-dose Moderna vaccine on March 29, 2021. 2d Medical Records at PageID.14742.

For these reasons, Gills's fear of contracting COVID-19 is not a compelling and extraordinary reason to release him.

### ii. Youth

Next, Gills argues that he should be released due to his youth at the time of the conduct underlying his convictions. 2d Reply at PageID.14628–14634. Gills, citing various articles, contends that "[d]evelopments in psychology and brain science" show that the prefrontal cortex of the brain—which is responsible for impulse control and decision-making—does not reach "full adult maturity" until "the early to mid-20s," and, therefore, Gills did not have full decision-making capacity when he committed the conduct underlying his criminal convictions between the ages of 13 and 19. Id. at PageID.14629, 14631 (punctuation modified).

Gills's age when he committed the underlying criminal conduct was a fact known at the time of his sentencing. However, as the Sixth Circuit has explained, "§ 3582(c)(1)(A)'s text and structure, together with its narrow scope, show that identifying 'extraordinary and compelling reasons' is a task that focuses on post-sentencing factual developments." United States v. Hunter, 12 F.4th 555, 569 (6th Cir. 2021). A defendant's age when he committed the underlying criminal conduct is a fact known pre-sentencing. Id. at 570. New academic articles regarding brain

7

development do not change this result. Id. at 570–571. As a result, Gills's age at the time of the underlying criminal conduct is not an extraordinary and compelling reason to release him. To hold otherwise would undermine § 3582(c)'s general rule of finality. Id. at 571.

### iii. Sentencing Disparity

Gills also argues that he "should not be serving a life sentence for attempt murders especially when the average federal sentence is 255 months for murder." 2d Reply at PageID.14635. However, Gills was not convicted for just one attempted murder. Rather, he was convicted on two counts of attempted murder, as well as on charges of racketeering and discharging a firearm. As detailed below, these crimes were heinous, and justifiably resulted in a life sentence. Thus, the fact that Gills's sentence is higher than the average federal sentence for murder is not an unwarranted disparity. See United States v. Wright, 991 F.3d 717, 719 (6th Cir. 2021) (affirming district court's decision that a defendant's greater-than-average sentence for murder was not an unwarranted disparity because the defendant had committed other crimes as well, and his crimes were "heinous").

### iv. Rehabilitation

Finally, Gills argues that his rehabilitation efforts warrant releasing him. 2d Reply at PageID.14618. However, "Congress was emphatically clear that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.'" Hunter, 12 F.4th at 572 (quoting 28 U.S.C. § 994(t)). Gills has not shown any other reason to release him, and his rehabilitation is insufficient to constitute an extraordinary and compelling reason to release him.

Thus, Gills has not shown an extraordinary or compelling reason to grant him compassionate release. Even if he had, his release would still be unwarranted based on the § 3553(a) factors, as explained below.

8

### B. Section 3553(a) Factors

Before granting a sentence reduction under the FSA, the Court must consider the § 3553(a) factors, which include the nature and circumstances of a defendant's offenses, the seriousness of the offenses, the need to promote respect for the law, and the need to protect the public from further crimes by the defendant.

Gills's crimes were undoubtedly serious. He was a member of the violent street gang known as "Murda Ville." Trial Trans. Vol. 10 at PageID.7171 (Dkt. 853). As a gang member, Gills personally attempted to kill several people, and he directed his fellow gang members to kill as well. One of Gills's attempted murder victims was Dartanian Edwards, a member of a rival gang. Trial Trans. Vol. 8 at PageID.7013 (Dkt. 851). After seeing Edwards in Murda Ville territory, two Murda Ville members confronted Edwards and called Gills for backup. Trial Trans. Vol. 7 at PageID.6735–6738 (Dkt. 850); Trial Trans. Vol. 11 at PageID.7330–7331 (Dkt. 854). Gills drove to the scene and opened fire, riddling Edwards's car with bullets. Trial Trans. Vol. 7 at PageID.6738–6740, 6809–6826. Edwards was shot once but survived. Id. at PageID.6827.

Another attempted murder victim was Jonathan Wilson. Gills and Wilson got into a dispute over a girl. Trial Trans. Vol. 11 at PageID.7336–7337; Trial Trans. Vol. 21 at PageID.9037–9045, 9054–9062 (Dkt. 864); Trial Trans. Vol. 31 PageID.10880–10884 (Dkt. 876). After Wilson pointed a gun at him, Gills told another Murda Ville member that he felt "disrespected" and was going to "lay law down." Trial Trans. Vol. 11 at PageID.7338–7339. Gills went looking for Wilson and pulled up next to a van that he thought Wilson was driving. Id. at PageID.7340, Trial Trans. Vol. 21 at PageID.9142. Wilson, however, was not in the van; it was full of four innocent people. Gills started shooting at the van, spraying the van with at least ten rounds before speeding away, clipping a mail truck with his car. Trial Trans. Vol. 21 at PageID.9078–9082, 9092–9093,

9

9144–9152, 9182–9189. Two of the van's passengers were hit but, fortunately, both survived. Id. at PageID.9093–9094, 9144, 9158.

Over a phone call, Gills told Wilson that Gills had intended to shoot Wilson. Id. at PageID.9047. Gills also threatened to kill Wilson's brother, Malachi. Id. at PageID.9052–9053. When two members of Murda Ville spotted Malachi, they called Gills to ask what they should do. Trial Trans. Vol. 25 at PageID.9745–9747 (Dkt. 870). Gills responded, "Lay law down." Id. at PageID.9747. The two members went over to Malachi, who was sitting in a parked SUV. They pulled open the SUV's door and began shooting. Trial Trans. Vol 22A at PageID.9257–9258, 9286–9291 (Dkt. 865); Trial Trans. Vol. 23A at PageID.9381–9382 (Dkt. 867); Trial Trans. Vol. 24 at PageID.9553 (Dkt. 869). Malachi escaped from the SUV and sprinted down the street. Trial Trans. Vol. 22A at PageID.9252–9253; Trial Trans. Vol. 24 at PageID.9553. But one of the gang members caught up to Malachi and put three bullets into his head, killing him. Trial Trans. Vol. 21 at PageID.9053–9054; Trial Trans. Vol. 22A at PageID.9253–9254, 9257–9266; Trial Trans. Vol. 24 at PageID.9553–9555.

As the Court stated at Gills's sentencing, Gills's crimes showed an extreme "callousness for life." Sentencing Trans. at PageID.11864 (Dkt. 883). Gills acknowledges that his crimes were serious. 2d Reply at PageID.14639. Yet he simultaneously attempts to minimize the extent of the seriousness of his crimes, arguing that his life sentence is not appropriate because he was convicted of attempted murder, not murder. Id. As noted above, Gills was not just convicted for one attempted murder; rather, he was convicted for two attempted murders, racketeering, and discharging a firearm. And murder is not the only crime for which a life imprisonment may be imposed. Gills's Guidelines imprisonment range was 360 months to life. Given the particularly

10

heinous nature of Gills's crimes, his sentence of life imprisonment for all four of his crimes—though higher than the average federal sentence for one count of murder—is justified.

Gills's criminal conduct demonstrating a gross disregard for human life suggests that if released, he would continue to pose a danger to the public. Unsurprisingly, Gills takes the opposite view, arguing that if released, he would not be a danger to the community. 2d Reply at PageID.14641. He contends that he has made efforts towards rehabilitation while incarcerated, completing over 50 educational courses, has maintained a "relatively short disciplinary history" while incarcerated, and has two solid release plans. Id. at PageID.14640–14643. Gills's arguments are unconvincing.

First, while Gills's efforts towards self-improvement are commendable, his behavior while incarcerated has been far from perfect. While incarcerated, he has been disciplined six times, including once for fighting. Id. at PageID.14642.

Second, Gills's actions during the pendency of his trial undercut his argument that he would not pose a danger to anyone in the community if released. While awaiting trial, Gills threatened Malcolm Evans, who was cooperating with the Government. Trial Trans. Vol. 29 at PageID.10565–10572 (Dkt. 874). Gills posted a video on social media—titled, "Rats"—threatening to kill Evans if he testified. Id. at PageID.10570–10572. Gills also threatened Evans's family, including his young daughter. Id. In addition, Gills threatened Evans's sister, posting publicly on social media that she was a "rat" and "betta hope I don't get out[,] bitch." Id. at PageID.10565. He threatened her more in private messages. Id. He also ordered another gang member "to beat her lil rat ass." Id. Gills did not confine his witness tampering to social media. He threatened or assaulted cooperating witnesses who were in the same jail as him. Trial Trans. Vol. 21 at PageID.9164–9170; Trial Trans. Vol. 29 at PageID.10403–10462, 10497–10499. He

11

threatened another witness by voicemail and told other Murda Ville members to shoot up the witness's house and "cut" his "throat." Trial Trans. Vol 13 at PageID.7718–7725 (Dkt. 856). If released, there is a real danger that Gills would seek revenge against those who cooperated with the Government or testified against him and other gang members.

Releasing Gills when he has served only a few years of his sentence would not provide just punishment or promote respect for the law. See Ruffin, 978 F.3d at 1008 (affirming district court decision that § 3553(a) factors did not support a sentence reduction in part because the defendant had served less than half of his sentence); United States v. Richards, No. 12-20372, 2021 WL 912389, at *3 (E.D. Mich. Mar. 10, 2021) ("[A]llowing Defendant to be released after serving less than half of his sentence would not promote respect for the law or proper deterrence, [or] provide just punishment . . . ."). In fact, given the particularly heinous nature of Gills's crimes and the threats that he made to witnesses while awaiting trial, reducing Gills's sentence at all would fail to provide just punishment, promote respect for the law, or protect the public from further crimes by Gills.

The § 3553(a) factors, therefore, weigh heavily against granting Gills's motion.

## II. CONCLUSION

For the reasons stated above, Gills's motion for compassionate release (Dkt. 1051) is denied.

SO ORDERED.

Dated: December 27, 2021             s/Mark A. Goldsmith
    Detroit, Michigan                MARK A. GOLDSMITH
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 27, 2021.

s/Karri Sandusky
KARRI SANDUSKY
Case Manager
